JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR. (SBN 175783)
SHAWN E. FIELDS (SBN 255267)
501 West Broadway, Suite 1720
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT ROSENDAHL and VERONICA CLARK, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, and UNIVERSITY OF THE ROCKIES, <br><br> Defendants. | CASE NO.  '11 CV61  WQHWVG <br><br> CLASS ACTION COMPLAINT FOR: <br><br> (1) BREACH OF IMPLIED CONTRACT; <br> (2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; <br> (3) VIOLATION OF BUS. & PROF. CODE § 17200; <br> (4) VIOLATION OF BUS. & PROF. CODE § 17500; <br> (5) VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT; <br> (6) NEGLIGENT MISREPRESENTATION; and <br> (7) FRAUD. <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned counsel, allege as follows:

**NATURE OF THE ACTION**

1.     This action is brought as a class action on behalf of a nationwide plaintiff class (the "Class") consisting of all persons who enrolled in and/or attended classes at one of the two academic institutions operated by Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") – Ashford University ("Ashford") or University of the Rockies ("The Rockies") – during the period approximately from March 1, 2005 through the present (the "Class Period").

**SUMMARY OF THE ACTION**

2.     Bridgepoint, a for-profit higher education company headquartered in San Diego, California, was founded in 2004.  The Company owns and operates two academic institutions, Ashford and The Rockies, which offer Associate, Bachelor's, Master's and Doctoral programs online, as well as through traditional campuses in Clinton, Iowa and Colorado Springs, Colorado.

3.     As demonstrated below, throughout the Class Period Bridgepoint has engaged in a pattern of improper, fraudulent, and illegal behavior in an effort to recruit students and over-charge the federal government for financial aid.  In particular, Bridgepoint has subjected Plaintiffs and all members of the Class to the following uniform misleading recruitment tactics:

(a)     Hiding required disclosure information from prospective students on its websites, and requiring prospective students to enroll before gaining access to this information, in violation of Title IV of the Higher Education Act of 1965 ("Title IV") and the California Private Postsecondary Education Act of 2009;

(b)     Misrepresenting the true cost of attendance at its universities by misleadingly claiming that Ashford and The Rockies provide "some of the lowest cost tuition programs available," quoting to prospective students false and misleading tuition rates for its degree programs, and failing to disclose non-tuition costs such as administrative fees;

(c)     Misrepresenting the quality of academic instruction;

(d)     Misrepresenting The Rockies' accreditation with the American Psychological Association ("APA") and ability to qualify students to obtain professional psychology licensure;

-1-
CLASS ACTION COMPLAINT

(e)   Misrepresenting students' post-graduation employability and earnings potential; and

(f)   Misrepresenting the obligation to repay federally-subsidized student loans and omitting to disclose the fact that student loans are not dischargeable in bankruptcy.

4.   These uniform material misrepresentations are made in three ways: through uniform written materials (including materials on the schools' websites) that are available and/or given to all Class members, through uniform scripted oral misrepresentations made by the schools' "enrollment advisors," and through material omissions of information that Bridgepoint had a duty to disclose and on which Class members relied in deciding to enroll at Ashford or The Rockies.

5.   Students rely on these misrepresentations when deciding to enroll because they are misled to believe that they will receive a quality education at an affordable price, and that they will graduate with a degree that qualifies them for professional licensure and/or for high paying employment in their chosen profession.  As demonstrated below, however, students pay some of the highest tuition rates in the country, are unwittingly placed in courses that are irrelevant to their stated concentration, receive low quality instruction from teachers who, among other things, improperly award grades for assignments that have not even been completed, and graduate with a degree that neither qualifies them to obtain the professional licensing they were led to believe they would obtain nor qualifies them for any job placement other than low-wage, low-skill employment.

6.   Bridgepoint continues to make these misrepresentations after students enroll, by falsely and misleadingly reassuring students that they are receiving a high quality education at an affordable price and that the degrees the enrolled students will receive will greatly benefit them in seeking and obtaining high-wage employment in their chosen profession.

7.   Bridgepoint systematically makes these misrepresentations to prospective and enrolled students for one reason only: to recruit and enroll as many students as possible, regardless of the students' stated academic and career objectives, the best interests of the students, or even the students' ability to finance their education with Bridgepoint.   Bridgepoint's wrongdoing results in irreparable harm to the Class because federally-subsidized student loans *are not dischargeable in*

*bankruptcy.* Thus, the victims of Bridgepoint's fraud are saddled with high debt for the rest of their lives.

8.     This singular objective is demonstrated through Bridgepoint's improper and unlawful practice of setting enrollment quotas for its enrollment advisors, financially rewarding enrollment advisors who outperform these quotas, and disciplining and/or terminating advisors who fail to reach these quotas. According to Confidential Witness 1 ("CW1"), a former enrollment advisor who was promoted to Senior Enrollment Manager and served in this position for nearly two years, enrollment advisors are divided into teams and compete with one another to enroll the most students. Advisors on teams that enroll more students receive prizes, cash bonuses, and rapid promotion – in direct violation of Title IV's prohibition against providing incentive-based compensation for meeting enrollment quotas. Advisors on teams that enroll fewer students are reprimanded -- sometimes directly from Bridgepoint Chief Executive Officer ("CEO") Andrew Clark – and in many cases, terminated. As CW1 explained, the sole concern of management throughout this process is increasing enrollment numbers and thereby maximizing Bridgepoint's profits. Providing accurate information to prospective students, honoring the desires of prospective students, or working in these individuals' best interests is of "no concern at all."

9.     In fact, enrollment advisors who do act in prospective students' best interests can be harshly disciplined or even terminated if doing so results in not enrolling the prospective students. According to Confidential Witness 2 ("CW2"), an enrollment advisor with Ashford in 2010, s/he was disciplined numerous times for not meeting set enrollment quotas, hearing the constant refrain that "applications save your seat, retention gets you paid." On more than one occasion CW2 was given orders in writing to "turn in a minimum of 3 applications per week" after failing to meet the established enrollment quotas. CW2 was also disciplined on two separate occasions for refusing to enroll prospective students who decided they did not want to attend Ashford. Under intense pressure and threat of termination, CW2 eventually submitted both applications for enrollment anyway, being sternly warned that "now is not the time to let students go."

10.     CW2 also described the need to continue to reassure students who are already enrolled about the quality and value of their Bridgepoint education, and the high emphasis of

retaining students who have already enrolled. CW2 was reprimanded multiple times for not maintaining a minimum 70-75% retention rate for enrolled students, and was encouraged to make whatever misrepresentations were necessary to retain his/her students.

11.     In addition to employing deceptive tactics to induce prospective students into enrolling in its academic programs, Bridgepoint also misleadingly encourages students to apply for federal financial aid in the form of student loans that it knows students do not necessarily need nor necessarily can repay. These tactics include pressuring students to apply for the maximum allowable amount of federal financial aid even when it exceeds the cost of attendance, downplaying or completely failing to disclose students' repayment obligations to the federal government, and failing to disclose that students must begin repaying their loans immediately upon enrollment – rather than upon completion of the degree, as is standard for federal student loans. Bridgepoint also fails to disclose to prospective students that their student loans are not dischargeable in bankruptcy.

12.     Bridgepoint also omits the material fact that its Cohort Default Rates – the percentage of students who default on their students loans – is significantly higher than average. For example, Bridgepoint reported in its 2009 Form 10-K filed with the U.S. Securities and Exchange Commission that the Cohort Default Rate for Ashford in 2008 (the latest year for which data is available) was 13.3%, nearly double the average student loan default rate of 7.0%. In fact, the Department of Education projected an unofficial Cohort Default Rate for Ashford as high as 17.4% for 2008, two and a half times the nationwide average. This omission is material because high student default rates are a leading indicator that graduates cannot repay their loans for one reason or another, whether because their education did not adequately prepare or qualify them for employment, because their degrees only allow them to secure low-wage jobs, or because their schools' tuition rates are excessive relative to the schools' value in helping graduates find meaningful and gainful employment. As demonstrated below, all these reasons play a role in Bridgepoint students' inability to repay their student loans.

13.     Such a high Cohort Default Rate is significant for the additional reason that federal bankruptcy law precludes the discharging of federal student loan debt, meaning that students who were misled into applying for loans must still repay that debt even after filing for bankruptcy and

-4-

attempting to restore their credit.  As demonstrated below, repayment of these loans is immensely difficult for current and former students who graduate with a worthless degree from Bridgepoint and owe tens of thousands of dollars in student loans.

14.     Plaintiffs and the other members of the Class relied on these material misrepresentations and omissions regarding federal financial aid when enrolling at Ashford or The Rockies because they would not have enrolled had they known they would be responsible for paying back more loans than necessary to finance their education, that they would be responsible for immediately repaying their loans upon enrollment, that Bridgepoint students' federal loan default rate was twice the national average, and that student loans are not dischargeable in bankruptcy.

15.     Bridgepoint's motivation for making these misrepresentations to induce prospective students to apply for federal student loans in maximum allowable amounts stems from the fact that Bridgepoint can derive up to 90% of its total revenues from federal funding.  Known as the "90/10 Rule," Title IV allows for-profit universities to secure all but ten percent of its total funding from the federal government, including federal student loan money.  As CW1 stated, Bridgepoint executives are well aware of this ceiling and regularly discuss ways in which to reach the 90% ceiling, including by pressuring students to "max out their federal loans."

16.     Bridgepoint pressures students to apply for the maximum allowable student loan amount even when it knows or suspects that the student will be unable to repay the loan because federal student loans are fully guaranteed by the federal government.  In other words, Bridgepoint's business model relies almost entirely on securing up to 90% of its funding from the federal government through misleading and deceptive tactics, selling a product that virtually ensures that a significant number of the students who must repay the loans will be unable to do so, and profiting at the expense of the students, the federal government and, by extension, the American taxpayer.

17.     Bridgepoint also specifically targets members of the military and military veterans for its deceptive recruitment practices because the money Bridgepoint receives from veterans via federal tuition assistance programs, such as the Post-9/11 GI Bill, does not count towards the 90% cap, notwithstanding the fact that it is federal money. *As Iowa Senator Tom Harkin explained when commenting on a Senate study of for-profit universities, this backdoor channel created for for-*

*profit universities to receive unlimited federal money "has unintentionally subjected this new generation of veterans to the worst excesses of the for-profit industry: manipulative and misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."*

18.     As CW1 explained, Bridgepoint devotes significant energies to exploiting this backdoor channel by dedicating entire divisions of its enrollment advisor workforce solely to military recruitment.  Bridgepoint sends these divisions to bases to recruit active duty personnel and veterans in person, often employing fellow veterans as enrollment advisors.  These advisors are trained to engage in the same deceptive and misleading practices to recruit and enroll as many students as possible.  As Bloomberg News observed in a December 9, 2010 article titled "For Profit Colleges Scam Military for $521 Million, Report Says," these deceptive practices have paid significant dividends: "***Bridgepoint Education, Inc., based in San Diego, ranked second [in receiving tuition assistance from the Defense Department] with $41.2 million.***"

19.     Bridgepoint and its CEO have profited handsomely from their wrongdoing: last year Bridgepoint CEO Andrew Clark earned more than $20 million.

## JURISDICTION AND VENUE

20.     Jurisdiction is conferred pursuant to 28 U.S.C. Section 1332(d)(2)(A), because this is a class action in which minimal diversity exists and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

21.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a)(2) because Bridgepoint is headquartered and maintains its principal place of business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Bridgepoint has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiffs

22.     Plaintiff Scott Rosendahl ("Rosendahl") is an active duty member of the United States Air Force.  He enrolled in online courses with Ashford in 2008 after speaking with an online

enrollment advisor.   Throughout 2008 and 2009 he completed five online courses, and Ashford alleges that he owes over $4,000.  He is a citizen and resident of Iowa.

23.     Plaintiff Veronica Clark ("Clark") is a citizen of California and a resident of San Diego County.  After receiving her Master's Degree in military history, she enrolled in the Doctor of Psychology program at The Rockies from 2009 to 2010.  Upon the advice of an enrollment advisor at The Rockies, she chose this program because she was told it would qualify her for licensure as a clinical psychologist in the U.S. military.  She completed nearly one year of the program before discovering that this was not the case.  The Rockies alleges that she owes over $23,000.

***Defendants***

24.     Defendant Bridgepoint Education, Inc., founded in 2004, is a Delaware corporation with its company headquarters at 13500 Evening Creek Drive North, Suite 600, San Diego, CA 92128.  Bridgepoint purchased The Franciscan University of the Prairies, then a non-profit campus-only college in Iowa, in March 2005, renamed it Ashford University, and converted it into a for-profit online institution.  On September 11, 2007, Bridgepoint purchased the non-profit campus-only Colorado School of Professional Psychology, renamed it University of the Rockies, and converted it into a for-profit online institution.  Bridgepoint hires all employees for both academic institutions and maintains small campuses in Clinton, Iowa (Ashford) and Colorado Springs, Colorado (The Rockies).  Bridgepoint conducted an initial public offering on April 14, 2009 and is currently one of the largest publicly-traded for-profit college companies in the United States.

25.     Defendant Ashford University is an academic entity founded by Bridgepoint in 2005 to run the college formerly known as The Franciscan University of the Prairies, founded in 1918.  Ashford maintains a small campus in Clinton, Iowa, but 99% of the institution's students are currently enrolled only in an "online" capacity.

26.     Defendant University of the Rockies is an academic entity founded by Bridgepoint in 2007 to run the college formerly known as Colorado School of Professional Psychology.  The Rockies maintains a small campus in Colorado Springs, Colorado, but 99% of the institution's students are currently enrolled only in an "online" capacity.

CLASS ACTION COMPLAINT

*Non-Defendant Executive Officers of Bridgepoint*

27.     Andrew S. Clark ("Clark") founded Bridgepoint in 2004 and has served as its Chief Executive Officer since its founding.  He has also served as Bridgepoint's President since February 2009.  He served on the Board of Trustees of Ashford from March 2005 to December 2008 and currently serves on the Board of Trustees for The Rockies.  In 2009, Clark received $20,532,304 in compensation from Bridgepoint.  He is a citizen of California and resident of San Diego County, with residences in La Jolla, Rancho Santa Fe, and San Diego.

28.     Ross L. Woodard ("Woodard") is the Chief Marketing Officer and a Senior Vice President of Bridgepoint.  He oversees all marketing and public advertising for Bridgepoint's two academic institutions, including the department responsible for training enrollment advisors in marketing the academic institutions to prospective students.

29.     Christopher Spohn ("Spohn") joined Bridgepoint in January 2004 and currently serves as the Senior Vice President and Chief Admissions Officer.  He manages all admissions functions for Bridgepoint's two academic institutions.

30.     Rodney T. Sheng ("Sheng") joined Bridgepoint in January 2004.  He has served as the Senior Vice President and Chief Administrative Officer since November 2008, overseeing all administrative functions for Bridgepoint's two academic institutions.

31.     Charlene Dackerman ("Dackerman") joined Bridgepoint in September 2004 and is the Senior Vice President of Human Resources.  She is responsible for supervising and coordinating all human resource functions for Bridgepoint and its two academic institutions.

32.     Jane McAuliffe ("McAuliffe") joined Bridgepoint in July 2005.   She is the Chancellor/President of Ashford University.  She also served as the Vice President of Academic Affairs from September 2007 to November 2008.

33.     Charlita Shelton ("Shelton") is the President of The Rockies.

## CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action both on behalf of themselves and as a class action under F.R.C.P. 23(a) and 23(b) on behalf of the following Class:

-8-

All persons in the United States who, during the period from approximately March 1, 2005 through the present (the "Class Period"), enrolled in and/or attended classes offered by Bridgepoint Education through either of its two academic institutions, Ashford University or University of the Rockies.  Excluded from the Class are defendants, their immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns or transferees, any person acting on behalf of defendants, all governmental entities, and co-conspirators.

35.     Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants.  Upon information and belief, Plaintiffs believe that there are tens of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

36.     Plaintiffs' claims are typical of the claims of the Class in that:

(a)     Plaintiffs were enrolled in online degree programs offered by Bridgepoint and its two academic institutions during the Class Period;

(b)     Plaintiffs were induced to enroll in these online degree programs by uniform affirmative written misrepresentations published by Bridgepoint, uniform scripted affirmative oral misrepresentations made by Bridgepoint enrollment advisors, and through Bridgepoint's material omissions;

(c)     Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein; and

(d)     The relief sought is common to the Class.

37.     Numerous questions of law or fact arise from Defendants' unfair and deceptive conduct that is common to the Class.  Among the questions of law or fact common to the Class are:

(a)     Whether Defendants misrepresented material information about their academic institutions to Plaintiffs and the Class;

(b)     Whether Defendants misrepresented material information about federal student loan requirements to Plaintiffs and the Class;

(c)     Whether Plaintiffs and the Class were recruited by Defendants to attend one of Bridgepoint's academic institutions;

(d)     Whether Plaintiffs and the Class enrolled in and/or attended online classes offered by Bridgepoint's academic institutions;

(e)     Whether Defendants improperly and/or illegally provided prohibited incentive payments to their enrollment advisors;

(f)     Whether Defendants improperly and/or illegally targeted veterans and active duty military personnel through their deceptive marketing practices;

(g)     Whether Defendants engaged in unfair and/or unlawful business practices during the Class Period;

(h)     Whether Defendants engaged in unfair and/or unlawful deceptive marketing practices, including false advertising, during the Class Period;

(i)     Whether Defendants had a duty to disclose and failed to disclose material facts to Plaintiffs and the Class;

(j)     Whether Defendants breached the implied covenant of good faith and fair dealing implied in their student enrollment contracts; and

(k)     Whether Class-wide damages, declaratory and/or injunctive relief is appropriate and, if so, the proper measure of the damages, declaratory and/or injunctive relief.

38.     These questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

39.     Plaintiffs will fairly and adequately represent the interests of the Class in that:

(a)     Plaintiffs are typical former students of online degree programs offered by Defendants;

(b)     Plaintiffs were induced to enroll in an online degree program offered by Defendants through deceptive marketing and/or unfair business practices; and

(c)     Plaintiffs have no conflicts with any other member of the Class.

40.     Plaintiffs have retained competent counsel experienced in class action litigation.

41.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

42.     Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

43.     Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

44.     Plaintiffs reserve the right to expand, modify, or alter the Class definition in response to information learned during discovery.

## FACTUAL ALLEGATIONS

### *Background*

45.     Bridgepoint, a for-profit higher education company headquartered in San Diego, California, was founded in 2004.  The Company owns and operates two academic institutions, Ashford and The Rockies, which offer Associate, Bachelor's, Master's and Doctoral programs online, as well as through traditional campuses in Clinton, Iowa, and Colorado Springs, Colorado.

46.     As of September 30, 2010, the Company had 77,179 students enrolled in its institutions, 99% of whom were attending classes exclusively online.   The Company offers approximately 1,200 courses and 70 degree programs with 130 concentrations and specializations. As of December 31, 2009, the Company had more than 5,800 employees.

47.     In the past few years, the Company has experienced unprecedented student enrollment at its universities.   Total student enrollment at Ashford and The Rockies increased 115.4% to 42,025 students on March 31, 2009, compared with 19,509 students at the end of the first quarter of 2008.   New student enrollment for the first quarter of 2009 at both of Bridgepoint's academic institutions was approximately 16,800, an increase of 90.9%, compared with new enrollments of approximately 8,800 for the first quarter of 2008.

48.     As demonstrated below, this explosive growth in enrollment at Bridgepoint's online academic institutions was the result of deceptive marketing tactics designed to recruit students to attend its schools, and improper prohibited employee incentive programs designed to encourage "enrollment advisors" to recruit as many students as possible.

***Bridgepoint Employs Deceptive Marketing Tactics***

49.     As demonstrated below, Bridgepoint recklessly and/or negligently employs deceptive marketing tactics designed to entice prospective students to enroll at its universities and apply for federal loans they do not need and cannot pay back.  In particular, Bridgepoint improperly hides information from prospective students on its websites, misleads students either through affirmative misrepresentations or material omissions regarding the true cost of attending its universities, the quality of academic instruction, students' post-graduation employability, and students' need for federal student loans and obligation to repay them.  These deceptive tactics are designed solely to sign up as many students as possible and to sign them up for as many federal loans as possible in order to maximize Bridgepoint's profits at the expense of its students, the federal government, and the American taxpayer.

***Bridgepoint Improperly Hides Information From Prospective Students on Its Websites***

50.     Federal law requires educational institutions receiving Title IV funds from the federal government to "make certain information readily available to enrolled and prospective students. Institutions may satisfy their disclosure requirements by posting the information on their Internet Web sites.  Information to be provided includes: tuition, fees, and other estimated costs; the institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information; and the institution's completion or graduation rate."  Both federal and California law require academic institutions to make this information readily available to prospective students *before they enroll in any program*.

51.     The primary way in which prospective Ashford or The Rockies students obtain information about the schools before enrolling is by accessing the schools' websites.  Since students at both schools take classes exclusively online, all students must be computer literate and be able to access the schools' websites using the computer.  However, Ashford and The Rockies employ a sophisticated – and misleading – tactic in displaying information on their websites.  In both cases, when prospective students enter the search terms "Ashford University" or "University of the Rockies" into an internet search engine, the first several search results direct individuals to a

-12-

polished-looking yet basic site that offers vague and misleading praise for the universities and an option to enroll online. Attempts to find specific information on either site – including the information required by the federal disclosure law – lead only to an option to complete an online enrollment form, in violation of federal and California law. While a more comprehensive website for both schools exists, they cannot be easily accessed by prospective students without previously knowing the exact web addresses.

### *Bridgepoint Misrepresents the True Cost of Attending Ashford and The Rockies*

52.     Bridgepoint uniformly misrepresents to all potential students the true cost of attending Ashford and The Rockies. In particular, Bridgepoint misrepresents to potential students that Ashford and The Rockies offer some of the lowest-tuition, most affordable degree programs available when in fact they offer among the highest cost, least affordable degree programs available.

53.     For example, Ashford's website claims that the school represents "higher education made affordable . . . You deserve a quality education at an affordable price . . . You'll find Ashford University, founded in 1918, is an ideal choice for you as a working adult or someone with an uncompleted degree because Ashford is affordable: *benefit from one of the lowest program costs*." The website's "Military Benefits" page also claims that Ashford "*offers one of the lowest tuition costs available*" without specifying anywhere on its enrollment site the actual cost of attendance.

54.     In reality, however, Ashford's undergraduate tuition rates are among the highest in the country at $372 per credit hour. The U.S. Department of Veterans Affairs (the "VA") publishes an annual table listing the state-by-state rates for "the *highest* in-state, undergraduate, public tuition" in each state in the country. In determining which schools are the most expensive, the VA explains that "all undergraduate program costs were taken into consideration to determine the highest in-state maximum tuition per credit hour and the maximum fees per term. These figures may include program tuition for high cost programs such as flight courses taken as part of a degree requirement or undergraduate pharmacy, nursing and engineering degrees." In other words, the VA's table lists the costs to attend *the very most expensive public colleges* in each state and territory in the country. In the last updated table, published August 30, 2010, a full 28 states' *most expensive public colleges* charged less than $372 per credit hour. Put simply, Ashford University – which claims to offer

students "one of the lowest tuition costs available" ***charges more tuition per credit hour than all of the public colleges and universities in over half of the states in the entire nation.***

55.     In fact, for students in many states (and some U.S. territories) Ashford's tuition rates are more than double the cost of the most expensive public school alternatives:

| State/Territory | Maximum In-State Tuition Rate | % Increase to Attend Ashford |
|---|---|---|
| Alaska | $170 | 219% |
| Arkansas | $210 | 177% |
| Montana | $205 | 181% |
| Nebraska | $251 | 148% |
| Nevada | $156 | 238% |
| New Mexico | $229 | 162% |
| Oklahoma | $188 | 200% |
| Puerto Rico | $90 | 413% |
| South Dakota | $99 | 376% |
| Utah | $238 | 156% |
| Virgin Islands | $125 | 298% |
| Wyoming | $99 | 376% |

56.     As the VA's table and the table above demonstrate, the claim that Ashford offers one of the most affordable college educations for students simply is not true. The reality is that an Ashford student who completes his or her undergraduate degree with the bare minimum 120 credits will pay nearly $45,000 in tuition alone, not including the outrageous hidden fees described below.

57.     Tuition at The Rockies is even more expensive, at a whopping $682 per credit hour for the school's Master's program and $882 per credit hour for the doctorate degree. While admittedly more expensive than Ashford in part because The Rockies offers exclusively graduate degrees, these far higher than average tuition rates, coupled with the relative worthlessness of the degree for job placement purposes (as detailed below), clearly make Bridgepoint's statements about its institutions' "great value" false and misleading.

-14-

58.     In addition to the written misrepresentations regarding the value of a Bridgepoint education, prospective students are uniformly orally misled by Bridgepoint enrollment advisors, who mislead students regarding the true cost of attendance through scripted recitations provided by Bridgepoint. Plaintiff Rosendahl, for example, was induced to enroll in Ashford's undergraduate program in large part because his enrollment advisor misleadingly claimed that Ashford offered "one of the cheapest undergraduate degree programs in the country." The charts discussed and reproduced in part above demonstrate that this statement is false and misleading.

59.     Moreover, Bridgepoint enrollment advisors misrepresent the total cost of attendance at Bridgepoint's schools by quoting to prospective students tuition rates for nine months of attendance when a program in fact lasts for twelve months, and by quoting only the tuition rates during the enrollment process, while failing to disclose numerous hidden administrative fees. Only after a student enrolls and promises to pay for classes does s/he become aware of the following fees:

| Fee | Cost at Ashford | Cost at The Rockies |
|---|---|---|
| Technology Services Fee | $1290 | $250 |
| Sponsored Professional Training Assessment (per credit hr.) | $30 | N/A |
| Prior Learning Assessment Experiential Learning Essay Assessment (per course) | $125 | N/A |
| Books and Materials (per course) | $100 | $200 |
| Graduation Fee | $110 | $500 |
| Education Partnership Fee | $30 | N/A |
| **TOTAL** (based on min. 120 credit hrs. for undergraduate degree at Ashford; 68 credit hrs. for doctoral degree at The Rockies) | **$14030** | **$5350** |

60.     In the case of Plaintiff Clark, for example, her enrollment advisor told her on numerous occasions that the total cost of her Doctor of Psychology ("PsyD") degree program would be $53,000. Only later did she find out that, in fact, the $53,000 failed to account for the numerous annual administrative fees and the fact the PsyD program is a three year program. When she spoke with a school administrator, Plaintiff Clark discovered that to complete her program she would have to pay *a minimum of $75,000*. Even after this discovery, enrollment advisors reassured Plaintiff Clark that her PsyD was a great value compared to other schools because of the quality of

instruction, the quality of the residency program, and her qualification for and ability to obtain professional licensure after graduation.

### *Bridgepoint Misrepresents the Quality and Reputation of Its Academic Programs, Its Job Placement Rate, and Its Students' Post-Graduate Employability*

61.     Bridgepoint also makes uniform written and scripted oral misrepresentations regarding the quality of its academic programs and the reputation these programs enjoy with potential employers.

62.     Both Ashford's and The Rockies's websites state the following in the "Frequently Asked Questions" section of their respective sites:

> **How does my degree compare to degrees from other schools?**
> Your degree from Ashford University/University of the Rockies is equally valuable, accepted, and honorable as any equivalent degree you could earn from another accredited school or university, whether on a traditional campus or online. ***The only difference between a degree from Ashford University/University of the Rockies and a degree from another school is the money and time you'll save through Ashford University/University of the Rockies.***

63.     This statement is false and misleading in two ways.  First, it misleadingly suggests to prospective students that degrees from one of Bridgepoint's academic institutions are somehow of "equal value" to other accredited schools or universities, presumably including the top schools in the country.   Second, and more importantly, this statement misleadingly suggests that degrees from Ashford or The Rockies will be recognized as valid by potential employers or other academic institutions that recognize degrees from other accredited schools and universities.  This is not the case, however.  A large number of universities will not accept any transfer credits from any online universities, nor will they recognize an undergraduate degree from an online university as satisfying the academic prerequisites for admission to a graduate or professional degree program.  Moreover, many employers specifically do not recognize degrees from online institutions as proof that a prospective employee qualifies for a certain position, whereas they will recognize an identical degree from a traditional campus as proof of qualification.

64.     The Rockies, for example, offers certificate programs as well as Master's and doctorate degrees in psychology.  In order to practice psychology in any state or with the military,

CLASS ACTION COMPLAINT

one must possess both a relevant degree in psychology and a professional license of the jurisdiction within which the student wishes to practice. However, none of the degree programs offered at The Rockies are recognized as relevant academic degrees, nor are they intended to prepare students for professional licensure. In fact, while the school makes misrepresentations to the contrary as shown below, it simultaneously admits in the fine print of its program enrollment form that "this program is not intended to prepare students for professional licensure or certification in any field, regardless of concentration." In other words, the school admits that its degrees do not prepare students for employment *in any field* while simultaneously claiming its degrees are "equally valuable" and "equally honored" as degrees from traditional universities.

65.    Notwithstanding the fact that Bridgepoint knows its degrees are worthless for anyone desiring to become a licensed psychologist, school President Charlita Shelton, on the home page of the school's website, misleadingly states that "*the University's goal is to provide a professional graduate education in psychology to individuals who seek licensure as psychologists.*" This statement is false and misleading because, by the school's own admission elsewhere, the programs are specifically not intended to prepare students for professional licensure.

66.    Bridgepoint's enrollment advisors likewise make uniform scripted oral misrepresentations about the quality and reputation of its schools, describing Ashford and The Rockies as great schools with amazing professors who offer individualized attention to their students. Moreover, these advisors explain to prospective students, following uniform written scripts and instruction from Bridgepoint, *that a degree from Ashford or The Rockies will prepare them and qualify them for a number of professional occupations and provide them with a competitive advantage over graduates from other schools*. These statements are false and misleading because the quality of instruction at Ashford and The Rockies is uniformly subpar, the instructors are far less qualified than professors from comparable universities, and degrees from these schools actually place graduates at a competitive disadvantage given the fact that many employers refuse to even recognize the validity of the degrees.

67.    Bridgepoint enrollment advisors continue to make false and misleading statements about the quality and value of a Bridgepoint education, and about students' job placement prospects,

-17-

during the student's period of enrollment.  In an effort to maintain a high "retention rate," advisors reassure students that the students are still receiving a quality education at an affordable price and that they should continue pursuing their degrees to completion.

68.     Plaintiff Clark's experience provides a perfect example.  Plaintiff Clark was induced to enroll at The Rockies in part because her enrollment advisor claimed that The Rockies offered one of the highest quality PsyD programs available, its highly qualified instructors provided individualized feedback to students, and it had a well-regarded residency program for aspiring clinical psychologists.  She further explained that numerous students like Plaintiff Clark who desired to become a licensed clinical psychologist had in fact done so after completing the PsyD program, and that The Rockies had an exemplary job placement rate for aspiring licensed psychologists. Plaintiff Clark specifically and repeatedly stated her desire to be a clinical psychologist with the U.S. military and was repeatedly assured that the PsyD program would qualify her for such a position.

69.     In reality, however, nothing could have been further from the truth.  Throughout Plaintiff Clark's enrollment at The Rockies, she was encouraged by her advisor to enroll in courses that patently had no relation to her declared Mediation and Conflict Resolution Concentration. Further, many of her classes were taught by graduate students rather than professors or licensed practitioners, and on more than one occasion fellow students in her classes were preemptively awarded "A" grades for assignments they had not completed.  In at least one instance, a professor told her and other students in person that his wife graded many of his students' papers.  Moreover, the highly-touted residency program was in fact run entirely by graduate students – not a single "professor" running the residency program even had a doctorate degree.

70.     Plaintiff Clark was forced to withdraw before the start of her second year in the program, after having already spent nearly $25,000.

71.     Having completed one year of a purportedly "equally valuable" doctoral program, Plaintiff Clark submitted her transcript – with a perfect 4.00 grade point average – to outside psychology professionals and to representatives of the U.S. Navy's organizational psychology program.  Every person with whom she spoke told her the degree was worthless.  The Navy refused even to look at her transcript, explaining that any online degree that was not accredited by the

-18-

American Psychological Association (APA) and was unacceptable for any psychology position with the U.S. military – even for research only positions. She received similar feedback from civilian psychologists, who stated that she would have to begin her degree program again at an APA accredited institution.

72.     Bridgepoint's false and misleading written and oral statements detailed above are and were false and misleading for the additional reasons that they omit to disclose to students the following material facts:

(a)     That Ashford and The Rockies charge among the highest tuition rates in the nation, higher than every public undergraduate institution in over half of the states in the country;

(b)     That degrees from Ashford and The Rockies are not as marketable as similar degrees from traditional postsecondary schools;

(c)     That degrees from Ashford and The Rockies would only be of *de minimis* use to helping graduates seek employment in their chosen profession; and

(d)     That salaries quoted to students as representative of their "earning potential" in certain professions were earned by less than 5% of all individuals in those professions.

### ***Bridgepoint Employs Deceptive Tactics Regarding Federal Tuition Assistance***

73.     As described above, Bridgepoint has an incentive to induce prospective students to apply for the maximum dollar amount of federal loans possible because Bridgepoint can accept up to 90% of its funding from the federal government's loan programs, because the loans are disbursed directly to the school, and because the loans are completely guaranteed by the federal government – and by extension, the American taxpayer. Indeed, Bridgepoint does employ uniform deceptive tactics to induce prospective students to apply for federal student loans that they may not need, may not be able to repay, and for which they may not have applied had they not been misled into applying for them.

74.     For example, pursuant to uniform written scripts and instructions provided to enrollment advisors during training, Bridgepoint employees pressure prospective students to enroll in a degree program before completing their financial aid applications. Once enrolled, Bridgepoint completes and submits the financial aid applications on the students' behalf, requesting the

maximum allowable amount even if the amount exceeds the cost of attendance at the university. During this process, enrollment advisors further fail to tell prospective students that the loans are disbursed directly to the school and not the individual, thus allowing the school to demand payment immediately upon enrollment rather than allowing students to defer payment until after graduation.

75.     Bridgepoint also encourages enrollment advisors to mislead prospective students regarding how much of their degree program will be covered by federal financial assistance. In one instance, CW2 explained that an enrollment manager sought to enroll a student who expressed reluctance because of the length of time it would take to graduate. This manager suggested that the student enroll and take twice the course load to graduate in half the time. However, the manager failed to disclose that only half of these classes could be paid for through federal financial aid and the student would have to pay the rest out of pocket, even though the manager knew the student could not afford to do so. Through this misrepresentation the manager was successful in inducing the prospective student to enroll.

76.     Bridgepoint also *misleadingly downplays students' federal loan repayment obligations, often telling prospective students not to worry about loan repayment or telling students that they don't have to worry about repaying students loans or that the federally-mandated obligation to repay one's student loans "isn't that big a deal."* Bridgepoint also fails to disclose to prospectus students that federally-subsidized student loans are not dischargeable in bankruptcy. The motivation here is obvious: by downplaying the seriousness of one's repayment obligations Bridgepoint makes applying for federal loans more attractive to the student, and because these loans are federally guaranteed, Bridgepoint profits regardless of whether a student defaults.

77.     These misleading tactics are incredibly harmful to students, who are tricked into applying for loans that they cannot pay back and which will remain obligations for the rest of their lives since federal student loans are not dischargeable through bankruptcy. Thus, those thousands of Class members who have defaulted on their loans (as high as 17.4% of students according to one government estimate) after being misled by Bridgepoint's deceptive tactics will continue to carry a poor credit rating – potentially for life – even if they file for bankruptcy and attempt to restore their

financial health.  This fact is a far cry from the Bridgepoint misrepresentation that repaying federal loans "isn't that big a deal."

78.     These statements are also false and misleading because Bridgepoint failed and fails to disclose the following material facts to Plaintiffs and the Class:

(a)     That far from repayment of loans not being "that big a deal," students have an absolute obligation to repay student loans and risk being saddled with their loan debt for life because federal student loans are not dischargeable through bankruptcy;

(b)     That Ashford and The Rockies were not a "great value" but instead charged some of the highest tuition rates in the country;

(c)     That degrees from Ashford and The Rockies are not as marketable as similar degrees from traditional postsecondary schools, making it hard for their graduates to repay their student loans after graduation;

(d)     That degrees from Ashford and The Rockies are only of *de minimis* use to graduates seeking employment in their chosen profession, making it more difficult for graduates to repay their student loans after graduation;

(e)     That salaries quoted to students representing their "earning potential" in certain professions were earned by less than 5% of all individuals employed in those professions; and

(f)     That members of the U.S. military and military veterans drop out and default on student loans at a much higher rate at for-profit colleges like The Rockies and Ashford than at traditional non-profit colleges.

### *Bridgepoint Targets Veterans for Its Deceptive Tactics*

79.     In a particularly shocking attempt to maintain its Title IV standing and receive billions from the federal government in federal tuition assistance, Bridgepoint specifically targets veterans and active duty military personnel for enrollment, employing many of the same deceptive marketing practices described above.  In fact, according to CW1, Bridgepoint employs entire divisions of enrollment advisors solely for the purpose of recruiting and enrolling active military personnel and military veterans.  These divisions often are composed of veterans who go directly to

-21-

military bases to recruit service members.  Bridgepoint's motivation for this is simple.  In order to maintain its Title IV standing, Bridgepoint must derive no less than 10% of its revenues from sources other than Title IV funds and certain other federal programs.  However, the money Bridgepoint and other for-profit universities receive from veterans via the Post-9/11 GI Bill does not count towards the 90% limit these schools can receive in federal funding.  Thus, Bridgepoint can collect unlimited money from the federal government via the Post-9/11 GI Bill and still maintain its Title IV standing for purposes of receiving federal student aid.

80.     As Iowa Senator Tom Harkin explained on December 9, 2010, this backdoor channel created for for-profit universities to receive unlimited federal money has "unintentionally subjected this new generation of veterans to the worst excesses of the for-profit industry: manipulative and misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."

81.     That same day, Bloomberg News reported that twenty for-profit colleges "reaped $521 million un U.S. taxpayer funds in 2010, seven times more than in 2006, by recruiting armed-services members and veterans through misleading marketing," noting in particular that "***Bridgepoint Education, Inc., based in San Diego, ranked second [in receiving tuition assistance from the Defense Department] with $41.2 million.***"  Bloomberg News, "For-Profit Colleges Scam Military for $521 Million, Report Says," December 9, 2010.

82.     The Bloomberg News article explained the motivation behind Bridgepoint and other for-profit colleges increasing the focus of their misleading marketing campaigns on veterans:

> *Getting the money from military personnel helped the companies circumvent a cap on the aid they can receive from the Education Department, their main source of income,* according to the report from Iowa Democrat Tom Harkin, chairman of the Senate Health, Education, Labor and Pensions committee.  Congress should protect veterans and taxpayers from documented abuses by those colleges, the report's authors said.
>
> The Post 9/11 GI Bill, which Congress passed in 2008, raised educational benefits for almost all military veterans, and in some cases allowed them to pass money for school to spouses and children, according to the report.  The colleges made it a priority to recruit military members to exploit the surge in benefits, the authors said.
>
> 'New Tool'

-22-

A 1992 law allows for-profit colleges to get as much as 90 percent of their revenue from federal financial aid.  The companies seek military students and veterans because their education benefits are counted as a non-government source, according to the Harkin report.

83.  However, as with other students misled into taking out huge loans to pay for costly and ineffective for-profit online college courses, members of the U.S. military and military veterans misled into enrolling have dropped out and defaulted on loans at a much higher rate than veterans at traditional non-profit colleges:

Dropout Rates

Statistics suggests that the for-profit colleges attended by military members have high dropout rates and poor educational results, according to the report.  At 4 of the 5 for-profit colleges receiving the most in Post-9/11 GI Bill funding, loan repayment rates were below 37 percent, according to the report.

At the same 4 schools, 24 percent of the students defaulted on their loans, according to the report.  The national rate of student default on government loans was 7 percent in the academic year ended 2008, the most recent period for which data are available, according to the Education Department.

84.  In addition to subjecting veterans to the same misrepresentations and material omissions described above, Bridgepoint engages in a number of deceptive practices aimed directly at veterans who are considering enrolling at Ashford or The Rockies.  For example, Ashford's enrollment website includes a page entitled "Military Benefits."  On this page, Ashford claims to "offer[] one of the lowest tuition costs available" without specifying anywhere on its enrollment site the actual cost of attendance.  However, as shown above, Ashford's tuition rates are among the highest in the country at $372 per credit hour.  The VA, which administers the Post-9/11 GI Bill, publishes an annual table on its website containing the state-by-state maximum dollar amount of tuition and fees that the Post-9/11 GI Bill and other veteran education assistance programs will cover.  As the site explains, these maximums are set "in accordance with the VA's statutory requirement to determine the *highest* in-state, undergraduate, public tuition."  In other words, the VA's table lists the costs to attend *the very most expensive public colleges* in each state of the country.  In the last updated table, published August 30, 2010, a full 28 states' most expensive public colleges charged less than $372 per credit hour.  Put simply, Ashford – which claims to offer

veterans "one of the lowest tuition costs available," ***charges more tuition per credit hour than all of the public colleges and universities in 56% of the states in the entire nation.***

85.     This fact has particularly important consequences for veterans choosing between various higher education options.  As noted above, the Post-9/11 GI Bill will only pay for tuition costs up to the maximum charge per credit hour of the most expensive public college in a given state.  While this is an incredibly generous benefit, unfortunately for veterans in 28 states it simply is not generous enough to cover the extremely high costs of attending Ashford.

86.     The result of this deception is that veterans who otherwise should never have been forced to take out loans to finance their postsecondary education are encouraged by Bridgepoint to apply for loans, and often end up with far more debt than was necessary or than they can pay back.  As the Bloomberg News article above observed, student loan default rates among veterans at for-profit institutions are much higher than for veterans at comparable public or non-profit schools.  Had these veterans not been misled into attending such an expensive and low-quality institution, many of them likely would have never attended Ashford or The Rockies, never taken out a loan, and would have graduated from a more reputable college with no debt.

87.     The statements detailed above that were and are directed at military veterans and active duty military personnel are false and misleading because Bridgepoint failed and fails to disclose the following material facts to Plaintiffs and the Class:

(a)     That far from repayment of loans not being "that big a deal," students have an absolute obligation to repay student loans and risk being saddled with their loan debt for life because federal student loans are not dischargeable through bankruptcy;

(b)     That Ashford and The Rockies were not a "great value" but instead charged some of the highest tuition rates in the country;

(c)     That degrees from Ashford and The Rockies are not as marketable as similar degrees from traditional postsecondary schools, making it hard for their graduates to repay their student loans after graduation;

(d)     That degrees from Ashford and The Rockies are only of de minimis use to graduates seeking employment in their chosen profession, making it more difficult for graduates to repay their student loans after graduation;

(e)     That salaries quoted to students representing their "earning potential" in certain professions were earned by less than 5% of all individuals employed in those professions; and

(f)     That members of the U.S. Military and military veterans drop out and default on student loans at a much higher rate at for-profit colleges like The Rockies and Ashford than at traditional non-profit colleges.

### *Bridgepoint's Prohibited Incentive System Encourages "Enrollment Advisors" to Employ Deceptive and Harassing Marketing Tactics*

88.     Universities that participate in Title IV education programs, such as Bridgepoint, are prohibited from providing incentive payments to employees for securing student enrollment. However, Bridgepoint provides both incentive payments to its enrollment advisors for recruiting and securing student enrollment, and fosters a competitive environment whereby an enrollment advisor's success or failure is determined not by the accuracy or quality of advice given to prospective students, but by the number of prospective students the advisor actually enrolls.  The result is that enrollment advisors give false and misleading information to get students to enroll, and also agree to enroll prospective students even when it is obvious that the prospective student did not qualify or would not benefit from the program.

89.     Bridgepoint's hundreds of enrollment advisors work in large call centers and are divided into teams.  According to CW1, a Senior Enrollment Manager for nearly two years, the highest performing teams – as determined solely by number of students enrolled – win prizes and often receive substantial raises.   Underperforming team members do not receive bonuses or pay raises, and often are fired for failure to enroll more students.   This type of hypercompetitive atmosphere not only fosters a culture in which misrepresentations are encouraged in order to drive up enrollment numbers, but also flatly violates federal law.

90.     CW2, an enrollment advisor for Ashford in 2010, received several verbal and written warnings that s/he was "performing at an unsatisfactory level" solely because s/he was not enrolling

-25-

enough students.  In each formal reprimand, CW2 only received criticism for his/her inability to meet enrollment quotas – no mention of CW2's ability to offer accurate information or give helpful advice or guidance to prospective students was ever mentioned.  In fact, the action plan designed for CW2 was focused only on enrolling a maximum number of students, including "focusing on the activities that will enroll students: outbound phone calls, appointment setting, and conducting interviews."  CW2 was warned in writing that if s/he did not "turn in a minimum of 3 applications per week," "schedule a minimum of 2 appointments per day," and "conduct a minimum of 6 appointments/interviews per week," s/he would be terminated.  These actions are improper and unlawful, as they require an enrollment advisor to submit a minimum number of applications regardless of his/her prospective students' desire to enroll or not.

91.     CW2 received additional direct pressure from multiple Bridgepoint/Ashford managers to increase his/her enrollment numbers.  One manager warned him/her that s/he could receive a pay cut, and explained that "the pay cut is designed to demoralize some people [who do not meet their quotas], and they will not want to stay after being cut."  Another manager sternly warned CW2 that "applications save your seat, and retention gets you paid."  Even more telling was CW2's meeting with a company risk manager, who stated that his/her inability to meet the minimum "average applications per week is a direct risk for the company based on the numbers I have to report.  Therefore, anyone not meeting these numbers is a risk."

92.     CW2 also described the immense pressure to retain students once they are enrolled, being admonished on multiple occasions to maintain a "minimum 70-75% retention rate."  These managers often encouraged enrollment advisors to misleadingly reassure enrolled students about the quality and value of their education throughout their enrollment period, particularly if a student considered withdrawing after discovering previously undisclosed administrative fees or deficiencies in the academic programs in which they were enrolled.

### *The Government Accountability Office Exposes Widespread For-Profit College Misfeasance*

93.     In 2009, the federal government instructed the U.S. Government Accountability Office ("GAO") to investigate the practices of for-profit colleges and universities like Bridgepoint for the following reasons:

(a)    ***Exploding Enrollment***: Enrollment in these colleges has grown far faster in the last decade than at traditional higher-education institutions.  Enrollment in for-profit colleges has grown from about 365,000 students in 2004 to approximately 1.8 million in 2009;

(b)    ***Growth of Publicly-Traded For-Profit Colleges***: The fourteen largest for-profit corporations (which includes Bridgepoint), worth $26 billion as of July 2010, enrolled some 1.4 million students in their wholly owned subsidiary for-profit colleges;

(c)    ***Disproportionate Federal Financial Assistance***: In 2009, students at for-profit colleges received more than $4 billion in Pell Grants (a type of federal government student tuition grant) and more than $20 billion in federal loans provided by the Department of Education. This represents roughly 25% of all Federal Pell Grants and federal loans given to college students throughout the country, despite the fact that for-profit college students represent only approximately 9% of all college students; and

(d)    ***Disproportionate Student Loan Default Rates***: Students at for-profit colleges also represent a vastly disproportionate percentage of students who default on their federally administered student loans. ***When a student defaults on a federal loan, the government and the American taxpayer must pick up the tab.***  In 2009, despite representing only 9% of college students throughout the country, students at for-profit colleges and universities were responsible for 44% of all student loan defaults in the country.

94.    On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like Bridgepoint, had engaged in a pattern of behavior whereby they systematically recruited students through deceptive marketing, harassing recruitment tactics, and prohibited employee incentive programs in an attempt to increase student enrollment and drive up company profits.  The GAO report confirmed the systematic nature of the deceptive and unlawful practices described above that are employed by for-profit institutions like Bridgepoint, concluding that they misrepresented to prospective students, among other things, the true cost of attending the school, their ability to receive and obligation to repay federal tuition assistance, and their post-graduation employability and salary potential.  The report further confirmed that many of these schools also paid bonuses to enrollment advisors based directly on the numbers of students the advisors enrolled

-27-

or retained with the school, in direct violation of federal law. The GAO also found that every for-profit institution investigated made deceptive and misleading statements regarding federal financial aid in a direct effort to secure a students' application for the maximum allowable loan amount under federal guidelines.

95.     The GAO report further concluded that many of these for-profit institutions specifically targeted veterans and active military personnel by offering misleading military benefits plans. For example, many schools recruited potential students who received tuition assistance under the Post-9/11 GI Bill by claiming to offer military discounts on tuition, when in reality they were charging tuition rates far in excess of what the Post-9/11 GI Bill and other veterans' tuition assistance programs cover.

## EQUITABLE TOLLING ALLEGATIONS

96.     At all relevant times when Defendants induced Plaintiffs and members of the Class to enroll at Ashford or The Rockies through misleading misrepresentations and under false pretenses, Defendants fraudulently concealed relevant facts that would have allowed Plaintiffs to discover the false and misleading misrepresentations complained of herein. In addition, Defendants continued to make reassuring misrepresentations to Plaintiffs and the Class following their enrollment in a fraudulent effort to retain Plaintiffs and the Class in their online degree programs under false pretenses for as long as possible. As a result of this fraudulent concealment, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiffs and the Class. Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiffs and the Class with respect to the true cost of attending Bridgepoint's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential, The Rockies' accreditation under the APA and ability to qualify graduates for professional psychology licensure, federal student loan repayment options and obligations, and Bridgepoint's students' federal loan repayment rate.

97.     Plaintiffs exercised due diligence to discover Defendants' wrongdoing. However, such wrongdoing was not discoverable prior to the date of the filing of this action since Defendants fraudulently concealed their wrongdoing. Defendants have never publicly disclosed their

wrongdoing in making the uniform, class-wide written and oral misrepresentations and material omissions. Plaintiffs exercised due diligence by promptly filing their Complaint after discovering the facts giving rise to these claims.

## FIRST CLAIM FOR RELIEF
### *Breach of Implied Contract*

98.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

99.     Plaintiffs, members of the Class and Defendants entered into implied contracts based upon numerous promises of performance made by Defendants.   Specifically, Defendants misrepresented to Plaintiffs and the Class that they would deliver the following benefits:

(a)     Provide a high-quality education at one of the lowest tuition rates available;

(b)     Prepare students for successful job placement in their profession of choice;

(c)     Provide students the opportunity to earn top salaries in their chosen profession; and

(d)     Prepare and qualify students to obtain professional licensure.

100.     In reliance on these misrepresentations, and as consideration for performance of these promises by Defendants, Plaintiffs and the Class promised to enroll as online students at Ashford or The Rockies, and pay the tuition rates quoted to them by Defendants for their degree programs.

101.     Plaintiffs and members of the Class complied with all their obligations under the implied contracts.

102.     Plaintiffs and members of the Class have been deprived of the benefits of their agreements with Defendants.

103.     Defendants breached their implied contracts with Plaintiffs and members of the Class by failing to deliver the benefits promised.

104.     As a result of Defendants' breach of implied contract, Plaintiffs and members of the Class have suffered damages.

105.     Defendants are accordingly liable to Plaintiffs and members of the Class for breach of implied contract.

## SECOND CLAIM FOR RELIEF
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

106.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

107.    There is a covenant of good faith and fair dealing implied in every contract.  This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

108.    Defendants breached the implied covenant of good faith and fair dealing in their contracts with Plaintiffs and the Class by taking steps to interfere with the ability of the Class to receive the benefits of the education promised by Defendants.

109.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and members of the Class have been damaged.

110.    Defendants are accordingly liable to Plaintiffs and members of the Class for breach of the implied covenant of good faith and fair dealing.  Plaintiffs seek actual damages and an injunction ordering Defendants to comply with the obligations of the contracts entered into by the Class and Defendants, and to refrain from taking any action to interfere with the Class's right to receive contractual benefits.

## THIRD CLAIM FOR RELIEF
### *Violation of Bus. & Prof. Code § 17200 et seq.*

111.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

112.    The Unfair Trade Practices Act defines unfair competition to include any "unfair" or "unlawful" business act or practice.  Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising." *Id.*  The Act also provides for injunctive relief and restitution for violations. *Id.*  § 17203.

113.    This cause of action is brought on behalf of Plaintiffs, members of the Class, and members of the general public pursuant to California Business & Professions Code § 17200 *et seq.*  Under Bus. & Prof. Code § 17200 *et seq.*, Plaintiffs are entitled to enjoin Defendants' wrongful

practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

114.    As a direct and proximate result of the acts and practices alleged above, members of the Class and the general public who enrolled in and/or attended classes at Ashford or The Rockies have been injured.  This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

115.    Defendants violated Bus. & Prof. Code § 17200 *et seq.* because they breached their contracts with Plaintiffs and the Class, breached the implied covenant of good faith and fair dealing, violated the Consumer Legal Remedies Act, violated Bus. & Prof. Code § 17500 *et seq.*, negligently misrepresented facts to Plaintiffs and the Class, committed fraud, and violated Title IV.

116.    Defendants further violated Bus. & Prof. Code § 17200 *et seq.* because they violated numerous provisions of the California Private Postsecondary Education Act of 2009.  Under this Act, private postsecondary institutions may not:

(a)    Promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation (§ 94897(b));

(b)    Advertise concerning job availability, degree of skill, or length of time required to learn a trade or skill unless the information is accurate and not misleading (§ 94897(c));

(c)    Pay any consideration to a person to induce that person to sign an enrollment agreement for an educational program (§ 94897(h));

(d)    Compensate an employee involved in recruitment, enrollment, admissions, student attendance, or sales of educational materials to students on the basis of a commission, commission draw, bonus, quota, or other similar method related to the recruitment, enrollment, admissions, student attendance, or sales of educational materials to students (§ 94897(n)); or

(e)    Require a prospective student to provide personal contact information in order to obtain, from the institution's Internet Web site, educational program information that is required to be contained in the school catalog or any information required pursuant to the consumer information requirements of Title IV of the federal Higher Education Act of 1965, and any amendments thereto (§ 94897(o)).

CLASS ACTION COMPLAINT

117.   Defendants violated each of these provisions by virtue of their deceptive, misleading and unfair business practices complained of herein.

118.   Defendants' unlawful and unfair business acts and practices, as described above, present a continuing threat to members of the Class and of the general public, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17200. This Court is empowered to, and should, grant restitution to the Class as well as preliminary and permanent injunctive relief against Defendants' acts and practices.

**FOURTH CLAIM FOR RELIEF**
*Violation of Bus. & Prof. Code § 17500 et seq.*

119.   Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

120.   The False Advertising Act makes it is unlawful to "make or disseminate or cause to be made or disseminated before the public [a statement] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading" with the intent to "induce the public to enter into any obligation relating thereto." Such statements include statements made through "any advertising device," including "over the Internet." Bus. & Prof. Code § 17500.

121.   This cause of action is brought on behalf of Plaintiffs and the Class under Bus. & Prof. Code § 17500 *et seq.* Under Bus. & Prof. Code § 17500 *et seq.*, Plaintiffs are entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

122.   Defendants violated Bus. & Prof. Code § 17500 *et seq.* by making or disseminating or causing to be made or disseminated false and misleading statements on their websites about the true cost of attending Bridgepoint's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential, and The Rockies' accreditation under the APA and ability to qualify graduates for professional psychology licensure. These false and misleading statements were made with the intent to induce the general public, including Plaintiffs and the Class, to enroll in Defendants' online degree and certificate programs.

123.     Plaintiffs and the Class did in fact rely on these false and misleading statements when deciding to enroll in Defendants' online certificate and degree programs.  As a direct and proximate result of the acts and practices alleged above, members of the Class and the general public who enrolled in and/or attended classes at Ashford or The Rockies have been injured.  This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

124.     Defendants' unlawful and false and misleading advertising, as described above, presents a continuing threat to members of the Class and the general public, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17500 *et seq*.  This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

## FIFTH CLAIM FOR RELIEF
### *Violation of the Consumer Legal Remedies Act*

125.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

126.     This cause of action is brought on behalf of Plaintiffs and the Class under California Civil Code § 1750 *et seq*.  Under California Civil Code § 1750 *et seq*., Plaintiffs are entitled to enjoin Defendants' wrongful practices by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

127.     The Consumer Legal Remedies Act prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods and services.

128.     Defendants violated the Consumer Legal Remedies Act by misrepresenting to Plaintiffs and members of the Class the true cost of attendance at Ashford and The Rockies, by misrepresenting: the quality of academic instruction at these schools, students' post-graduation employability, job placement prospects, and qualification for professional licensure, and prospective students' federal financial assistance options.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

129.     Defendants' unlawful and unfair business acts and practices, and unfair, deceptive, untrue, and misleading advertising, as described above, present a continuing threat to Plaintiffs, members of the Class and members of the general public, in that Defendants continue to mislead prospective students into enrolling in programs offered by Bridgepoint in violation of the Consumer Legal Remedies Act.  This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

130.     By reason of the above-described violations of the Consumer Legal Remedies Act, Plaintiffs and each member of the Class have suffered damages.  Plaintiffs seek an injunction barring Defendants' illegal and unfair business practices.

### SIXTH CLAIM FOR RELIEF
#### *Negligent Misrepresentation*

131.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

132.     Defendants made uniform and identical material written representations regarding the cost of attending Ashford and The Rockies, the value of the degree programs offered at these schools, the quality of the schools as compared to other institutions, and students' post-graduation qualification for certain professional licenses.  Defendants also omitted to disclose the material facts alleged herein.  When Defendants made these representations and omissions, they had no reasonable grounds for believing them to be true.  Nonetheless, Defendants made these material representations and omissions in order to induce Plaintiffs and the Class to act in reliance on these representations and to enroll at Ashford or The Rockies, or with the expectation that they would so act.  Plaintiffs and each member of the Class relied on these negligent representations before enrolling at one of these schools and relied on these misrepresentations in deciding to so enroll.

133.     At the time Defendants made the misrepresentations discussed above, Plaintiffs and the members of the Class were ignorant of the true facts.  Had they known the true facts, Plaintiffs and the members of the Class would not have enrolled in Ashford or The Rockies.

134.     As a proximate result of Defendants' negligent conduct, Plaintiffs and members of the Class have been damaged in an amount in excess of this Court's jurisdiction, the exact amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### *Fraud*

135.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

136.    As part of their fraudulent recruiting program, Defendants engaged in a pattern and practice of knowingly and intentionally making numerous false representations of material fact, and material omissions, with intent to deceive and/or induce reliance by Plaintiffs and the Class. Plaintiffs and the Class did in fact justifiably rely on these misrepresentations and omissions, resulting in substantial damage to Plaintiffs and the Class.

137.    Defendants induced Plaintiffs and the Class to enroll and/or attend classes at Ashford or The Rockies by making one or more, or in many cases all, of the following false and fraudulent misrepresentations of fact to Plaintiffs and the Class:

(a)    The Rockies prepares and qualifies its students for a professional psychology license: "The University's goal is to provide a professional graduate education in psychology to individuals who seek licensure as psychologists."   Charlita Shelton, President of The Rockies, http://www.rockies.edu/home/index.php (last accessed Jan. 7, 2011).

   i.    This statement was false and misleading at the time it was made.

   ii.   As demonstrated above, throughout the Class Period The Rockies has never intended to provide an adequate education to students seeking licensure as psychologists, or to otherwise prepare its students to obtain a license to practice psychology.  The Rockies is not accredited by the APA; only degrees from schools that have an APA accreditation will qualify individuals to obtain professional licensure in psychology in any jurisdiction within the United States.

   iii.  Defendants knew this statement to be false and misleading at the time it was made.  While fraudulently misrepresenting on its website and through uniform scripted oral representations that students at The Rockies could obtain professional licensure, Defendants fraudulently concealed the fact that a degree from The Rockies "is not intended to

-35-

prepare students for professional licensure or certification in any field, regardless of concentration."

    (b)    Ashford and The Rockies offer "among the lowest tuition rates" in the country: "You'll find that Ashford offers one of the lowest tuition costs available." Ashford University, http://degrees.ashford.edu/military.php (last accessed Jan. 7, 2011).

        i.    This statement was false and misleading at the time it was made.

        ii.    As demonstrated above, throughout the Class Period, Ashford and The Rockies did not provide one of the lowest tuition costs available, but rather charged among the highest tuition rates in the country. Ashford's $372 per credit hour tuition rate was higher than the tuition rate for every single public undergraduate institution in twenty-eight states in the country, representing nearly 56% of the jurisdictions in the United States.

        iii.    Defendants' statements regarding their low tuition rates were also false and misleading when made because Defendants, through both uniform written misrepresentations, scripted oral misrepresentations, and material omissions, failed to disclose the substantial administrative fees associated with attending Ashford or The Rockies. For Ashford, Defendants failed to disclose to Plaintiffs and members of the Class that its administrative fees alone totaled over $14,000 for a minimum 120 credit hour bachelor's program.

    138.    The representations set forth above were part of a common scheme or plan and a pattern or practice conceived and executed by Defendants, over the course of the entire statutory period and prior, through their individual employees, including without limitation, enrollment advisors and financial aid officers.

    139.    Defendants knew that these misrepresentations were false when made, and made them with the intent to induce Plaintiffs and the Class to rely upon them.

140.   In addition, Defendants occupied a fiduciary position as educators, and owed a heightened duty to Plaintiffs and the Class to act in good faith and with full candor and honesty. Defendants breached these fiduciary duties and duties of good faith, candor, and disclosure by omitting to disclose material facts alleged above to Plaintiffs and the Class, including:

(a)   That Ashford and The Rockies charge some of the highest tuition rates in the country;

(b)   That federal student loans are not dischargeable through bankruptcy;

(c)   That degrees from Ashford and The Rockies are not nearly as marketable as similar degrees from traditional postsecondary schools;

(d)   That degrees from Ashford and The Rockies are only of *de minimis* use in helping graduates seek employment in their chosen profession; and

(e)   That the salaries quoted by Defendants as representative of "earnings potential" in a given profession were earned by less than 5% of individuals in those professions.

141.   Plaintiffs and the Class were ignorant of the true facts and relied upon Defendants' misrepresentations in deciding to enroll at Ashford and/or The Rockies.

142.   Accordingly, each Plaintiff and Class member has been damaged.

143.   Defendants' herein-alleged wrongful acts and omissions, and each of them, were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiffs and the Class, and each of them, all to the substantial financial benefit of Defendants.   As a result, Plaintiffs and the Class are entitled to punitive damages.

144.   As a proximate result of Defendants' negligent conduct, Plaintiffs and members of the Class have been damaged in an amount in excess of this Court's jurisdiction, the exact amount to be proven at trial.

145.   This Court is empowered to, and should, impose punitive damages for Defendants' fraudulent conduct in an amount sufficient to set an example of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 on behalf of the Class as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class;

B.     A declaration that Defendants' conduct alleged herein constitutes a breach of contract, breach of the implied covenant of good faith and fair dealing, a violation of Bus. & Prof. Code §§ 17200 and 17500, a violation of Title IV, a violation of the California Private Postsecondary Education Act of 2009, a violation of the Consumer Legal Remedies Act, and negligent misrepresentation;

C.     An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful conduct alleged herein;

D.     For restitution to Plaintiffs and each member of the Class, as his or her interest may appear, of all sums unlawfully collected by Defendants from the Plaintiffs and other members of the Class during the Class Period;

E.     For disgorgement of all profits obtained by Defendants as a result of their unfair business practices;

F.     For an award of punitive damages sufficient to make an example of Defendants;

G.     An award for Plaintiffs and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

H.     An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

//
//

CLASS ACTION COMPLAINT

**JURY DEMAND**

Plaintiffs demand a jury trial of all triable issues.

DATED: January 11, 2011

JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
SHAWN E. FIELDS

FRANCIS A. BOTTINI, JR.

501 West Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

Counsel for Plaintiffs

CLASS ACTION COMPLAINT

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Scott Rosendahl and Veronica Clark, on behalf of themselves and all others similarly situated, | Bridgepoint Education, Inc., Ashford University, and University of the Rockies, |

**(b)** County of Residence of First Listed Plaintiff   Miller County, MO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Johnson Bottini, LLP, Francis A. Bottini, Jr., 501 W. Broadway, Ste. 1720, San Diego, CA 92101, (619) 230-0063

Attorneys (If Known)

'11CV61   WQHWVG

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332(d)(2)(A)
Brief description of cause:
Breach of contract, implied covenant, violation of Bus. & Prof. Code §§17200, 17500, fraud, misrep.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   PROOF

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
01/11/2011

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**       **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**       **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**       **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**       **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**       **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**       **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**       Example:       U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.**       **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**       **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.