# Ashford University's Administration of the Title IV, Higher Education Act Programs

## FINAL AUDIT REPORT



**ED-OIG/A05I0014**

**January 2011**



Our mission is to promote the efficiency, effectiveness, and integrity of the Department's programs and operations

U.S. Department of Education
Office of Inspector General

# NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General.  Determinations of corrective action to be taken will be made by the appropriate Department of Education officials.

In accordance with the Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF INSPECTOR GENERAL

AUDIT SERVICES
Chicago/Kansas City Audit Region

January 21, 2011

Dr. Elizabeth Tice
President
Ashford University
400 North Bluff Boulevard
Clinton, IA 52732-3997

Dear Dr. Tice:

The enclosed final audit report, Control Number ED-OIG/A05I0014, presents the results of our audit titled ***Ashford University's Administration of the Title IV, Higher Education Act Programs.***  This report incorporates the comments you provided in response to the draft report.  If you have any additional comments or information that you believe may have a bearing on the resolution of this audit, you should send them directly to the following Department of Education official, who will consider them before taking final Departmental action on this audit:

> William J. Taggart
> Chief Operating Officer
> Federal Student Aid
> U.S. Department of Education
> Union Center Plaza, Room 112G1
> 830 First Street, N.E.
> Washington, DC 20202

It is the policy of the U. S. Department of Education to expedite the resolution of audits by initiating timely action on the findings and recommendations contained therein.  Therefore, receipt of your comments within 30 days would be appreciated.

In accordance with the Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.

Sincerely,

/s/

Gary D. Whitman
Regional Inspector General for Audit

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

# TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY ..............................................................................1

BACKGROUND ..........................................................................................3

AUDIT RESULTS .......................................................................................7

    FINDING NO. 1 –   Compensation Plan Included Incentive Payments
and the University Did Not Establish Eligibility for
Safe Harbor ...............................................................7

    FINDING NO. 2 –   Incorrect Return of Title IV Aid Calculations .........................16

    FINDING NO. 3 –   Untimely Return of Title IV, HEA Program Funds ................30

    FINDING NO. 4 –   Lack of Proper Authorization to Retain Student
Credit Balances ..........................................................33

    FINDING NO. 5 –   Improper Disbursements of Title IV, HEA
Program Funds...........................................................37

    FINDING NO. 6 –   Lack of Support for Students' Leaves of Absence...................44

OBJECTIVES, SCOPE, AND METHODOLOGY ................................................48

APPENDIX A:  Enrollment Advisor Evaluation Factors.......................................52

APPENDIX B:  University Comments on the Draft Audit Report, July 30, 2010 ...............54

APPENDIX C:  Consultant's Analysis of Enrollment Advisors' Compensation, July
29, 2010........................................................................112

APPENDIX D:  University Supplemental Comments on the Draft Audit Report,
November 19, 2010........................................................142

APPENDIX E:  University's Second Supplemental Comments on the Draft Audit
Report, January 10, 2011 ...............................................152

**Abbreviations, Acronyms, and Short Forms Used in this Report**

| | |
|---|---|
| ACG | Academic Competitiveness Grant |
| ACS | Affiliated Computer Services, Inc. |
| C.F.R. | Code of Federal Regulations |
| COD | Common Origination and Disbursement system |
| COO | Chief Operating Officer |
| Department | U.S. Department of Education |
| FFEL | Federal Family Education Loan |
| FSA | Federal Student Aid |
| FSEOG | Federal Supplemental Educational Opportunity Grant |
| FWS | Federal Work Study |
| GPA | Grade Point Average |
| HEA | Higher Education Act of 1965, as amended |
| OIG | Office of Inspector General |
| Pell | Federal Pell Grant |
| Perkins | Federal Perkins Loan |
| National SMART | National Science and Mathematics Access to Retain Talent |
| University | Ashford University |

# EXECUTIVE SUMMARY

The objectives of our audit were to determine whether, for its distance education programs, Ashford University (University) complied with selected provisions of the Higher Education Act of 1965, as amended (HEA), and regulations governing (1) incentive compensation; (2) student eligibility; (3) disbursements; and (4) return of Title IV, HEA program funds.  Our audit covered the period July 1, 2006, through June 30, 2007 (award year 2006-2007).

We identified noncompliance by the University with the incentive compensation requirements, as well as instances of noncompliance with the disbursements, and return of Title IV, HEA program funds requirements.  Specifically, the University

- Designed a compensation plan for enrollment advisors that provided incentive payments based on success in securing enrollment and did not establish that its plan and practices qualified for the regulatory safe harbors;
- Did not properly perform return of Title IV aid calculations, resulting in the improper retention of $29,036 of Title IV, HEA program funds for 38 of the 85 students in our samples (based on statistical sampling techniques, we are 90 percent confident that the University improperly retained at least $1.1 million of 2006-2007 Title IV, HEA program funds);
- Did not return Title IV, HEA program funds timely;
- Retained student credit balances without proper authorizations;
- Did not always disburse Title IV, HEA program funds in accordance with Federal regulations or its own policy; and
- Did not maintain supporting documentation for students' leaves of absence.

Except for the disbursement and leaves of absence issues noted above, the University generally complied with the student eligibility requirements.

We recommend that the Chief Operating Officer (COO) for Federal Student Aid (FSA) require the University to

- Provide records of all salary adjustments made during our audit period and any documentation, not disclosed to the Office of Inspector General (OIG), that demonstrates that any specific adjustments qualified for the regulatory safe harbor described in
34 Code of Federal Regulations (C.F.R) § 668.14(b)(22)(ii)(A);
- Return to the U.S. Department of Education (Department) and lenders, as appropriate, $29,036 resulting from the improper return of Title IV aid calculations and post-withdrawal disbursements that exceeded what the 38 students in our samples were entitled to receive;
- Review its files for the students not included in our samples, identify the amount of Title IV, HEA program funds that were improperly retained for Title IV, HEA

> program recipients in the distance education programs who withdrew from the
> University during award year 2006-2007, and return that amount, plus any interest
> and special allowance, to the Department or lenders, as appropriate;
> - Cease drawing, disbursing, and holding credit balances of Title IV, HEA program
>   funds for which there are no currently assessed institutional charges;
> - Review its records for all students who were not included in our samples and who
>   received Title IV, HEA program disbursements during award year 2006-2007;
>   identify all disbursements made to students who were not eligible for them at the time
>   of the disbursement and never became eligible for the disbursements, and return those
>   amounts to the Department or to Federal Family Education Loan (FFEL) Program
>   lenders, as appropriate; and
> - Develop and implement written policies and procedures to provide reasonable
>   assurance of compliance with requirements for participation in the Title IV, HEA
>   programs, as described in this report.

Because of the seriousness of the findings, we also recommend that the COO for FSA consider
taking appropriate action under 34 C.F.R. Part 668, Subpart G.[1]

We provided a draft of this report to the University for review and comment on May 24, 2010.
We received the University's comments, along with additional documentation, on July 30, 2010.
The University also provided supplemental comments on November 19, 2010, and sent a letter to
the Assistant Inspector General for Audit on January 10, 2011.  The University disagreed with
all aspects of the findings and the recommendations for Finding Nos. 1, 2, and 4.  The University
agreed with some of the facts discussed in Finding Nos. 3, 5, and 6; however, the University did
not agree with those findings or the recommendations for those findings.  We summarized the
University's comments at the end of each finding.

Based on our analysis of the University's comments and the additional documentation, we made
minor revisions to Finding Nos. 1, 2, 5, and 6.  We also revised the Recommendations for
Finding No. 1 and made minor revisions to Recommendations 2.1, 2.2, 2.3, 4.3, 5.1, and 6.3(a).
We removed Recommendations 2.5, 3.3, 4.1, 4.2, 6.1, 6.2, and 6.3(b) and renumbered the other
recommendations accordingly.

The entire narrative of the University's comments dated July 30, 2010, and November 19, 2010,
and the letter dated January 10, 2011, are included as APPENDIX B, APPENDIX D, and
APPENDIX E, respectively.  Other than the University's consultant's report (APPENDIX C),
we have not included the University's attachments to its comments on the draft audit report
because they were voluminous.  Copies of the attachments, less any personally identifiable
information or other information exempt under the Freedom of Information Act (5 U.S.C. §
552(b)), are available upon request.

---

[1] All regulatory citations are to the July 1, 2006, volume unless otherwise noted.

# BACKGROUND

Ashford University (University) is a proprietary coeducational, liberal arts university located in Clinton, Iowa.  It originally was founded in 1918 as a residential campus junior college named Mount St. Clare College.  In 1979, the institution received approval to award baccalaureate degrees.  In 2002, the University changed its name to The Franciscan University.  In 2004, The Franciscan University, a non-profit institution, conferred its first graduate degrees.  That same year, the institution changed its name to The Franciscan University of the Prairies to avoid confusion with similarly named schools.  Since 2005, it has been owned by Bridgepoint Education, Inc., which is located in San Diego, California.  The institution changed its name to Ashford University when Bridgepoint Education, Inc., purchased it in 2005 and converted the University to a for-profit institution.

The University is accredited by The Higher Learning Commission, a Commission of the North Central Association of Colleges and Schools.  It offers more than 30 programs awarding associates, bachelors, and masters degrees.  Students can be enrolled in either a distance education course or a traditional course, but not both, within a single academic semester.  As of March 2008, the University offered programs to approximately 15,000 students (14,500 distance education students and 500 residential students).[2]  As of December 31, 2009, the University had 68,470 Title IV, HEA program recipients.[3]

The purpose of the programs authorized by Title IV of the Higher Education Act of 1965 (HEA) is to provide financial assistance to students attending eligible institutions of higher education.  During award year 2006-2007, the University was approved to participate in seven Title IV, HEA programs:

1.  Federal Family Education Loan (FFEL);
2.  Federal Pell Grant (Pell);
3.  Federal Supplemental Educational Opportunity Grant (FSEOG);
4.  Federal Work Study (FWS);
5.  Federal Perkins Loan (Perkins);
6.  Academic Competitiveness Grant (ACG); and
7.  National Science and Mathematics Access to Retain Talent (National SMART).

Table 1 summarizes the Title IV, HEA program funding the University received on behalf of its distance education students for award year 2006-2007.[4]

---

[2] The enrollment numbers were provided to us by the University's President.
[3] The 2009 enrollment numbers were reported in the University's *Compliance Attestation Examination of the Title IV Student Financial Assistance Programs* for the fiscal year ended December 31, 2009.
[4] The University's Vice President of Finance provided us with the Title IV, HEA program funding information for the distance education students.

**Table 1.  Title IV, HEA Program Funding 2006-2007**

| Program | Distance Education Students |
|---|---|
| FFEL Program–Unsubsidized Stafford Loan | $41,373,308 |
| FFEL Program–Subsidized Stafford Loan | $30,733,760 |
| FFEL Program–PLUS | $     134,523 |
| Pell | $ 9,135,593 |
| FSEOG | $          1,000(a) |
| FWS | $          0 |
| Perkins | $          0 |
| ACG | $          0 |
| National SMART | $     4,000 |
| **Total** | **$81,382,185(b)** |
| (a)  FSEOG was not offered to distance education students during our audit period.  One student in the universe transferred from a traditional program to a distance education program during award year 2006-2007.  The student received FSEOG while enrolled in the traditional program. | |
| (b)  The sum does not exactly equal the total of the numbers in the column due to rounding. | |

During award year 2009-2010, the University received about $613,003,158 in Title IV, HEA program funds.


**Distance Education Title IV Student Population**
The University began offering distance education courses after the change in ownership in March 2005.  Since then, the number of distance education Title IV, HEA program recipients has significantly increased.

**Table 2.  Distance Education Title IV, HEA Program Recipients**

| Award Year | Number of Distance Education Title IV, HEA Program Recipients* | Increase in Recipients from Prior Award Year | Percent Change From Prior Award Year (%) |
|---|---|---|---|
| 2005-2006 | 1,849 | | |
| 2006-2007 | 8,440 | 6,591 | 356 |
| 2007-2008 | 24,460 | 16,020 | 190 |
| 2008-2009 | 32,948 | 8,488 | 35 |
| *The numbers in this column were provided by the University's Vice President of Finance. | | | |

Approximately 78 percent of distance education students were Title IV, HEA program recipients during award year 2006-2007.  About 75 percent of the Title IV, HEA program recipients enrolled in the distance education programs during award year 2006-2007 were between the ages of 21 and 40 when they first enrolled at the University.   Approximately 72 percent came to the University with transfer credits.  As of September 2008, about 40 percent were active students, approximately 43 percent had withdrawn, and about 17 percent had graduated.[5]

---

[5] The data in this paragraph were provided directly or calculated using data provided by the University's Vice President of Finance.

**Contractor and University Staff Administered the Title IV, HEA Programs for Distance Education Students**

Since July 2005, the University has contracted with Affiliated Computer Services, Inc. (ACS), a services provider to higher education institutions, to perform most functions of administering Title IV, HEA program funds for students in the distance education programs. ACS performs functions such as award packaging, verification, and return of Title IV aid calculations. University staff stated that all staff working directly with all distance education students (Title IV and non-Title IV distance education students) work in "pods." These pods include financial service advisors, enrollment advisors, and academic advisors. According to the University,

- Financial service advisors conduct phone consultations with potential and current distance education students on financing their education, work closely with ACS to ensure new students are packaged with their financial aid, and stay in contact with current students to ensure they successfully complete the reapplication process in a timely manner. They also collect required documentation from new and current students. Financial service advisors also are responsible for collection of funds for past due accounts.

- Enrollment advisors are responsible for recruiting and enrolling distance education students. They make outbound calls to prospective students and conduct phone appointments with prospective students to further explore the prospective students' motivations for going to school. The enrollment advisors disseminate course and program information to new and potential students. They also ensure students are eligible for admission. Prior to the students taking their initial course, the enrollment advisors make sure that the students are prepared for the course (for example, assisting them in ordering their books). Enrollment advisors assist new students from the beginning of the enrollment process through the completion of their first course. The students are then transferred to an academic advisor.

- Academic advisors work with the distance education students through the rest of their enrollment at the University. They contact students on a regular basis to ensure student retention. Academic advisors also closely monitor student attendance and grades to assure retention and progression. In addition, they define and interpret University policies and procedures for students.

Table 3 shows the growth in the number of financial service advisors, enrollment advisors, and academic advisors from award year 2005-2006 through award year 2008-2009.

**Table 3.  University Staff for Distance Education Students**

| Award Year | | | | |
|---|---|---|---|---|
| Job Title | 2005-2006 | 2006-2007 | 2007-2008 | 2008-2009* |
| Financial Service Advisor | 7 | 65 | 132 | 202 |
| Enrollment Advisor | 101 | 327 | 635 | 985 |
| Academic Advisor | 6 | 24 | 63 | 130 |
| * Through May 2009. Data presented in the table were provided by the Vice President of Finance. | | | | |

According to the University's Vice President of Finance, the number of employees who work as financial service advisors does not include ACS staff who administer the Title IV, HEA programs for the University.  As of June 2009, according to the University's Vice President of Finance, ACS had the equivalent of 135 employees who worked on administering the University's Title IV, HEA programs.

**Enrollment Advisors' Performance Evaluation Process**
The University used matrices to evaluate enrollment advisors' performance for 6-month rating periods.  The University used two evaluation matrices: one for the enrollment advisor's first 6 months of employment and a second for each subsequent 6-month review period.  The enrollment advisors' ratings on the evaluations determine their salaries for the following 6-month period.

Each section of the matrix contains categories on which the enrollment advisor is rated.  The rating standards are "Always Exceeds," "Often Exceeds," "Meets Expectations," "Requires Improvement," and "Unsatisfactory."  The criteria for meeting each rating standard specific to each category are identified on the matrix.  The matrix has a corresponding point assignment sheet that assigns a number of points to each rating standard for each category on the matrix.  The maximum points an enrollment advisor can receive on an evaluation is 100.  APPENDIX A lists the categories on the matrix, their definition or rating criteria, the University's classification of the category as either quantitative or qualitative, and the maximum points for each category.[6]

**On-line Learning Management System**
The University uses an on-line learning management system to deliver its on-line courses.  Both students and instructors use the on-line learning management system.  Examples of information in the system include academic postings, grades, participation in discussion groups, academic assignments, and records of interactions with the instructor.

---

[6] The information in the table is based on the evaluation matrices used from April 2007 through December 2008.

# AUDIT RESULTS

For award year 2006-2007, we identified noncompliance by the University with the incentive compensation requirements, as well as instances of noncompliance with the disbursements, and return of Title IV, HEA program funds requirements.  The University

- Designed a compensation plan for enrollment advisors that provided incentive payments based on success in securing enrollment and did not establish that its plan and practices qualified for the regulatory safe harbors (see Finding No. 1);
- Did not properly perform return of Title IV aid calculations, resulting in the improper retention of $29,036 of Title IV, HEA program funds for 38 of the 85 the students in our samples (based on statistical sampling techniques, we are 90 percent confident that the University improperly retained at least $1.1 million in Title IV, HEA program funds during award year 2006-2007 (see Finding No. 2));
- Did not return Title IV, HEA program funds timely (see Finding No. 3);
- Retained student credit balances without proper authorizations (see Finding No. 4);
- Did not always disburse Title IV, HEA program funds in accordance with Federal regulations or its own policy (see Finding No. 5);  and
- Did not maintain supporting documentation for students' leaves of absence (see Finding No. 6).

Except for the disbursement and leaves of absence issues noted above, the University generally complied with the student eligibility requirements.

## FINDING NO. 1 – Compensation Plan Included Incentive Payments and the University Did Not Establish Eligibility for Safe Harbor

The University designed a compensation plan for enrollment advisors that provided incentive payments based on success in securing enrollment.  Although changes to salaries were made only every 6 months, the University provided managers with discretion to adjust salaries within each of the salary ranges and did not document on what basis it adjusted salaries. The University could not demonstrate that its enrollment advisors' salary adjustments were not based solely on success in securing enrollment.  Therefore, we could not determine whether the University's compensation plan and practices qualified for the safe harbor for salary adjustments found in 34 C.F.R. § 668.14(b)(22)(ii)(A).

Under the compensation plan that the University implemented in April 2007, enrollment advisors could earn salaries in excess of $27,474 a year only if they earned additional evaluation points that were based directly and indirectly on success in securing enrollments.[7]  According to the

---

[7] We evaluated only the April 2007 compensation plan as that plan made substantial changes to the plan in effect earlier in our audit period; the revised plan also continued after our audit period.

University's compensation plan, enrollment advisors' salaries were to be based on the total number of points received on the evaluation matrix, which established salary ranges for various point totals. Every 6 months, the University evaluated enrollment advisors' performance in 18 categories. Of the 18 categories, 8 were based directly or indirectly on success in securing enrollments. Those 8 categories could account for 74 of the maximum 100 evaluation points that an enrollment advisor could receive. The April 2007 compensation plan revised the weighting of points previously available. Under the prior plan, only 35 points were based on success in securing enrollments; 65 points were based on other factors. Specifically for our incentive compensation objective, we evaluated the University's compensation plan that was in effect from April 2007 through December 2008. We did not evaluate any of the University's compensation plans that were in effect either before or after this period.

Of the 74 points in the April 2007 plan that were based on securing enrollments, 72 consisted of various statistics and ratios constructed from the number of leads, applications received, and the number of students who started classes.[8] The most heavily weighted category, "Net Starts," allowed an enrollment advisor to earn up to 30 points based on the number of students who submitted applications and completed their first course.[9] In addition to the 30-point "Net Start" category, the evaluation matrix included three 12-point categories and three 2-point categories that were directly or indirectly attributable to the enrollment advisor's success in securing enrollments:

- 12-point Categories: (1) ratio of applications to students who start the first week (Gross Starts), (2) the ratio of applicants to Net Starts, and (3) the ratio of Gross Starts to Net Starts.

- 2-point categories: (1) ratio of leads to applications, (2) ratio of leads to Net Starts, and (3) average number of applications per week.

Although its title suggests otherwise, another 2-point category, "Informs Supervisor and Affected Personnel of Status of Current Assignments," was, in fact, directly related to securing enrollments because the rating criterion for this category required the enrollment advisor to meet numeric team goals. In interviews with admission staff, we learned that enrollment advisors received numeric weekly and monthly goals. These goals included a set number of applications, retaining students (a number of net starts), or number of referrals.

With 74 of the 100 points directly or indirectly attributable to success in securing enrollments, an enrollment advisor could earn a maximum of $27,474 in the University's $24,000 to $110,000 salary range from the 26 points that were not based on securing enrollments. To earn a salary that exceeded $27,474, an enrollment advisor would have had to earn additional evaluation points that were based directly and indirectly on success in securing enrollments.

---

[8] Specific examples of the data in the evaluation matrices are based on the evaluation matrix used from April 2007 through December 2008 for enrollment advisors after their first 6 months of employment.
[9] The length of the course depends on the program: graduate program courses are 6-weeks; bachelor program courses are 5-weeks; and the associate program courses are 8-weeks.

According to Section 487(a)(20) of the HEA and 34 C.F.R. § 668.14(b)(22)(i), incentive payments based directly or indirectly upon success in securing enrollments are prohibited. The University's compensation plan violates this prohibition. However, a school's practices are not considered to violate this provision if they qualify for a safe harbor in 34 C.F.R. § 668.14(b)(22)(ii).[10]

According to 34 C.F.R. § 668.14(b)(22)(ii), activities that an institution may carry out without violating the provisions of 34 C.F.R. § 668.14(b)(22)(i) include

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. . . .

**Actual Salaries Were Not Calculated Based on the University's Compensation Plan**

We could not confirm the basis on which the University calculated and adjusted salaries. Therefore, we could not determine that the salaries were not adjusted solely based on success in securing enrollments. Our tests showed that enrollment advisors' actual salaries were not always based on the University's compensation plan. Of the 27 salary adjustments that we reviewed, 15 percent of the resulting salaries were outside the ranges specified by the evaluation matrix, and 92 percent did not match the salary that would be expected under the compensation plan explained to us during our audit.

During our audit, University officials informed us that the points on the matrix were the basis for salary adjustments. The University maintained a *Personnel Change Form* that documented changes in salary. The *Personnel Change Form* documented the salary that the enrollment advisor received during the prior evaluation period and the salary that the enrollment advisor would receive for the subsequent evaluation period. The salary could be the same, higher, or lower than the salary for the prior evaluation period. However, the University did not provide us with written procedures for calculating enrollment advisors' salaries or with documents that supported the actual salary calculations. In response to our draft report, the University stated that managers had discretion to set salaries within a salary range. According to the evaluation matrix, salary ranges corresponded to the points an enrollment advisor received on the evaluation.

Our interviews indicated that enrollment advisors and their managers understood that the points on the evaluation matrix determined the salaries that enrollment advisors received. However, only two officials, a Director of Admissions and the Admissions Performance Assessor, explained how points were used to calculate the salaries. They were the only 2 of the 22 enrollment advisors or their managers interviewed who could provide us with an example of how the points were applied. The two officials explained that the formula used to calculate the salary was based on the number of points an enrollment advisor received and the corresponding salary for those points on the matrix.

---

[10] Pursuant to final regulations issued on October 29, 2010, the safe harbors will be eliminated, effective July 1, 2011.

We reviewed the personnel files for a sample of 45 enrollment advisors randomly selected from a universe of 262 enrollment advisors who were active employees at any point during award year 2006-2007. Of the 45 enrollment advisors, 12 had at least one evaluation from the evaluation matrix in effect from April 2007 through December 2008. The 12 enrollment advisors had a total of 27 evaluations from the matrix in effect April 2007 through December 2008.

Because the University did not provide any documentation during our audit showing how enrollment advisors' salaries were calculated, we used the formula orally provided by a Director of Admissions and the Admissions Performance Assessor to verify that salaries received were calculated using the points the enrollment advisors received on their evaluations. For the 27 evaluations, 92 percent of salaries received did not match the amount that we calculated using the formula provided: 16 (59 percent) were more than the formula calculation and 9 (33 percent) were less than the formula calculation. Only 2 (7 percent) were equal to the formula calculation.[11]

We also determined that 4 of the 27 evaluations (15 percent) resulted in salaries that were outside the salary ranges associated with the total points the enrollment advisors received. For one evaluation, the salary that the enrollment advisor received was $1,000 less than the salary range for the points received. For three other evaluations, the salaries that the enrollment advisors received were more than the salary range for the points received. These enrollment advisors' salaries were $1,000, $6,500, and $7,000 more than the maximum amount allowed per the matrix. Our analysis demonstrates that the University did not always calculate salaries based on the points and salary ranges identified on the matrix. In addition, the University did not provide documentation to show how it calculated the actual salaries.

**Institutions Are Required to Maintain Records Documenting Proper Administration of Title IV, HEA Programs**
According to 34 C.F.R. § 668.24(a)(3), "An institution shall establish and maintain, on a current basis . . . program records that document . . . [i]ts administration of the Title IV, HEA programs in accordance with all applicable requirements . . . ."

University policy did not require managers to maintain supporting documentation for enrollment advisors' evaluations and salary calculations. Enrollment advisors' managers stated in interviews that documentation supporting an enrollment advisor's evaluation was not maintained, and there was no written guidance on the evaluation matrix. University officials, including the Senior Vice President of Admissions, the Director of Admissions, and enrollment managers, stated that the evaluation matrices were "self-explanatory" and guidance on completing the evaluations was not necessary.

After we completed our interviews and analyses, the University informed us that it did not apply the compensation plan as explained to us by two of its officials. Instead, the University informed us that managers had discretion, within the parameters of the compensation plan, in translating total points into a salary adjustment. The University also stated that the compensation plan did not specify how managers should determine salary within each range, asserting that there were a

---

[11] The percentages do not equal 100 percent due to rounding.

number of ways one could translate points into salary consistent with the University's
compensation plan.

The fact that managers had discretion to set salaries within a range confirms our conclusion that
the University cannot demonstrate that its compensation plan and practices qualify for the safe
harbor.  Once an enrollment advisor earned the points needed to qualify for a particular salary
range, the enrollment advisor's salary could vary by $9,000 to $34,000.  Yet the University
provided no records to document the basis on which any manager exercised discretion and
adjusted a salary to a particular salary within the various ranges.  Therefore, despite having
designed a highly incentivized compensation plan where eligibility for a higher salary range was
directly based on securing enrollments, the University did not document that a salary adjustment
was not based solely on success in securing enrollment.

Because the University did not provide documentation to show how the points were used to
calculate salary adjustments, it did not demonstrate that the adjustments were based on factors
other than securing enrollment.  Therefore, it did not establish that it qualified for the regulatory
safe harbor.  Our testing disclosed that, for 92 percent (25 of 27) of the evaluations in our
sample, the salary adjustments were not based on the compensation plan as described to us
during the audit.  Further, for 15 percent (4 of 27) of the evaluations in the sample, the
employees received salaries that were outside of the salary ranges associated with the points
received on the evaluations,

**Recommendations**

We recommend that the Chief Operating Officer (COO) for Federal Student Aid (FSA)

1.1     Require the University to provide records of all salary adjustments made during our audit
        period and any documentation, not disclosed to the Office of Inspector General (OIG),
        that demonstrates that any specific adjustments qualified for the safe harbor described in
        34 C.F.R. § 668.14(b)(22)(ii)(A).

1.2     For all salary adjustments that do not qualify for the safe harbor, take appropriate action
        under 34 C.F.R. Part 668, Subpart G.

**University Comments and OIG Response**

The University objected to the finding and the recommendations.  We summarize and respond to
the University's comments below.

*University's General Comments:*  The University stated that its compensation plan included no
bonus, commission, or other incentive payment.  Therefore, it does not come under the coverage
of the HEA's incentive compensation statute (20 U.S.C. 1094(a)(20)).  Nevertheless, the
University stated that it satisfied the applicable safe harbor because it did not base salary
adjustments solely on the number of students recruited, and it maintained records to demonstrate
that fact.

The University commented that the OIG auditors were unable to determine whether the University violated the incentive compensation statute and had, in fact, concluded that the University's salary adjustments were not solely based on enrollment. The University also had a statistical report prepared by an outside consultant. According to the consultant's report, the University's salary adjustments were not based solely on securing enrollments. In addition, the University stated that it was not required to maintain multiple levels of documentation to demonstrate its compliance. Finally, the University stated that, during our audit period, it provided discretion to its managers to set individual salaries. However, it has since made changes to ensure that all salary adjustments are made uniformly and in accordance with its designed compensation plan.

*OIG Response:* We clarified our finding in response to the University's comments. We also revised the recommendation regarding the documentation that FSA should require the University to provide and the recommendation that FSA should take appropriate action under 34 C.F.R. Part 668, Subpart G. However, the University's comments did not provide us with a basis to alter our overall conclusions on its incentive compensation practices. The University did not provide any additional documentation and did not dispute the fact that its compensation plan awarded at least 74 of the available 100 points based on success in securing enrollments. The University is incorrect in its assertion that we were unable to reach a conclusion about its compensation practices. We concluded that its compensation plan included incentive payments in the form of salaries based on success in securing enrollment. What we could not conclude was whether the University's actual salary adjustments qualified for the regulatory safe harbor. Only 2 of the 27 salary adjustments that we examined matched the salary that we expected under the compensation plan explained to us by 2 admissions officials. Of the other 25 salary adjustments, 16 were higher than we expected, and 9 were lower than we expected.

*University Comment on Formula and Discretion:* The University stated that managers had discretion, within the parameters of the compensation plan, in translating total points into a salary adjustment. The University also stated that the compensation plan did not specify how managers should determine salary within each range, asserting that there were a number of ways one could translate points into salary consistent with the University's compensation plan.

*OIG Response*: The University did not describe the parameters of discretion provided or explain how the discretion was to be exercised. Except for comments on four evaluations provided on January 10, 2011 (which we discuss below), the University also did not provide any explanation or documentation demonstrating the reasons for any particular salary adjustment. During our audit, none of the officials that we interviewed stated that managers had the discretion to adjust salaries within a range, and two of the officials told us that the evaluation points from the matrix directly determined the salary. Given the University's statement that it provided discretion and adjusted salaries for reasons that are not documented, the University cannot establish that salaries provided under its highly incentivized compensation plan qualify for the safe harbor.

*University Comment That Statutory Prohibition Does Not Cover Salaries:* The University stated that its compensation plan does not include any bonus, commission, or other incentive payments. Therefore, it does not come under the coverage of the HEA's incentive compensation statute (20 U.S.C. 1094(a)(20)).

*OIG Response*: We disagree with the University's assertion that salaries are excluded from the statutory prohibition on incentive payments. If salaries were excluded from the statutory prohibition, then the regulatory safe harbor would serve no purpose.

*University Comment on Consultant's Report on the OIG's Analysis:* The University hired a consultant to conduct a statistical analysis of the salaries of enrollment advisors and included the consultant's report with its comments (See APPENDIX C). The consultant concluded that (1) the effective weights of qualitative criteria exceeded the weights that were embedded in the evaluation system designs at the University; (2) the observed patterns of quantitative ratings, qualitative ratings, and salary adjustments are inconsistent with the hypothesis that salary adjustments were solely determined by quantitative ratings; and (3) the observed patterns of quantitative and qualitative ratings are inconsistent with certain types of manager behavior which could have muted the role of enrollment advisors' qualitative ratings and boosted the role of their quantitative performance in determining salary adjustments.

The consultant also concluded that the differences between actual salaries and salaries based on formulas communicated by University officials to the OIG did not disproportionately benefit enrollment advisors with high quantitative (incentive) ratings. The higher the quantitative rating, the smaller or more negative the difference between actual and expected salary.

*OIG Response:* Given the University's statements that it did not use a formula to set salaries and that supervisors had discretion to determine salaries for reasons that are not documented, a statistical analysis cannot demonstrate the basis for the University's adjustments to individual salaries. The consultant's analysis appears to support rather than refute our finding: for enrollment advisors' compensation that was determined using the April 2007 matrix (the matrix we reviewed in our finding), the analysis does not find any consistent relationship between enrollment advisors' salaries and their quantitative and qualitative ratings.

The consultant's conclusion that quantitative ratings were not the sole factors used to determine salary adjustments assumes that, if a salary adjustment was not based solely on the quantitative ratings defined in the April 2007 matrix, any additional factor upon which the salary adjustment was based must have been a qualitative factor. This assumption is not confirmed by the consultant's analysis of the correlation between the qualitative ratings and salaries that we reviewed; for those salaries and ratings, the consultant concluded that while the correlation with qualitative factors appeared positive, it was "not statistically significant." Nor is the assumption adequately supported by the consultant's subsequent analysis, which was performed using additional data selected by the consultant. That subsequent analysis mixed 58 performance evaluations from the April 2007 matrix period (which was included in our review) with 61 performance evaluations using the January 2009 matrix (which was outside of our review). The January 2009 matrix was implemented before we first discussed the initial results of our audit with the University.

Any additional factor or factors upon which the enrollment advisors' salaries were finally adjusted after the exercise of discretion by the University remain unidentified. The final salaries could have been based on qualitative factors, selected or additional quantitative factors, other factors, or the subjective or arbitrary judgment of the University. Since the analysis does not

provide evidence that each salary adjusted under the April 2007 matrix was not based solely on quantitative factors, we cannot change our finding that we were unable to determine whether the University's compensation plan as implemented qualified for the safe harbor.

*University Comment on Our Audit Documentation:* Analyses included by the OIG in its audit documentation also concluded that non-incentive points did appear to affect salary and indicated that, if the University used the matrix to calculate enrollment advisors' salaries, it would likely be in compliance with the safe harbor.

*OIG Response:* Our audit documentation does not contradict our final conclusion that compliance with the regulatory safe harbor cannot be determined from the University's records. The audit documentation included as an attachment to the University's comments expressed only a tentative conclusion that, if the University applied its salary matrix, it would appear to satisfy the safe harbor. According to the University, however, it did not apply the matrix as explained to us by two of its officials, but instead provided discretion for salaries to be adjusted over wide ranges for undocumented reasons. The tentative conclusion was reached prior to the University's explanation of the role of discretion in its compensation plan.

*University Comment on Records, Burden of Proof, and Documentation:* The University stated that there is no requirement that an institution maintain multiple levels of personnel records to show that it did not violate the safe harbor. The audit improperly shifts the burden of proof to the institution when the government has the burden to establish a violation. The University also commented that it complied with applicable record-keeping requirements. The data for the quantitative performance factors were obtained from its database systems and recorded on the evaluation matrices for each enrollment advisor. The University maintained the matrices in the employees' permanent records. Regarding support for the qualitative performance factors, evaluation matrices contained descriptions of the performance requirements necessary to obtain an evaluation for each ranking. The University maintained the records (evaluation matrices) reflecting the results of the evaluations for each enrollment advisor and provided them to the audit team during the audit.

*OIG Response:* The University misstates its obligations with respect to the safe harbor. Having established a highly incentivized compensation plan that violates the general prohibition against incentive compensation found in § 487(a)(20) of the HEA and 34 C.F.R. § 668.14(b)(22)(i), the University must be able to demonstrate that it qualifies for the safe harbor in 34 C.F.R. § 668.14(b)(22)(ii)(A). Though we agree that there is no requirement for an institution to maintain multiple levels of personnel records related to its compensation practices, the University is required to maintain documentation sufficient for us to determine that it implemented its compensation plan as designed and adjusted salaries for reasons not solely based on success in securing enrollment. This is not a shift in the burden of proof. Although the U.S. Department of Education (Department) does have the burden of proof if it brings an administrative action under 34 C.F.R. Part 668, Subpart G, an institution is always obligated to maintain documentation sufficient to demonstrate compliance with Title IV, HEA program requirements.

Based on the University's comments and additional review of the documentation, we agree that the University maintained completed evaluation matrices for each enrollment advisor that we reviewed during our audit. The University also maintained completed personnel change forms documenting approval of salary adjustments. However, the University did not maintain documentation that tied the results of the evaluation matrices to the salary adjustments. We made changes to the finding clarifying that the documentation maintained was not sufficient to determine how the points received on the evaluation matrices corresponded to the salary adjustments.

*University Comment on Changes to its Compensation Plan:* The University stated that it has implemented new procedures and now evaluation points translate to salary in the same manner as described to the audit team by the two employees referenced in the draft audit report. The University made the changes after the audit started but before the exit interview or receipt of the draft audit report. Enrollment managers now must complete and submit to Human Resources management their qualitative evaluations before being provided the data on which the quantitative score is determined. According to the University, the enrollment managers are not aware of quantitative performance when they complete the qualitative elements. The change was done to ensure uniformity and to ensure that the compensation plan was implemented as designed.

*OIG Response:* Because the University made the changes after our audit period, we have not evaluated whether the changes have been implemented or whether the changes would enable the University to qualify for the regulatory safe harbor. However, based on our interviews, managers may access, at any time, systems that contain the data needed to complete the quantitative section of the evaluation. Unless this access has been restricted, managers still will be aware of the quantitative data before completing the qualitative portion of the evaluation.

We also note that, pursuant to final regulations issued on October 29, 2010, the safe harbors will be eliminated, effective July 1, 2011.

*University Comments on Four Evaluations with Salary Adjustments Outside the Salary Ranges:* In a January 10, 2011, letter to the Assistant Inspector General for Audit, the University provided explanations for the four evaluations in which the enrollment advisors received salaries outside of the salary ranges associated with the points they received on their evaluations (See APPENDIX E). The University stated that, for one of the evaluations, the enrollment advisor's promotion was soon to take effect. That is why the salary was lower than expected. For two of the evaluations, the University stated that the enrollment advisors had a decline in performance compared to the prior evaluation period. That is why the salaries were higher than expected. For the fourth evaluation, the University stated that the personnel file did not indicate why the manager chose to adjust the salary above the range.

*OIG Response:* The University did not provide any documentation to support the reasons that it gave for the enrollment advisors receiving salary adjustments outside of the salary ranges for the points received. The University did provide documentation to support that the one enrollment advisor received a promotion. However, it did not provide documentation to support that the salary was not adjusted, based on the evaluation matrix, because a promotion was expected to be

processed in the near future. For the other three evaluations, the University provided no
supporting documentation. For one of the three evaluations, the University acknowledges that
the personnel records did not indicate why the enrollment advisor received a higher salary than
the salary range for the points received on the evaluation matrix. For the other two evaluations
the University claims that the managers did not follow the evaluation matrix in order to "soften
the blow" for enrollment advisors' poor performance. The University did not provide any
evidence from the personnel records to support the managers' reasons for giving the enrollment
advisors salaries above the salary ranges for the points on their evaluation matrices.

## FINDING NO. 2 – Incorrect Return of Title IV Aid Calculations

The University did not properly calculate the amounts it was to return to Title IV, HEA
programs. The University did not (1) revise the payment period end date for students who did
not complete their credits according to schedule; (2) use the last date of attendance at an
academically related activity as the withdrawal date; and (3) correctly project the tuition charges
that would have been charged to the students if they had completed the credits for the semester.
As a result, the University improperly retained $29,036 of Title IV, HEA program funds for
38 of the 85 (45 percent) students in our samples. Based on statistical sampling techniques, we
are 90 percent confident that the University improperly retained at least $1.1 million in 2006-
2007 Title IV, HEA program funds.

Distance education students at the University are enrolled in credit-hour, non-term programs.
Federal regulations at 34 C.F.R. § 668.22(e) and (g) require, among other requirements, that
return of Title IV aid calculations be based on the total number of days in the payment period
and tuition charges applicable for the payment period. Institutions, such as the University, that
are not required to take attendance must use the midpoint of the payment period as a student's
withdrawal date unless the institution chooses to use the student's last date of attendance at an
academically related activity as the withdrawal date (34 C.F.R. § 668.22(c)(1)(iii) and (3)(i)).
The University chose to use a student's last date of attendance at an academically related activity
as the withdrawal date. Institutions that have non-term, self-paced programs are required to
project the completion date of the payment period based on the student's progress during the
payment period. (Dear Colleague Letter GEN-04-03, *Return of Title IV Aid* (Revised
November 2004)).

### Samples Used to Identify Calculation Errors
To determine whether the University properly handled return of Title IV aid calculations, we
used one judgmental sample and two random samples generated from two universes provided to
us by the University.

- *Return of Title IV Aid Universe.* The first universe provided by the University
  consisted of 3,779 distance education students who received Title IV, HEA program
  funds and withdrew or had a zero grade point average (GPA),[12] or both, during award
  year 2006-2007. From this universe, we selected two samples: one judgmental and

---

[12] A student with a zero GPA potentially could be a student who withdrew from the University without notifying the
University.

one random.  We judgmentally selected 24 students.  The 24 students in this sample were judgmentally selected to provide coverage of students who withdrew, students with a zero GPA, and students who had Title IV, HEA program funds returned and students who did not.  We selected 10 students who withdrew and had a zero GPA (5 who had Title IV, HEA program funds returned and 5 who did not); 9 students who withdrew and did not have a zero GPA (5 who had Title IV, HEA program funds returned and 4 who did not); and 5 students who did not withdraw and had a zero GPA (3 who had Title IV, HEA program funds returned and 2 who did not).  We then randomly selected 50 students from the universe of 3,779.

- *Leave of Absence Universe.*  The second universe provided by the University consisted of 587 distance education students who received Title IV, HEA program funds and were placed on a leave of absence during award year 2006-2007.  We randomly selected 40.  We performed return of Title IV aid testing for 12 of the 40 students who did not return from their leaves of absence as of the end dates of their leaves of absence and who had a return of Title IV aid calculation performed.[13]

**Improper Determination of the Payment Period Length**
The University did not use the appropriate payment period end dates when it calculated the percentage of Title IV aid earned.  A student's semester begins with the first course and ends when the student has successfully completed 12 credits for undergraduate students or 9 credits for graduate students.  Students enrolled in a bachelor or graduate degree program generally take one course at a time.  The course is 5 or 6 weeks long.  Students enrolled in an associate degree program generally take two courses at a time.  The courses are 8 weeks long.  Distance education students are allowed to take a break between courses for up to 29 days without being withdrawn from the University.  A student's semester could be extended if the student does not successfully complete a course or if the student takes a break between courses.

If a student successfully completed his or her courses and did not take any breaks between courses prior to withdrawal, we assumed that the student would have completed the payment period on the originally scheduled end date.  If the student did not successfully complete his or her courses, or if the student took breaks between courses prior to withdrawal, we used the guidance in *Dear Colleague Letter GEN-04-03, Return of Title IV Aid (Revised November 2004)* and the formula provided to perform the return of Title IV aid calculations.  We determined the number of credit hours a student had completed and the number of days the student had attended for the payment period prior to withdrawing.  We used that information to determine, on average, the number of days it took the student to complete each credit hour.  We used that average to project the number of additional days it would take a student to complete the payment period.

The results of our samples showed that the University did not always properly revise the payment period end date for students who did not successfully complete their credits according to schedule.  If a student did not successfully complete a course in the payment period, the University recalculated the payment period end date, taking into consideration courses the

---

[13] One student in the Leave of Absence sample was also in the Return of Title IV Aid sample.

student had failed or did not successfully complete during the payment period. Generally, the University extended the payment period by the number of days required to complete the course, starting consecutively after the end date of the class from which the student withdrew. However, according to guidance in *Dear Colleague Letter GEN-04-03, Return of Title IV Aid (Revised November 2004),* the University should have used the student's progress as of the withdrawal date to determine the total number of calendar days for that student's payment period. As a result of the University improperly determining the number of days in the payment period, the University overestimated the percentage of days that the students completed during the semester. We identified 33 payment period end date errors (39 percent) for the 85 students in our samples.

**Incorrect Last Date of Attendance**
University policy states that a student must attend 2 days each week to be considered in attendance for that week. The University considers a week to be from Tuesday through Monday. A student's academic activity is documented in the University's on-line learning management system. However, the University did not review data from the system for academic activity to confirm attendance. Instead, the University reviewed a log generated from the system for the number of times each student clicked into his or her on-line learning management system course each day. The attendance clicks were recorded when the student logged onto the screen for the learning block for the course in which he or she was enrolled. The click generated on the log might or might not have been related to academic activity. If the student clicked into his or her course at least 2 days during a given week, the University considered the student to have met the attendance requirements for the week. The University then used the last date of that week as the last date of attendance. For example, if a student's last click into a course was on Thursday, and the student had a minimum of two clicks on different days for that week, then the University considered the last date of attendance to be the following Monday, the last day of the University-defined week. This attendance policy is contrary to 34 C.F.R. § 668.22(c)(3), which defines the last date of attendance as the last date of academically related activity, not the last date of the week in which the student visited a course Web site 2 days during the week.

The University did not always use the date of the student's last academic activity as the student's withdrawal date when performing return of Title IV aid calculations. We reviewed data from the University's on-line learning management system to determine the last week in the course in which the student had academic activity on at least 2 days. As support for academic activity, we reviewed the on-line learning management system information for evidence of discussion postings related to the coursework, completed quizzes, and homework submissions. We did not consider any type of click to be evidence of academic activity. We used the last date of academic activity in that week, not the end of the week, as the withdrawal date for recalculating the amount the institution was permitted to retain. If the student received a passing grade (A, B, C, or D) in the course from which the student withdrew, we considered the student to have attended through the last date in that course.[14] When we compared the last date of academic activity with the withdrawal date that the University used for its return of Title IV aid

---

[14] Students generally only take one to two courses at a time, depending on the degree program. Therefore, a student can successfully complete a course and not have completed the entire term and still be considered a withdrawal.

calculations, we determined that the withdrawal date that the University used for its calculations was incorrect for 47 (55 percent) of the 85 students in our samples.[15]

- For 12 (14 percent) of the 85 students, the University used the last day of the week as the last date of attendance when the last day of an academically related activity occurred on a day earlier in that week.[16]  The University identified the correct week in which the student last attended but did not use the correct last date of attendance in that week.

- For 28 (33 percent) of the 85 students, the University used a last date of attendance in a week that was earlier or later than the last week in which the student had academically related activity.

  - For 3 (11 percent) of the 28 students, we used a date from a week after the week used by the University because we counted posted assignments and exams taken that did not show up on the log of clicks.

  - For 25 (89 percent) of the 28 students, we used a date in a week earlier than the week that the University used because the last activity on the log of clicks was not academic in nature.  Therefore, we used the date of the last date of academically related activity.

- For 9 (11 percent) of the 85 students, the University determined that the students attended during the payment period, even though the students' records did not support such an attendance determination.  The University considered the students to have met the attendance requirements based on the log of clicks.  However, our review indicated that there was no academically related activity on 2 days in any week during the students' courses to support attendance.  Therefore, these students never attended during the payment period.

**Improper Projection of Tuition Charges**
The University used the wrong tuition charges when determining the amount of Title IV, HEA program funds it had to return to the Department or lenders for 20 (24 percent) of the 85 students in our samples.  Students were charged tuition for one course at a time instead of being charged tuition for the entire semester.  Using the student's University-determined grade level for the semester from which the student withdrew, the University projected the additional courses the student would have completed had he or she remained enrolled for the entire semester.  We used the student's class schedule for the semester in which he or she withdrew to project the tuition that would have been charged to the student had the student completed the semester.  When we

---

[15] One student was in the Leave of Absence sample and the Return of Title IV Aid sample and had an incorrect last date of attendance in both samples.  For the bullet points, there are students represented in one bullet point that could be represented in another bullet point because students might have withdrawn more than once during the award year.

[16] One student was in the Leave of Absence sample and the Return of Title IV Aid sample and had an incorrect last date of attendance (both samples) because the University used the last day of the week as the last date of attendance when the actual last date of academically related activity was earlier in the week.

compared our projected tuition charges to the tuition charges that the University used for its return of Title IV aid calculations, we determined that the University did not always correctly project the tuition charges for the students in our samples.

The overall results of our return of Title IV aid testing are summarized in Table 4.

**Table 4.  Improper Return of Title IV Aid Calculations**

| Sample | Sample Size (Students) | Sample Size (Withdrawals) | Universe Size | Improper Determination of Payment Period Length | Incorrect Last Date of Attendance | Improper Tuition Charges |
|---|---|---|---|---|---|---|
| Judgmental Return of Title IV Aid | 24 | 24 | 3,779 | 8 | 16 | 7 |
| Random Return of Title IV Aid | 50 | 57 | 3,779 | 21 | 25 | 10 |
| Leave of Absence | 12 | 13 | 587 | 4 | 7 | 2 |

**Institutions Are Required to Properly Calculate the Amount of Earned and Unearned Title IV, HEA Program Funds**
According to 34 C.F.R. § 668.22(c)(1)

> For purposes of this section, for a student who ceases attendance at an institution that is not required to take attendance, the student's withdrawal date is—
> (i) The date, as determined by the institution, that the student began the withdrawal process prescribed by the institution;
> (ii) The date, as determined by the institution, that the student otherwise provided official notification to the institution, in writing or orally, of his or her intent to withdraw;
> (iii) If the student ceases attendance without providing official notification to the institution of his or her withdrawal . . . the mid-point of the payment period (or period of enrollment, if applicable) . . . .

According to 34 C.F.R. § 668.22(c)(3)

> (i) . . . [A]n institution that is not required to take attendance may use as the student's withdrawal date a student's last date of attendance at an academically-related activity provided that the institution documents that the activity is academically related and documents the student's attendance at the activity.
> (ii) An "academically-related activity" includes, but is not limited to, an exam, a tutorial, computer-assisted instruction, academic counseling, academic advisement, turning in a class assignment or attending a study group that is assigned by the institution.

Although the University is not required to take attendance, it elected to calculate the amount to return to Title IV, HEA programs using the student's last date of attendance instead of the mid-point of the payment period or period of enrollment.

According to 34 C.F.R. § 668.22 (a)(1),

> When a recipient of title IV grant or loan assistance withdraws from an institution
> during a payment period or period of enrollment in which the recipient began
> attendance, the institution must determine the amount of title IV grant or loan assistance
> . . . that the student earned as of the student's withdrawal
> date . . . .

According to 34 C.F.R. § 668.22(e)

> (1) *General*.  The amount of title IV grant or loan assistance that is earned by the
> student is calculated by—
> (i) Determining the percentage of title IV grant or loan assistance that has been
> earned by the student . . . ; and
> (ii) Applying this percentage to the total amount of title IV grant and loan
> assistance that was disbursed (and that could have been disbursed . . .) to the student, or
> on the student's behalf, for the payment period or period of enrollment as of the student's
> withdrawal date.

> .   .   .   .   .   .   .

> (4) *Total amount of unearned title IV assistance to be returned.*  The unearned
> amount of title IV assistance to be returned is calculated by subtracting the amount of
> title IV assistance earned by the student . . . from the amount of title IV aid that was
> disbursed to the student as of the date of the institution's determination that the student
> withdrew.

According to 34 C.F.R. § 668.22(a)(3),

> If the total amount of title IV grant or loan assistance, or both, that the student earned as
> calculated under paragraph (e)(1) of this section is greater than the amount of title IV
> grant or loan assistance that was disbursed to the student or on behalf of the student in the
> case of a PLUS loan, as of the date the institution's determination that the student
> withdrew, the difference between these amounts must be treated as a post-withdrawal
> disbursement . . . .

According to 34 C.F.R. § 668.22(g),

> (1) The institution must return . . . the lesser of—
> (i) The total amount of unearned title IV assistance to be returned . . . ; or
> (ii) An amount equal to the total institutional charges incurred by the student for
> the payment period or period of enrollment multiplied by the percentage of title IV grant
> or loan assistance that has not been earned by the student . . . .
> (2) For the purposes of this section, "institutional charges" are tuition, fees, room
> and board . . . and other educationally-related expenses assessed by the institution.

According to 34 C.F.R. § 668.173(c)(1),

> An institution does not comply with the reserve standard under § 668.173(a)(3) if, in a compliance audit conducted under §668.23, an audit conducted by the Office of the Inspector General, or a program review . . . , the auditor or reviewer finds –
>> (i) In the sample of student records audited or reviewed that the institution did not return unearned title IV, HEA program funds within the timeframes described in paragraph (b) of this section for 5% or more of the students in the sample.

Dear Colleague Letter GEN-04-03, *Return of Title IV Aid, Revised* (November 2004) states

> We recognize that in a credit-hour nonterm program, the ending date for a period and, therefore, the total number of calendar days in the period, may be dependent on the pace at which an individual student progresses through the program.  Therefore, for a student who withdraws from a credit-hour nonterm program where the completion date of the period is dependent on an individual student's progress, an institution must project the completion date based on the student's progress as of his or her withdrawal date to determine the total number of calendar days in the period.

**University Retained Incorrect Amounts of Title IV, HEA Program Funds**
Because it did not properly perform the return of Title IV aid calculations, the University (1) returned less in Title IV, HEA program funds than it was required to return by Federal regulations and (2) made post-withdrawal disbursements that exceeded what the students were entitled to receive.  For the students in our three samples, the University improperly retained $29,036 in Title IV, HEA program funds.[17]  Table 5 shows the effect of the return of Title IV aid calculation errors.  Multiple errors were made for 30 students.

**Table 5.  Effect of Improper Return of Title IV Aid Calculations**

| Judgmental Return of Title IV Aid Sample Results | Students | Title IV, HEA Program Funds Retained by University | |
|---|---|---|---|
| | | Excess | Less |
| Underpaid lender or Department | 4 | $ 6,260 | |
| Overpaid lender or Department | | | |
| Overdisbursed post-withdrawal | 7 | $ 1,253 | |
| Underdisbursed post-withdrawal | 2 | | $ 2,046 |
| **Totals** | **13** | **$7,514** | **$ 2,046** |

---

[17] The $29,036 consists of $15,377 in Unsubsidized Stafford loans; $8,956 in Subsidized Stafford Loans; and $4,703 in Pell.  Of the improperly retained funds, $7,514 came from the Judgmental Return of Title IV Aid sample; $21,419 from the Random Return of Title IV Aid sample; and $103 from the Leave of Absence sample.  See Table 5 for details.  The dollars do not add up exactly to the sum due to rounding.

**Table 5.  Effect of Improper Return of Title IV Aid Calculations**

| Random Return of Title IV Aid Sample Results | Students | Title IV, HEA Program Funds Retained by University | |
| --- | --- | --- | --- |
| | | Excess | Less |
| Underpaid lender or Department | 21 | $20,544 | |
| Overpaid lender or Department | 2 | | $   327 |
| Overdisbursed post-withdrawal | 4 | $    875 | |
| Underdisbursed post-withdrawal | 1 | | $   810 |
| **Totals** | **28** | **$21,419** | **$ 1,137** |
| **Leave of Absence Sample Results** | | | |
| Underpaid lender or Department | 1 | $     52 | |
| Overpaid lender or Department | 1 | | $   424 |
| Overdisbursed post-withdrawal | 1 | $     51 | |
| Underdisbursed post-withdrawal | 1 | | $   644 |
| **Totals** | **4** | **$    103** | **$ 1,068** |

The Federal government is harmed when an institution improperly retains Title IV, HEA program funds because it must pay interest on a subsidized student loan during in-school status, the grace period, and during authorized deferment periods and because it must pay special allowance to lenders on the average unpaid principal balances of all eligible FFEL loans. Borrowers are harmed when an institution improperly retains Title IV, HEA program funds because they are responsible for the interest that accrues on unsubsidized loan amounts that should have been returned to the lenders.

Based on statistical sampling techniques, we are 90 percent confident that the University improperly retained at least $1.1 million of the $81.4 million in Title IV, HEA program funds disbursed to distance education students who withdrew or had a zero GPA, or both, during award year 2006-2007.  The $1.1 million in Title IV, HEA program funds represents funds improperly retained because the University improperly calculated the amount of funds it was required to return to the Title IV, HEA programs.

Three factors contributed to the University improperly retaining Title IV, HEA program funds. First, the University's interpretation of how to determine the student's last date of attendance was not aligned with applicable regulations.  The University considered clicks into a student's learning block to be academically related activity that could support student attendance.  The University considered the last date of attendance to be the last day in the week in which the student attended, even if the student did not attend on that last day in the week.  Second, the University's interpretation of how to determine the student's payment period end date was not aligned with Department guidance.  If a student did not successfully complete courses in the payment period prior to withdrawal, the University recalculated the payment period end date by extending the payment period by the number of days required to complete those courses, starting consecutively after the end date of the class from which the student withdrew.  This methodology is contrary to Department guidance that requires a non-term institution to use the student's progress as of the withdrawal date to determine the total number of calendar days for that student's payment period.  Third, the University did not always correctly calculate tuition

charges that would have been assessed to students had they completed the semester. These three factors caused the University to improperly calculate the amount of Title IV, HEA program funds that it was allowed to retain.

**Recommendations**

We recommend that the COO for FSA require the University to

2.1    Return to the Department and lenders, as appropriate, $29,036 resulting from the improper return of Title IV aid calculations and post-withdrawal disbursements that exceeded what the students were entitled to receive for the 38 students in our samples.[18]

2.2    Review its files, excluding the files for the 85 students in our samples,[19] identify the amount of Title IV, HEA program funds that were improperly retained for Title IV, HEA program recipients in the distance education programs who withdrew from the University during award year 2006-2007 and return that amount, plus any interest and special allowance, to the Department or lenders.

2.3    Develop and implement written policies and procedures that provide reasonable assurance that it will

    (a) require a student's withdrawal date to be based on the last date of academic activity as supported by the distance education students' coursework;
    (b) correctly determine the end of payment period for refund calculations per Federal regulations and related Department guidance; and
    (c) accurately determine tuition charges when performing return of Title IV aid calculations.

We also recommend that the COO for FSA

2.4    Consider taking appropriate action under 34 C.F.R. Part 668, Subpart G because the University did not correctly perform return of Title IV, HEA program funds calculations.

**University Comments and OIG Response**

*University's General Comments:* The University did not agree with the finding or the recommendations. The University stated that it correctly calculated return of Title IV aid, with one exception totaling $101.25. The University did not believe that this small error rate warranted the imposition of a 100 percent file review. The University also stated that the finding was premised on a review of files for one award year (2006-2007) and did not provide any basis for expanding the review to cover a 4-year period.

---

[18] The 38 students consisted of 11 students from the Judgmental Return of Title IV Aid sample plus 25 students from the Random Return of Title IV Aid sample plus 2 students from the Leave of Absence sample.

[19] The 85 students consisted of 24 students from the Judgmental Return of Title IV Aid sample plus 50 students from the Random Refund sample plus 12 students from the Leave of Absence sample minus the 1 duplicated student.

The University stated that its methodology of using the last date of attendance instead of the midpoint of the payment period was stricter than required by law and regulation. The University also stated that its methodology resulted in the University's retaining fewer funds and returning more to students and lenders than the regulations required.

The University noted that, in five instances, the audit team used the midpoint of the payment period to recalculate the withdrawal date. The University stated that the audit team's use of the midpoint for these students and not others was arbitrary and contrary to governing regulations. The University declared that the finding would have to use the midpoint or a later documented date of attendance for all students in the samples in order to perform a genuine comparison between the University's return of Title IV aid calculations and those permitted under the regulations.

The University further noted that the Department has proposed regulations that would require institutions that are not required to take attendance to use attendance records to calculate the withdrawal dates instead of using the midpoint of the payment period if the institutions voluntarily took attendance. However, those rules have not been published in final form and would not take effect until July 1, 2011.[20] The University stated that the finding was retroactively applying proposed regulations, and the Department does not have the authority to impose recalculations based on attendance records that the law does not require the University to use for return of Title IV aid purposes.

The University also considered the error rates and dollar estimates to be distorted because the samples used were not randomly selected from the entire student population. (The University had similar comments regarding the samples used for Finding No. 3 and Finding No. 5.) The University stated that the audit team drew judgmental samples from targeted universes. The University also considered the finding's effect to be distorted because it reports discrepancies in last date of attendance, payment period end date, and tuition charges that, even if correct, would not have changed the University's return of Title IV aid calculations or would have resulted in the University returning less money to the Title IV, HEA programs.

*OIG Response:* We made minor revisions to the finding. We also removed our draft report's recommendation to request a letter of credit from the University, and revised Recommendation 2.2 to limit the University's review of files to award year 2006-2007.

However, we do not agree with the University's assertion that we should have used the midpoint of the payment period to determine whether the University harmed the Title IV, HEA programs by retaining more Title IV, HEA program funds than it should have. Because the University was not required to take attendance, the regulations permit the University to use either (a) the midpoint of the payment period as the withdrawal date if the student did not provide official notification of the withdrawal or (b) the last date of attendance at an academically related activity as the withdrawal date. The institution can choose either option for the purpose of return of Title IV aid calculations. The regulations applicable to the option that the University selects would be used to determine whether the student received the Title IV, HEA program funds that

---

[20] The regulations became final on October 29, 2010, and will be effective July 1, 2011.

the student was entitled to receive. The applicable regulations also would be used to determine whether the University returned the appropriate amount of Title IV, HEA program funds to the Department or to the lenders. The University cannot use the last date of attendance as the withdrawal date for its return of Title IV aid calculations but then use the midpoint of the payment period as the withdrawal date for determining whether it properly retained Title IV, HEA program funds. The University's written policy, which was published in its catalog and made available to its students, required the use of the last date of attendance to perform return of Title IV aid calculations. We used the University's established policy to calculate return of Title IV aid. Using that policy, we determined that the University improperly retained Title IV, HEA program funds, and the error rate identified in the finding was significant enough to warrant a 100 percent file review for award year 2006-2007.

We agree that we used the midpoint of the payment period to recalculate the return of Title IV aid for six (not five) students in one of our samples. However, we did not arbitrarily use the midpoint when performing these recalculations. In these six instances, we could review academic activity in the on-line learning management system for the students but could not determine the dates on which academically related activity occurred because of problems related to how the University archived its data. Because we could not determine the last date of academically related activity but could confirm that the students attended those courses, we had no way to calculate the return of Title IV aid for those six students other than to use the midpoint of the payment period. For the rest of the withdrawals in the samples, we could determine the last date of attendance at an academically related activity from the information documented in the on-line learning management system. Therefore, we used the documented last date of attendance when recalculating the return of Title IV aid for the rest of the withdrawals in our samples.

We did not retroactively apply regulations that were not in effect during the audit period. Our finding applies only regulations that were in effect during the audit period, and we used the University's own published policies for applying those regulations.

We do not agree with the University's claim that our error rates and dollar estimates are distorted for this finding or for Finding Nos. 3 and 5. Our audit objectives were applicable only to distance education students who received Title IV, HEA program funds. Any exceptions identified are applicable only to the populations from which the samples were drawn. For Finding No. 2, the populations that we used for testing return of Title IV aid calculations (students who were on leave of absence; students who withdrew, or had a zero GPA, or both) represented students for whom a return of Title IV aid calculation might have been required. When we reported our error rates and dollar estimates, we included only the students in the universes sampled, not the University's entire student population. We added language in the finding to clarify that the dollar estimates were only for the population of distance education students who received Title IV, HEA program funds and withdrew or had a zero GPA, or both, during award year 2006-2007.

The University is incorrect when it implies that samples are judgmental just because the universes from which the samples are drawn do not include the University's entire student population. Samples are random as long as each unit in the universe used has an equal

opportunity of being selected.  For Finding Nos. 2, 3 and 5, we used only one judgmental
sample, which is clearly described as such.

We also do not agree that we should have included only errors in last date of attendance,
payment period end date, and tuition charges if those errors negatively impacted the return of
Title IV aid calculation.  The University did not always correctly determine the last date of
attendance, payment period end date, and tuition charges.  The fact that those errors did not
always require the return of additional Title IV, HEA program funds does not discount the fact
that the errors are indicative of a systemic internal control weakness that could have resulted in
incorrect amounts being returned.

*University Comments on Determination of Last Date of Attendance:*  The University stated that it
correctly calculated the withdrawal date for each of the students cited in the finding, with the
exception of one.  For distance education students, the University's attendance policy requires
students to have class attendance at least 2 days within a week to be counted as present for that
week.  The student's withdrawal date is the last day of the week in which the student attended a
course for at least 2 days during the week.  The University determines the students' dates of
attendance by monitoring the students' on-line clicks within its on-line learning management
system and counts only academic clicks when determining the students' attendance.  The
University defines an academic click to be when the student enters a learning block for a course.
The University considers entering the learning block to be an academically related activity and
consistent with the regulatory definition of attendance in 34 C.F.R. 668.22(c)(3).  The University
did not agree that it was required to use the last date of attendance within that week.  If a student
attended any 2 days in the week, then the student had fulfilled his or her attendance obligation
for the remainder of the week and would have a last date of attendance that was the last day of
that week.

*OIG Response:*  During the audit, we reviewed on-line learning management system data for
discussion postings related to coursework, completed quizzes, and homework submissions as
support that the student engaged in academically related activity.  We did not consider the
University's log of attendance clicks as support that the student engaged in academically related
activity.  We reviewed the additional documentation that the University provided to support the
last dates of attendance it used as the withdrawal date for its return of Title IV aid calculations.
We did not consider the additional documentation to be adequate to support the last dates of
attendance that the University used.

We understand that the University counted clicks as attendance only if the student entered one of
his or her learning blocks.  However, we did not consider clicking into the learning block to be
sufficient evidence that the student engaged in academically related activity.  According to
34 C.F.R. § 668.22(c)(3)(ii), examples of academically related activity include ". . . an exam, a
tutorial, computer-assisted instruction, academic counseling, academic advisement, turning in a
class assignment or attending a study group that is assigned by the institution."  Simply clicking
into a learning block would not be sufficient support that a student engaged in academically
related activity such as what is described above.  Without the opportunity to review actual
documentation (such as a homework submission) to support that the student engaged in
academically related activity, we do not have any assurances that the student actually

participated in activity that would constitute attendance.  For example, for one student in our samples, the record of clicks indicated that the student's only activity in the course was in the announcements section of the course.  Yet, the University considered the student to have attended that course.  For another student, the record of clicks indicated that the student's only activity in the course was in the announcements, grades, and tools area of the course.  These two examples indicate that the clicks that the University used to determine attendance were not always related to activity that could be construed as academically related activity.

We do not agree with the University's position that it could extend the last date of attendance to the last day in the week just because the students had attendance at least 2 days during that week.  Although the regulations and statute do not define "date," their use clearly indicates that it means the individual day on which the event occurred.  The University provided no basis in the regulations or in common practice in the industry that supports its contention that "date" means the last day in the week in which the event occurred.  The plain language in the governing regulations is clear that the last date of attendance is the last date on which the student engaged in academically related activity (we added language to the audit report to clarify what we accepted as support for academically related activity).  During the audit, we reviewed the University's records to ensure that each student had 2 days of academically related activity in a week to meet the University's attendance requirements for that week.  However, we did not consider the student to have attended through the end of the week unless the student engaged in academically related activity on the last day of that week.

*University Comments on the Calculation of Payment Period End Date:*  The University did not agree that it failed to revise the payment period end date for students who did not complete their credits according to the student's schedule.  For the students cited in the finding for whom the payment period calculation affected the return of Title IV aid, the University provided documentation that would support that the payment periods were properly determined.  The University also explained that, in two instances, the students were in a term program, and the payment period would not be adjusted in such instances.  The University explained that it did not adjust the payment periods in situations when the students did not fail to complete any of the courses in the payment period prior to the course in which they withdrew.  The University stated that this methodology was supported by guidance in the FSA Handbook (2006-2007 FSA Handbook, pp. 5-68 to 5-69).  If a student did not successfully complete a course in the payment period, the University recalculated the payment period end date, taking into consideration courses the student had failed or not successfully completed during the payment period.  Generally, the University extended the payment period by the number of days required to complete the course starting consecutively after the end date of the class from which the student withdrew.

The University also stated that the draft audit report did not explain or justify the different methodology it used to calculate the length of the payment periods.  The University noted that *Dear Colleague Letter GEN-04-03, Return of Title IV Aid (Revised November 2004)* gave an example of how the recalculation could be performed but stated that the Dear Colleague Letter gave the institution the discretion to adopt a reasonable methodology.  The University considered its methodology to be reasonable because it accounted for the student's progress by adding

additional days to the payment period sufficient to complete the courses that the students failed to complete during the payment period.

*OIG Response:* We agree that it was reasonable to assume that a student who successfully completed courses prior to withdrawal and did not have any breaks between courses prior to withdrawal would have completed the payment period on the originally scheduled end date. In those instances, we agree that the payment period would not need to be adjusted. In addition, we agree that term students do not require payment periods to be adjusted. Therefore, we made revisions to the total number of instances in which the University did not correctly calculate the end of the payment period. We also provided additional language to clarify how we calculated the payment period end date. Using the example in *Dear Colleague Letter GEN-04-03*, we determined the number of credit hours a student had completed and the number of days the student had attendance for the payment period prior to withdrawing. We used that information to determine, on average, the number of days it took the student to complete each credit hour. We used that average to project the number of additional days it would take a student to complete the end of the payment period.

We do not agree with the University's methodology for extending the payment period end date for students who did not successfully complete courses prior to withdrawal. The University should determine the number of additional courses the student needed to take to have completed the credits in the payment period and extend the payment period by the number of days necessary to complete those courses. *Dear Colleague Letter GEN-04-03* states that, if a program is self-paced, the University has to use the student's progress as of the withdrawal date to determine the total number of calendar days for that student's payment period. Therefore, a student who failed courses or had gaps between courses prior to withdrawal should have more days added to the payment period than a student who attended the same number of courses prior to withdrawal with passing grades and no gaps between courses. *Dear Colleague Letter GEN-04-03* further states that, if an institution has non-term programs, it must have reasonable procedures for determining the completion date of the payment period if the non-term program is such that the student does not earn credits or complete lessons during his or her progress through the program. That is not the case with the University. The University's students earn credits as they progress through the payment period. Therefore, the University is required to use the number of credits earned and the number of days it took to earn those credits as of the withdrawal date to project the additional time it would take the students to complete the payment period.

*University Comments on Projection of Tuition Charges:* The University did not agree with the draft finding's position concerning tuition charges used in the return of Title IV aid calculations stating that students are charged tuition one course at a time. The University stated that the return of Title IV aid regulations require that the University base the return of Title IV aid on tuition charges for the entire payment period. The University, therefore, projected the additional courses the student would have completed if the student had completed the entire semester. The University provided documentation to explain how the tuition charges were projected for the students in the finding for whom the tuition charges would have negatively affected the return of Title IV aid calculation.

The University explained that its methodology for determining the tuition charges for the payment period was to include (1) the actual charges for the course for which the University had charged the student and (2) the charges for courses at the student's certified grade level for the remaining courses for which the University had not charged the student. For example, for a student at grade level one (100 level courses) who withdrew after the first course in a 4-course payment period, the University should determine the tuition charges for the payment period by using the actual charges for the first course and then add charges for three additional courses at the 100 level.

*OIG Response:* We recalculated tuition charges for the payment periods in which the students withdrew using courses in the student's schedule to determine the charges the students would have incurred had they completed the remaining courses in the payment period. We also included the charges already assessed to the student to determine the total institutional charges that should have been included in the return of Title IV aid calculation. We interviewed officials from ACS who informed us that the student schedules were used to project tuition charges for the payment period that had not been incurred as of the student's withdrawal. We used that information to recalculate the tuition charges.

During our fieldwork, the University did not inform us that its policy was to determine tuition charges not incurred for the payment period based on the student's grade level. Regardless, the more appropriate methodology for projecting tuition charges was the student's schedule of anticipated courses, not a student's grade level. Therefore, we did not make any revisions to our calculation of the tuition charges that should have been used for the return of Title IV aid calculations for the students in our samples.

## FINDING NO. 3 – Untimely Return of Title IV, HEA Program Funds

The University did not return Title IV, HEA program funds timely. For distance education students for whom returns of Title IV, HEA program funds to the Department or lenders were due, the University did not return the Title IV, HEA program funds within 45 days after determining the distance education student had withdrawn. Of the 47 returns that the University determined were owed for students in our three samples, 21 (45 percent) were paid late (see Table 6).

**Table 6.  Untimely Return of Title IV, HEA Program Funds**

| Sample | Students in Sample | Students With Refunds Paid | Paid Late (Over 45 days) | Range (Number of Days Late) |
|---|---|---|---|---|
| Judgmental Return of Title IV Aid | 24 | 13 | 4 | 3 through 92 |
| Random Return of Title IV Aid | 50 | 26 | 13 | 2 through 41 |
| Leave of Absence | 12 | 8 | 4 | 21 through 273 |

A finding related to the untimely return of Title IV, HEA program funds was also identified in the University's Title IV compliance audit for the fiscal year ended December 31, 2008. According to the compliance audit, 2 students from a sample of 25 had Title IV, HEA program

funds returned from 4 to 20 days late.  The compliance audit reported that the University did not follow its control procedures for processing return of Title IV, HEA program funds.

According to 34 C.F.R. § 668.22(j)(1)(2007), "An institution must return the amount of title IV funds for which it is responsible . . . as soon as possible but no later than 45 days after the date of the institution's determination that the student withdrew . . . ."

The Federal government is harmed by late returns of Title IV, HEA program funds because it must pay interest on outstanding subsidized student loans during in-school status, the grace period, and during authorized deferment periods and because it must pay special allowance to lenders on the average unpaid principal balances of all eligible FFEL Program loans.  Borrowers are harmed by late returns because they are responsible for the interest that accrues on unsubsidized loans while waiting for the return of Title IV aid.

The University discussed the issue of untimely return of Title IV, HEA program funds with ACS, which processes the University's return of Title IV aid calculations, and found that ACS used a database (File Tracking Tool) to track students when they withdrew from school.  The database also contained student demographic information and return of Title IV aid information.  The University stated that ACS could run reports from this database by date of determination, so that it could ensure that withdrawals were processed in the correct order.  ACS also could run reports to determine work in progress, work completed, and the work completed by each processor.  Per the University, ACS, effective July 2008, enhanced its File Tracking Tool to provide better measurement of the timing of payments, added staff, and assigned a senior processor to ensure that calculations and payments are completed in a timely manner.

**Recommendations**

We recommend that the COO for FSA require the University to

3.1     Develop and implement written policies and procedures that provide reasonable assurance that unearned Title IV, HEA program funds are returned timely.

We also recommend that the COO for FSA

3.2     Consider taking appropriate action under 34 C.F.R. Part 668, Subpart G because the University failed to return Title IV, HEA program funds in a timely manner.

**University Comments and OIG Response**

*University Comments:* The University did not agree with the finding and the recommendations.  The University agreed that returns of Title IV, HEA program funds were late during the audit period, stating that the issue already was disclosed in its 2007 compliance audit.  The University stated that, in response to the 2007 compliance audit, it submitted a letter of credit to the Department and implemented corrective actions, including written policies and procedures to address this issue.  The University stated that success of those corrective actions was demonstrated by the absence of material untimely return findings in the University's Title IV

compliance audits for fiscal years 2008 and 2009. Because the University's two most recently completed compliance audits did not include late return findings in excess of regulatory maximums, the University stated that it should not have to submit a letter of credit.

The University stated that the regulations require an institution to return Title IV, HEA program funds related to a return of Title IV aid calculation ". . . no later than 45 days after the date of the institution's determination that the student withdrew. . . ." (34 C.F.R. § 668.22(j)(1)) According to 34 C.F.R. § 668.22(l)(3), if the student does not provide notification of his or her withdrawal, the date of the institution's determination that the student withdrew is defined as "the date the institution became aware that the student ceased attendance." The University also stated that 34 C.F.R. § 668.22(j)(2) does not require an institution to determine the withdrawal date of a student until 30 days after the end of the earlier of a student's payment period, the student's academic year, or the student's program. The University stated that, if an institution is not required to take attendance, the regulations permit the institutions to wait until 2.5 months after the student's payment period ends to make Title IV returns. This takes into account the 30-day time frame to determine the student withdrew and the 45 days beyond that to return the Title IV, HEA program funds.

The University stated that it voluntarily monitored attendance and made determinations of student withdrawals throughout the payment period. Therefore, it returned the cited Title IV, HEA program funds well in advance of the deadline that would have applied had it chosen not to take attendance and had it not made withdrawal date determinations until after the end of the payment period.

Finally, the University claimed that the finding's effect was distorted because the audit team did not test files randomly selected from the University's entire student population. Instead, the audit team drew three samples from two groups limited to Title IV, HEA program recipients who were on leave of absence, or who withdrew, had a zero grade point average, or both. The University stated that the samples were targeted, judgmental, and not representative of the University's entire student population. For that reason, the University stated that the error rates were distorted. The University also stated that the finding overstated the extent of the alleged untimely return of Title IV aid. The finding contends that the range of lateness extended up to 273 days. Yet only 4 of the cited returns were greater than 40 days late, and at least one-third were less than 7 days late.

*OIG Response:* We do not agree with the University's assertion that it is returning Title IV, HEA program funds timely. Therefore, we did not make any changes to the finding. The regulations require the return the Title IV, HEA program funds within 45 days of the actual date an institution determined the student withdrew, not 45 days after the maximum number of days within which the institution could have determined the student withdrew. In addition, according to 34 C.F.R. § 668.173, the University can meet the requirements for sufficient cash reserves if untimely return of Title IV, HEA program funds is below the threshold referenced. However, that does not mean that the University is in compliance with regulations related to the timely return of Title IV, HEA program funds.

According to the compliance audits for fiscal years 2008 and 2009, the University did not exceed the refund reserves standard's compliance threshold under 34 C.F.R. § 668.173(c). Therefore the University would not be required to submit a letter of credit. Accordingly, we removed draft Recommendation 3.3 (recommending that the University submit a letter of credit). However, the compliance audit for fiscal year 2008 reported a finding related to the untimely return of Title IV, HEA program funds (at the time of our audit, fiscal year 2008 was one of the two most recently completed fiscal years). From a sample of 25 students, 2 had Title IV, HEA program funds returned between 4 and 20 days late. Contrary to the University's response, the audit reported that the University's control procedures for processing return of Title IV, HEA program funds were not followed.

During our audit, the University provided us with a description of its new policies and procedures related to the timely return of Title IV, HEA program funds during our audit. However, the University did not provide us a copy of its new official written policies and procedures related to the return of Title IV aid. The compliance audits indicated that the University still had findings related to the untimely return of Title IV, HEA program funds in fiscal year 2008 but not for fiscal year 2009. Without an opportunity to review written policies and procedures related to the return of Title IV aid, we cannot make a determination as to whether those policies and procedures would provide reasonable assurance that unearned Title IV, HEA program funds are returned timely.

We disagree that the results of the finding are distorted. (For our general response to the University's comments on how we selected our samples, see the *OIG Response to the University's General Comments* for Finding No. 2) We selected our samples from the population of distance education students who received Title IV, HEA program funds and who were part of a population that would have the potential of having a return of Title IV aid calculation performed. The universes that we used did not distort the results of our testing because the students included in those universes were students for whom the testing was applicable for our audit period. We also are clear that there is a range of dates for the untimely return of Title IV aid. Providing a range of dates does not distort the results. It shows that the return of Title IV, HEA program funds were made after the prescribed timeframe but not always the same number of days late. Even if the University had returned funds only 1 or 2 days after the 45-day timeframe, it still would not be in compliance with the regulations.

**FINDING NO. 4 – Lack of Proper Authorization to Retain Student Credit Balances**

The University's credit balance authorization form did not comply with regulations. The authorization form used during our audit period was not clear, and was not voluntary. It was included on the University's financial aid application, and all students requesting financial aid were required to sign the application (the financial aid application provides a section for authorizations). However, the form did not clearly state that the student or parent had given the University the authorization to hold credit balances for the student or parent. The agreement stated

> *I (WE) authorize the crediting of federal financial aid funds directly to the*
> *student's account to cover educational costs for the payment period covered by*

*the awards.  If there are funds remaining on the account after educational costs have been withheld, the proceeds may be applied as follows (indicate by marking 'yes' or 'no'):*

*(Yes, No) I (WE) authorize Title IV student financial aid funds to be applied to other current charges for educationally related activities (i.e., books and equipment)*

*(Yes, No)  I (WE) authorize Title IV student financial aid funds to be applied to minor prior-year charges (i.e., any charges from previous academic year)*

*I (WE) understand that this form is valid while enrolled at Ashford University and that I (WE) may withdraw my approval for any one or all of the above authorizations at any time.  This may be accomplished by contacting the financial aid office.*

The form did not provide a student or parent the option not to authorize the University to retain a credit balance (the only yes or no options pertain to what the balance may be applied to other than tuition and fees).

The form also conflicted with other requirements that state (1) schools may credit a student's account for certain charges without the student's authorization, and (2) program funds for an award year could not be used for more than $100 in prior award year charges.

According to 34 C.F.R. § 668.164(d)

> (1) Without obtaining the student's or parent's authorization under § 668.165, an institution may use title IV, HEA program funds to credit a student's account at the institution to satisfy current charges for—
> (i) Tuition and fees;
> (ii) Board, if the student contracts with the institution for board; and
> (iii) Room, if the student contracts with the institution for room.
> (2) After obtaining the appropriate authorization from a student or parent under § 668.165, the institution may use title IV, HEA program funds to credit a student's account at the institution to satisfy—
> (i) Current charges that are in addition to the charges described in paragraph (d)(1) of this section that were incurred by the student at the institution for educationally related activities; and
> (ii) Minor prior award year charges if these charges are less than $100 or if the payment of these charges does not, and will not, prevent the student from paying his or her current educational costs.

> .   .   .   .   .   .

> (4) For purposes of this paragraph, current charges refers to charges assessed the student by the institution for—
> (i) The current award year; or

(ii) The loan period for which an institution certified or originated a loan under the FFEL or Direct Loan programs.

According to 34 C.F.R. § 668.164(e)

Whenever an institution disburses title IV, HEA program funds by crediting a student's account and the total amount of all title IV, HEA program funds credited exceeds the amount of tuition and fees, room and board, and other authorized charges the institution assessed the student, the institution must pay the resulting credit balance directly to the student or parent as soon as possible but—
(1) No later than 14 days after the balance occurred if the credit balance occurred after the first day of class of a payment period; or
(2) No later than 14 days after the first day of class of a payment period if the credit balance occurred on or before the first day of class of that payment period.

According to 34 C.F.R. § 668.165(b)

(1) If an institution obtains written authorization from a student or parent, as applicable, the institution may— . . .

.   .   .   .   .   .   .

(iii) . . . hold on behalf of the student or parent any title IV, HEA program funds that would otherwise be paid directly to the student or parent under § 668.164(e).
(2) In obtaining the student's or parent's authorization to perform an activity described in paragraph (b)(1) of this section, an institution—
(i) May not require or coerce the student or parent to provide that authorization;
(ii) Must allow the student or parent to cancel or modify that authorization at any time; and
(iii) Must clearly explain how it will carry out that activity.
(3) A student or parent may authorize an institution to carry out the activities described in paragraph (b)(1) of this section for the period during which the student is enrolled at the institution.

.   .   .   .   .   .   .

(5) If an institution holds excess student funds under paragraph (b)(1)(iii) of this section, the institution must—
(i) Identify the amount of funds the institution holds for each student or parent in a subsidiary ledger account . . . .

The Vice President of Finance informed us that, by signing the authorization form, the student or parent had authorized the University to retain funds for tuition and fees. The Vice President of Finance also said that the authorization form allowed students to withdraw their authorization (1) to retain funds, (2) to apply other current charges, or (3) apply minor prior year charges at any time. The University also contended that a credit balance did not exist if the balance on the student's account could cover future tuition charges in the payment period. Therefore, the University did not truly hold credit balances because the credit balances would pay tuition and fees for future classes during the payment period.

However, instead of charging all tuition for all the student's classes for the payment period, the University charged the distance education student for each class individually after the student started each class.[21]  When the Title IV, HEA program funds were disbursed for a payment period, all charges for the payment period had not yet been assessed.  Therefore, a credit balance existed until the tuition charges for the next class or two were applied.

Our review of student account records confirmed that the University was, in fact, holding credit balances.  The University disbursed Title IV, HEA program funds for charges that had not yet been assessed for the payment period.  This caused the students to have a balance on their accounts until the additional charges had been posted to their accounts.  According to 34 C.F.R. § 668.164 (d)(1) and (4), the University may use Title IV, HEA program funds to credit a student's account at the institution to satisfy current charges.  "Current charges" are defined as charges assessed for the current award year or for the loan period for which the institution certified or originated a loan under the FFEL or Direct Loan programs.  Federal regulations do not permit institutions to credit a student's account with Title IV, HEA program funds for charges that have not been assessed.  In addition, the University did not comply with Federal regulations that require institutions to maintain a subsidiary ledger account to identify credit balances it is authorized to hold for each student or parent for longer than 14 days (34 C.F.R. § 668.165(b)(5)).  The University did not maintain this subsidiary ledger account because it did not consider a positive balance in the student's account as a credit balance if future tuition charges were anticipated that would absorb the balance.

When the University retained Title IV, HEA program funds that it was not authorized to hold, distance education students did not have timely access to credit balances that they might have needed to buy books, supplies, and/or use for other expenses.  Further, the University could be earning interest on the funds it improperly held.

**Recommendation**

We recommend that the COO for FSA require the University to

4.1     Cease drawing, disbursing, and holding credit balances of Title IV, HEA program funds for which there are no currently assessed institutional charges.  The University may make multiple disbursements during a payment period, but it must draw and disburse Title IV, HEA program funds only when they are needed to pay allowable charges.

**University Comments and OIG Response**

*University Comments:* The University did not agree with the finding or the recommendations.  The University disagreed that its prior credit balance authorization did not comply with the regulations.  The University claimed that the prior authorization form was clear that a student could withdraw the authorization and explained how the student could withdraw the authorization.  Nonetheless, the University revised the form, submitted it to the Department for review, and now uses the revised form.  The University provided a copy of the revised credit

---

[21] Classes are sequential, not concurrent.

balance authorization form and copies of emails between the University and FSA officials. According to the emails, on November 13, 2009, an FSA official told the University that the revised authorization form appeared to be in compliance with the regulations and instructed the University to begin using the revised authorization form immediately. The emails also showed that the University planned to take immediate action to begin using the new form. The University stated that the revised form addresses each of the concerns in the finding; therefore, no further action is required.

The University also did not agree with the statement in the recommendation that the ". . . University may make multiple disbursements during the payment period, but it must draw and disburse Title IV, HEA program funds only when they are needed to pay allowable charges." The University stated that the regulations make it clear that the decision to make multiple disbursements during the payment period is not a requirement but a matter of institutional choice. According to the University, the finding maintains that 34 C.F.R. § 668.164(d)(1) and (4) do not permit institutions to disburse funds in excess of charges assessed as of the date of disbursement. The University further stated that the finding is incorrect and the regulations anticipated that Title IV, HEA disbursements might exceed charges assessed by the institution and stipulate requirements for handling the credit balances that would occur.

*OIG Response:* The University did not provide evidence to support that the authorization form it used during the audit period gave it authorization to hold student credit balances. However, we agree that the revised credit balance authorization form complies with the regulations. Therefore, we removed draft Recommendations 4.1 and 4.2 (which were related to the need for a revised credit balance authorization form) from the audit report (draft Recommendation 4.3 is Recommendation 4.1 in this final audit report).

The University did not provide any documentation showing that it has addressed the issue of assuring that Title IV, HEA program disbursements are made only for current institutional charges. Therefore, we still have concerns that the University is disbursing Title IV, HEA program funds for charges that have not yet been assessed for the payment period. The regulations require the amount disbursed to be for charges assessed, not for anticipated charges. For distance education students, the University charged tuition for each class individually after the student began the course. Because the University did not charge all tuition at the beginning of the payment period, the University may make multiple disbursements during the payment period. In our recommendation, we do not state that the University must use multiple disbursements during the payment period. Another option would be for the University to delay disbursing Title IV, HEA program funds until all charges for the payment period have been assessed. In any case, the University may only make disbursements of Title IV, HEA program funds to cover currently assessed charges.

## FINDING NO. 5 – Improper Disbursements of Title IV, HEA Program Funds

The University did not always disburse Title IV, HEA program funds in accordance with Federal regulations or University policy. We sampled from two universes—a disbursement universe and a leave of absence universe—to test for disbursements that the University might have made prior to the students being eligible to receive them. For the disbursement universe, we analyzed

distance education students' disbursements and transcripts.  The analysis disclosed
3,521 distance education students who we considered at risk of receiving improper
disbursements.  In a non-term program, a payment period is the period of time in which the
student completes half the number of credit hours in the program and half the number of weeks
in the program.  We considered the student to be at risk of an improper disbursement if the
disbursement were made prior to the student completing the prior payment period's hours.  We
determined which students were at risk of improper disbursements by comparing the length of
time it took the student to complete the prior disbursement period's credit hours with the timing
of the disbursements (based on credit hours earned on and after July 1, 2006)

**Review for Improper Disbursements**
We randomly selected 50 distance education students from our targeted universe of 3,521.  These
50 students received $342,949 from the total of $24,458,497 in Title IV, HEA disbursements that
we identified as being at risk of being improper disbursements.  Of the 50 students, 19  (38
percent)  received a total of $89,493 in Title IV, HEA program funds for which the students were
not eligible at the time of their 2006-2007 disbursements (see Table 7).[22]

**Table 7.  Improper Disbursements of Title IV, HEA Program Funds**

|  | Students | Title IV, HEA Disbursements |
|---|---|---|
| Universe | 3,521 | $24,458,497 (a) |
| Sample | 50 | $      342,949 (b) |
| Students With Improper Disbursements (Non-Duplicated) (c) | **19** | **$       89,493** |
| Disposition of  Improper Disbursements |  |  |
|    Became eligible in 13 -50 days (d) | 11 | $      24,889 |
|    Refunded in 4-93 days | 31 | $      59,354 |
|    Never became eligible and not returned | 2 | $        5,250 |
| **Totals** | **44** | **$       89,493(d)** |

(a)  $10,272,321 in Subsidized Stafford Loan; $12,316,696 in Unsubsidized Stafford Loan; $16,557 in PLUS;
       $1,847,923in  Pell; $1,000 in FSEOG; and $4,000 in National SMART grants.
(b)  $186,794 in Subsidized Stafford Loans; $138,363 in Unsubsidized Stafford Loans; and $17,792 in Pell.
(c)  We identified 19 unduplicated students with improper disbursements.  Three students included in "Became
       eligible 13-50 days" were also included, for other disbursements, in "Refunded 4-93 days."  The three students
       had one or more disbursements for which the students eventually became eligible and one or more disbursements
       that were eventually refunded.
(d)  $35,701 in Subsidized Stafford Loans; $52,292 in Unsubsidized Stafford Loans; and $1,500 in Pell.

Of the 44 improper disbursements:

- Eleven (25 percent) were made for students who did not become eligible for the
  disbursements until 13 to 50 days after the disbursements were made.

- Thirty-one (70 percent) were made for students who never became eligible for the
  disbursements, and the University did not return the funds until 4 through 93 days

---

[22] The $89,493 consisted of $35,701 in Subsidized Stafford Loans; $52,292 in Unsubsidized Stafford Loans; and
$1,500 in Pell.

after the improper disbursements were made.  These students received 2006-2007 Title IV, HEA program disbursements for which they never became eligible.

- Two (5 percent) were made for a student who never became eligible, and the disbursements were never returned.  When we brought this matter to the University's attention, the University determined that it had submitted a request to its guarantee agency for the funds to be returned.  According to the University, the guaranty agency rejected the request.  The University stated that the guarantee agency did not notify it that the request had been rejected.  The University then resubmitted its request for the $5,250 in improper Title IV, HEA disbursements to be returned and the funds were returned to the lender.

In addition, 3 of the 50 distance education students (6 percent) received award year 2007-2008 disbursements before successfully completing the credit hours for award year 2006-2007; therefore, the 3 students were not eligible at the time of the disbursements.[23]  The three students received a total of $13,092 in Title IV, HEA program funds from award year 2007-2008 before completing the credits for academic year 2006-2007.[24]

- One of the students never became eligible for award year 2007-2008 disbursements, and the University did not return the funds until 47 days after the improper disbursements were made;  and
- Two of the students successfully completed academic year 2006-2007 credit hours and became eligible for award year 2007-2008 disbursements from 12 through 23 days after the improper disbursements were made.

From the leave of absence universe, we randomly selected 40 of the 587 distance education students who received Title IV, HEA program funds during award year 2006-2007 and were placed on a leave of absence during their payment period.  We tested 42 leaves of absence for the 40 distance education students (2 distance education students each had 2 leaves of absence during the payment period).  Two students (5 percent) received a total of $6,624 in Title IV, HEA program funds for which they were not eligible at the time of the disbursement.[25]  The University returned the funds from 5 to 10 days after the disbursement.

University policy states that the first disbursement will be delivered on or after the start date of the course for the payment period.  According to 34 C.F.R. § 668.164(f)(2)

> If a student is enrolled in a credit-hour educational program that is not offered in semester, trimester, or quarter academic terms . . . the earliest an institution may disburse title IV, HEA program funds to a student or parent for any payment period is the later of—(i) Ten days before the first day of classes of the payment period; or (ii) The date the

---

[23] One student who received improper disbursements from award year 2007-2008 also received improper disbursements from award year 2006-2007.

[24] The $13,092 consisted of $5,937 in Subsidized Stafford Loans; $5,000 in Unsubsidized Stafford Loans; and $2,155 in Pell.

[25] The $6,624 consisted of $1,312 in Subsidized Stafford Loans and $5,312 in Unsubsidized Stafford Loans.

student completed the previous payment period for which he or she received title IV,
HEA program funds . . . .

According to 34 C.F.R. § 682.604(b)(2)

      (i) . . . a school may release the proceeds of any disbursement of a loan only to a
student . . . if the school determines the student has continuously maintained eligibility in
accordance with the provisions of § 682.201 from the beginning of the loan period for
which the loan was intended.

.   .   .   .   .   .   .

      (iv) If, prior to the transmittal of the proceeds of a disbursement to the student,
the student temporarily ceases to be enrolled on at least a half-time basis, the school may
transmit the proceeds of that disbursement and any subsequent disbursement to the
student if the school subsequently determines and documents in the student's file—
      (A) That the student has resumed enrollment on at least a half-time basis;
      (B) The student's revised cost of attendance; and
      (C) That the student continues to qualify for the entire amount of the loan,
notwithstanding any reduction in the student's cost of attendance caused by the student's
temporary cessation of enrollment on at least a half-time basis.

According to 34 C.F.R. § 682.604(d)

      (3) If a student does not register for the period of enrollment for which the loan
was made, or a registered student withdraws or is expelled prior to the first day of classes
of the period of enrollment for which the loan is made, the school shall return the
proceeds to the lender no later than the period specified in § 668.167.
      (4) If the school is unable for any other reason to document that a registered
student attended school during the period of enrollment for which the loan is made, the
school must determine the student's withdrawal date as required under § 682.605, and by
the deadline described in § 682.607(c), shall notify the lender of the student's withdrawal,
expulsion, or failure to attend school, if applicable, and return to the lender—
      (i) Any loan proceeds credited directly by the school to the student's account;
and
      (ii) The amount of payments made directly by the student to the school, to the
extent that they do not exceed the amount of any loan proceeds delivered by the school to
the student.

According to 34 C.F.R. § 668.21

      (a)(1) If a student officially withdraws, drops out, or is expelled before his or her
first day of class of a payment period, all funds paid to the student for that payment
period for institutional or noninstitutional costs under the Federal Pell Grant, FSEOG,
and Federal Perkins Loan programs are an overpayment.
      (2) The institution shall return that overpayment to the respective title IV,
HEA programs in the amount that the student received from each program.
      (b) For purposes of this section, the Secretary considers that a student drops out
before his or her first day of class of a payment period if the institution is unable to
document the student's attendance at any class during the payment period.

According to 34 C.F.R. § 668.4(b)

> *Payment periods for an eligible program that measures progress in credit hours and does not have academic terms. . . .*
>
> . . . . . . .
>
> (2)  For a student enrolled in an eligible program that is more than one academic year in length—
> (i) For the first academic year and any subsequent full academic year—
> (A)  The first payment period is the period of time in which the student completes half the number of credit hours in the academic year and half the number of weeks in the academic year; and
> (B)  The second payment period is the period of time in which the student completes the academic year.

The policy stated in the University's 2006-2007 catalog, Section 4, pages 67-68, would be in compliance with 34 C.F.R. § 668.164(f)(2) if it were followed. The policy states that the initial disbursement will be delivered on or after the start date of the course, depending upon completion of the financial aid paperwork. Any subsequent disbursement would be delivered once a student had successfully completed at least 12 undergraduate-level credit hours or at least 9 graduate-level credit hours. The student must also be registered for and start the next class, and at least half of the loan period (20 weeks for a bachelor program and 18 weeks for a graduate program) must have passed.

However, the University did not follow its own policy. Instead, the University established a disbursement schedule for the students for each semester that was based on the expectation that students would complete each course in the semester successfully and would not take any breaks between courses. The University did not revise the disbursement schedule when a student's course schedule changed.

**Potential Costs Associated with Improper Disbursements**
Because the University improperly disbursed unearned Title IV, HEA program funds to students who were not eligible for the disbursements when they were made, the University could have received interest on the $89,493 and $13,092 in Title IV, HEA program funds from award years 2006-2007 and 2007-2008, respectively. This would be interest on funds to which the University was not entitled. In addition, borrowers might have incurred additional interest expenses on improper disbursement of unsubsidized loans.

Based on statistical sampling techniques, we are 90 percent confident that the University disbursed between $3.7 million and $8.9 million in Title IV, HEA program funds before the students were eligible to receive the funds. This estimation is applicable only to distance education students who were at risk of receiving improper Title IV, HEA disbursements during award year 2006-2007.

**Recommendations**

We recommend that the COO for FSA require the University to

5.1     Review its records for distance education students who received Title IV, HEA program
        disbursements (including those who were on leave of absence) during award year 2006-
        2007; identify all disbursements made to students who were not eligible for them at the
        time of the disbursement and never became eligible for the disbursements; and return
        those amounts to the Department or to FFEL Program lenders, as appropriate.

5.2     Develop and implement written policies and procedures to provide reasonable assurance
        that Title IV, HEA program funds are not disbursed until after the University confirms
        the student's eligibility for the disbursement.

We also recommend that the COO for FSA

5.3     Consider taking appropriate action under 34 C.F.R. Part 668, Subpart G because the
        University disbursed Title IV, HEA program funds to students who were ineligible at the
        time of the disbursement.

**University Comments and OIG Response**

*University Comments:* Although the University agreed that, during the audit period, Title IV,
HEA program disbursements might have been made before they should have been, the
University did not agree with the finding or recommendations.  The University stated that, of the
90 students tested, the draft finding identified only 1 student who did not earn the funds without
the University returning the funds.  Those disbursements since have been repaid.  For the
remaining students who had disbursements made prematurely, the finding concludes that the
students ultimately became eligible for the disbursement, or the University returned the
disbursements.  Although the University did not agree that there was a systematic problem with
Title IV, HEA program disbursements, it stated that, after the audit period, it implemented
additional procedures that addressed the concerns identified in the finding.  However, because
only one student in the sample received disbursements for which the student never became
eligible and which the University did not return, the University did not believe a 100 percent file
review was warranted.  Also, the University stated that the finding was premised on a review of
files from only one award year (2006-2007) and did not provide a basis for expanding the review
to cover a 4-year period.
The University again stated that the finding's effect was distorted because the samples were not
drawn from the University's entire student population and were not random samples.  Instead,
the audit team drew a sample from a universe selected to target students at risk of receiving
improper disbursements and students on leaves of absence.  Therefore, the finding's effect was
not representative of the entire population of students.  The University also stated that the
sampling performed does not provide a basis for a file review to test for purported
noncompliance across the University's entire student population.  The University stated that at
least 15 of the cited improper disbursements reported in the finding were incorrect and provided
documentation that it stated would demonstrate that the disbursements were properly made.

*OIG Response:* The University provided additional documentation for 15 disbursements initially cited in the finding.  Therefore, we revised the number of instances in which the University made improper disbursements of Title IV, HEA program funds.  However, the University did not provide evidence to support that, in all instances cited in the finding, it disbursed Title IV, HEA program funds only to students who were eligible to receive them at the time of the disbursement.

The University stressed that we identified only 1 of the 90 students for whom the Title IV, HEA program funds were not eventually earned or returned.  We recognize that, in the case of the other improper disbursements cited in the draft finding, the students eventually completed enough courses to be eligible for the disbursements, or the University eventually returned the Title IV, HEA program funds.  However, the fact that the students eventually became eligible for those funds, or the University eventually returned the disbursements, does not discount the fact that, at the time that the disbursements were made, the students were not eligible to receive them.  If Title IV, HEA program disbursements are made to students prior to the students becoming eligible, or if Title IV, HEA program funds are disbursed to ineligible students and held for a time before being returned, there still is a negative impact on the Title IV, HEA programs.  The University's lack of compliance increases the risk that Title IV, HEA program funds would not be used for their intended purpose and that Title IV, HEA program loans would not be repaid.  Until the students become eligible for the disbursements, or until the disbursements are returned, borrowers could incur additional, unnecessary interest on unsubsidized loans.  Because our sample indicated a high error rate in disbursing Title IV, HEA program funds to students who were not eligible to receive them at the time of disbursement, we believe that a 100 percent file review is warranted.

We agree with the University that a file review should not be recommended for the entire student population when the samples used for testing were not drawn from the entire student population.  Therefore, we revised Recommendation 5.1 to be applicable only to students included in the universes from which the samples were drawn.  We also revised Recommendation 5.1 to be applicable only to award year 2006-2007.  However, we disagree with the University's claim that the results are distorted.  (For our general response to the University's comments on how we selected our samples, see the *OIG Response to the University's General Comments* for Finding No. 2)  Our samples were drawn from the sub-universe of students for whom improper disbursements were likely to have been made, and our estimation applies only to that sub-universe.  We did not project based on the University's entire student population.  To ensure that the language in the finding is clear, we added language to clarify that the estimation is applicable only to the population of distance education students who received Title IV, HEA program funds from award year 2006-2007 and who we identified as being at risk of receiving improper disbursements.

The University stated that, after the audit period, it implemented additional procedures that address the concerns expressed in the report.  The University provided the additional written policies and procedures that it approved for its servicer, ACS, and were effective July 2008.  The policies and procedures provide the criteria under which disbursements should be released.  However, for first disbursements, the policies and procedures state that a student must have an

acceptable school status to receive the disbursement but there is no description of what an acceptable status is.  Also, the policies and procedures are for its servicer.  The University did not provide policies and procedures applicable to its own employees.  The University is ultimately responsible for ensuring that Title IV, HEA program funds are disbursed only to eligible students, and it should develop its own policies and procedures to ensure it is in compliance with regulations related to disbursement of Title IV, HEA program funds.

## FINDING NO. 6 – Lack of Support for Students' Leaves of Absence

The University did not always have documentation to support distance education students' leaves of absence.  We randomly selected a sample of 40 of the 587 distance education students who received award year 2006-2007 Title IV, HEA program funds and who were placed on a leave of absence.  We reviewed a total of 42 leaves of absence (2 students were on a leave of absence twice each during the award year).  The University could not support leave of absence start dates for 19 leaves of absence (45 percent).

- For 15 leaves of absence, the students had academic activity to support attendance, but the actual last date of attendance as supported by an academically related activity was not the day the University used as the last date of attendance (the University used the last date of attendance as the start date of the leaves of absence).

- For three leaves of absence, there was no evidence of academic activity in the course used to determine the last date of attendance.  The University used the last day of the first week of class as the last date of attendance, but no activity was noted in the on-line learning management system for one and only introductions were found for the other two.  Therefore, the actual last date that the distance education student attended should have been the last date of academically related activity for the previous class.

- For one leave of absence, we could not determine the last date of attendance to support the start of the leave of absence.  Because of archiving problems, all the dates for the discussions posted were recorded in the on-line learning management system as December 19, 2006.

Because the correct last date of attendance was not used as the start of the leaves of absence, 10 of the 19 students were on leaves of absence longer than the maximum number of days allowed per the University's policy.  However, none of the leaves of absence exceeded 180 days in any 12-month period, the maximum number of days allowed by 34 C.F.R. § 668.22(d)(1)(vi).

**Approved Leaves of Absence Requirements**
According to 34 C.F.R. § 668.22(d)(1)

> For purposes of this section (and, for a title IV, HEA program loan borrower, for purposes of terminating the student's in-school status), an institution does not have to treat a leave of absence as a withdrawal if it is an approved leave of absence.  A leave of absence is an approved leave of absence if— (i) The institution has a formal policy regarding leaves of absence; (ii) The student followed the institution's policy in

requesting the leave of absence; . . . iv)  The institution approved the student's request in
accordance with the institution's policy. . . .

According to 34 C.F.R. § 668.22(d)(1)(vi)

> . . .[A] leave of absence is an approved leave of absence if . . . [t]he number of days in the
> approved leave of absence, when added to the number of days in all other approved
> leaves of absence, does not exceed 180 days in a 12-month period. . . .

According to the University's 2006-2007 catalog, the start date of the leave of absence should be
based on the last date of documented attendance.  Students who are requesting a leave of absence
must complete a leave of absence request form.  The leave of absence requests must be signed
and submitted on or before the last day of class attendance.  Requests submitted after the last day
of attendance require an explanation.  Requests submitted 15 days after the last date of
attendance will not be approved.  [Section 8, pages 270 (Associates program) and 281-282
(Bachelors program), and Section 9, page 298 (Graduate program)].

According to the University's 2006-2007 catalog, leaves of absence cannot exceed 65 days for
associates programs or 60 days for bachelors or graduate programs.  Specifically for the
bachelors and graduate programs, students experiencing extreme temporary hardship that limits
their ability to return to school within 60 days may contact the Financial Aid Office to discuss
potential options.  [Section 8, pages 270 (Associates program) and 281-282 (Bachelors
program), and Section 9, page 298 (Graduate program)].

There is a risk that distance education students are not on an approved leave of absence and
should be withdrawn from the University.  For those students, the University could be retaining
Title IV, HEA program funds that should be returned to the lender or the Department.  There
also is a risk that distance education students might have been on leaves of absence longer than
permitted by Federal regulations or University policy.  This would delay the withdrawal of
students and delay the return of Title IV aid calculations for distance education students who did
not return from their leaves of absence.  The results of our sample disclosed that 10 of 19
distance education students with unsupported leaves of absence had leaves of absence that
exceeded the maximum number of days allowed by University policy.  These 10 students were
on leaves of absence between 61 and 170 days, which exceeded the maximum number of days
allowed by University policy by 1 to 90 days.  (The students' leaves of absence did not exceed
the 180 maximum number of days per Federal regulations.)

**Recommendations**

We recommend that the COO for FSA require the University to

6.1    Revise and implement its policies and procedures to provide reasonable assurance that a
       student's last date of attendance is based on the last date of academically related activity
       as supported by the students' coursework.

**University Comments and OIG Response**

*University Comments:* The University did not agree with the finding or the recommendations. The University disagreed with the finding's assertion that the University did not always have documentation to support distance education students' leaves of absence during award year 2006-2007. However, it did agree that leave of absence forms were missing from 2 of the 40 student files that we reviewed. For the two students for whom leave of absence forms were not maintained in the files, the University stated that it was clear from other records on file that the students submitted and properly requested the leaves of absence. The University provided printouts from the University's database system that showed the University's receipt and approval of the leaves of absence for the two students. In both instances, the records supported the University's adherence to applicable regulations and its own policies, and there was no loss to Title IV, HEA programs.

The University stated that the draft finding indicated that 19 of the 40 students sampled had an unsupported last date of attendance, although the draft report acknowledged that only 11 of the 19 received a leave of absence in excess of the University's leave of absence policy. The University also noted that all but four of the purported discrepancies in the last dates of attendance are 7 days or less, and one resulted in a later last date of attendance. Although the University disagreed with the conclusion that 11 of the 40 students received a leave of absence in excess of University policy, the University stated that the assertion of noncompliance was with a University policy, not with the law. The University stated that it could not be sanctioned for noncompliance with an internal policy.

The University also asserted that it correctly calculated the return of Title IV aid calculations for the two students cited in the finding. For one student, the University stated that it correctly concluded that the student completed at least 60 percent of the payment period and that no return was required. For the second student, the University stated that it correctly calculated and paid the return amounts owed. The University stated that, even if the two students had incorrect return of Title IV aid calculations arising from their leaves of absence, the small error rate would not justify a full file review. Also, the University stated that the finding is premised on a review of files from one award year (2006-2007) and does not provide any basis for expanding the review to cover a 4-year period.

*OIG Response:* Based on the University's comments and additional documentation provided, we concluded that the University had sufficient documentation to support that two students originally cited in the finding were on approved leaves of absence. We also concluded that two students originally cited as having improper return of Title IV aid calculations attended more than 60 percent of the payment period, and a return of Title IV, HEA program funds was not required. Therefore, we revised the finding accordingly. We also removed draft Recommendations 6.1, 6.2, and 6.3 (b) (related to improper return of Title IV aid calculations and retention of leave of absence forms) and renumbered the remaining recommendations.

However, we disagree with the University's position that we incorrectly determined the last date of attendance for the students in the sample. Based on our determination of the students' last dates of attendance, 19 of the 40 students in our sample had unsupported last dates of attendance,

and 10 were on leaves of absence longer than permitted by the University's leave of absence policy. We also disagree with the University's assertion that the regulations do not allow it to be sanctioned for noncompliance with internal policy. According to 34 C.F.R. § 668.22(d)(1), the University has the responsibility to develop and implement a formal leave of absence policy. The University's leave of absence policy is published in its catalog and made available to its students. Because the regulation requires the University to have a formal leave of absence policy, the University is accountable for following its own policy. Although the students we included in our finding were not on leaves of absence longer than the maximum number of days allowed by Federal regulations, they were on leaves of absence longer than the maximum number of days allowed by the University's own policy. According to 34 C.F.R. § 668.22(d)(2), the University would have to use its own leave of absence policy to determine whether a student did not resume attendance at or before the end of the leave of absence and should be treated as a withdrawal.

# OBJECTIVES, SCOPE, AND METHODOLOGY

The objectives of our audit were to determine whether, for its distance education programs, the University complied with selected provisions of the HEA and regulations governing (1) incentive compensation; (2) student eligibility; (3) disbursements; and (4) return of Title IV, HEA program funds.  The audit covered the period from July 1, 2006, through June 30, 2007 (award year 2006-2007).

To achieve our audit objectives, we performed the following procedures.

1. Reviewed selected provisions of the HEA, regulations, and FSA guidance applicable to the audit objectives to gain an understanding of applicable law, regulations, and guidance.

2. Identified the amount of Title IV, HEA program funds that the University received on behalf of its students during award year 2006-2007.

3. Reviewed the University's Web site, Bridgepoint Education, Inc.'s Web site, on-line newspaper articles, and the University's 2006-2007 catalog to gain an understanding of the University's history and organization.[26]

4. Reviewed written policies and procedures and interviewed University officials, Bridgepoint Education officials, and ACS officials to gain an understanding of the University's internal control structure, policies, procedures, and practices applicable to the administration of its Title IV, HEA programs.

5. Reviewed *Bridgepoint Education, Inc. And Its Subsidiary, San Diego, California, Financial Statements December 31, 2006 and 2005*; *Ashford University L.L.C., Compliance Attestation Examination Of The Title IV Student Financial Assistance Programs For the Period Ending December 31, 2006*; *Bridgepoint Education, Inc. And Its Subsidiary Financial Statements, Poway, California,  December 31, 2005 and 2004*; *Ashford University Compliance Attestation Examination Of The Title IV Student Financial Assistance Programs For the Period Ending December 31, 2005*; *Bridgepoint Education, Inc. and Subsidiaries,  Consolidated Financial Statements December 31, 2007, 2006 and 2005*; and *Ashford University Compliance Attestation Examination Of The Title IV Student Financial Assistance Programs For The Fiscal Year Ending December 31, 2007,* to gain an understanding of any prior audit findings that could be relevant to our audit objectives.

6. Reviewed reports by or contacted, or both, the following oversight agencies: Higher Learning Commission, Iowa College Student Aid Commission, Iowa Department of

---

[26] Although requested, we did not receive the University's organizational chart or a staff directory.

Education, Wisconsin Educational Approval Board, Tennessee Higher Education Commission, Illinois Board of Higher Education, and the Great Lakes Higher Education Guaranty Corporation. We reviewed reports from the oversight agencies to determine whether the reports included findings and recommendations covering Title IV, HEA programs that could affect our audit objectives. We contacted the oversight agencies to obtain information that could be relevant to our audit objectives.

7.  Reviewed personnel files for 45 enrollment advisors randomly selected from a universe of 262 enrollment advisors from the San Diego, California, location who were active employees at any point during award year 2006-2007. We stratified the universe into five strata and selected a random sample from each stratum. The strata were as follows:

    (a)  61 enrollment advisors who were still active employees as of March 2009;
    (b)  25 enrollment advisors terminated after a year or more of employment;
    (c)  69 enrollment advisors terminated after 100 or more days and less than 1 year of employment;
    (d)  34 enrollment advisors that had been promoted to management positions as of March 2009; and
    (e)  73 enrollment advisors who were terminated in less than 100 days.

    In the sample there were: 10 enrollment advisors from the first stratum; 4 from the second stratum; 11 from the third stratum; 5 from the fourth stratum; and 15 from the fifth stratum. We reviewed the enrollment advisors' personnel files to determine whether the University's process for evaluating enrollment advisors resulted in compensation amounts being based on securing enrollments. Specifically for our incentive compensation objective, we evaluated the University's compensation plan that was in effect from April 2007 through December 2008. We did not evaluate any of the University's compensation plans that were in effect either before or after this period.

8.  Reviewed the academic and financial aid records and verification comparison worksheets for a sample of 38 students randomly selected from a universe of 3,021 distance education students who received Title IV, HEA program funds from award year 2006-2007 and were selected for verification.

9.  Reviewed the academic and financial aid records, withdrawal forms, return of Title IV aid calculations, leave of absence forms, iLink reports,[27] and Common Origination and Disbursement system (COD) reports for a sample of 40 students randomly selected from a universe of 587 distance education students who received Title IV, HEA program funds for award year 2006-2007 and went on a leave of absence during the award year. Two students in our sample were on leaves of absence twice during award year 2006-2007. Therefore, we reviewed a total of 42 leaves of absence for the 40 students in our sample.

---

[27] iLink is an electronic loan processing system used by the Iowa College Student Aid Commission, a guarantee agency the University uses.

10. Reviewed the academic and financial records for a sample of 50 students randomly selected from a universe of 3,521 distance education students who received Title IV, HEA program funds for award year 2006-2007 and, based on our own analysis, were at risk of receiving disbursements for which they were ineligible at the time of the disbursement. We developed a targeted universe of students at risk of receiving improper disbursements by applying analytical tools to the student disbursement and transcript files. We determined which students were at risk of improper disbursements by using analytical tools to compare the length of time the student completed the first disbursement period's credits with the timing of the disbursements (based on credit hours earned on or after July 1, 2006). If the disbursements were made prior to the student completing the prior disbursement period's credits, we considered the student to be at risk of an improper disbursement. The universe and sample included only disbursements that were identified through our analysis as being at risk of being an improper disbursement. From a universe of $24,458,497 in Title IV, HEA disbursements that we identified as at risk of being an improper disbursement,[28] we reviewed $342,949.[29] Our testing disclosed that there could be multiple disbursements in the universe for students who had multiple enrollments during award year 2006-2007 (such as students who completed an associates degree and then enrolled in a bachelors degree program).

11. Reviewed the academic and financial aid records, withdrawal forms, return of Title IV aid calculations, iLink reports, and COD reports for a sample of 24 students judgmentally selected and 50 students randomly selected from a universe of 3,779 distance education students who received Title IV, HEA program funds for award year 2006-2007 and withdrew from the University, had a zero GPA, or both. For the judgmental sample, we selected students to provide coverage of those who withdrew and those with a zero GPA. We also selected students to provide coverage of those who had Title IV, HEA program funds returned and those who did not. We selected 10 students who withdrew and had a zero GPA (5 who had Title IV, HEA program funds returned and 5 who did not); 9 students who withdrew and did not have a zero GPA (5 who had Title IV, HEA program funds returned and 4 who did not); and 5 students who did not withdraw and had a zero GPA (3 who had Title IV, HEA program funds returned and 2 who did not). For the random sample, we reviewed a total of 57 withdrawals for the 50 students in our sample (7 students withdrew twice during the award year). We reviewed the academic and financial aid records of the 74 students in the samples to determine whether the University complied with the requirements related to the return of Title IV aid.

---

[28] $10,272,321 in Subsidized Stafford Loans; $12,316,696 in Unsubsidized Stafford Loans; $16,557 in PLUS; $1,847,923 in Pell; $1,000 in FSEOG; and $4,000 in National *SMART* grants.

[29] $186,794 in Subsidized Stafford Loans; $138,363 in Unsubsidized Stafford Loans; and $17,792 in Pell.

We relied, in part, on data provided to us by University officials, including a report listing all students who received Title IV, HEA program funding from award year 2006-2007.  We conducted interviews with the Director of Business Analytics and the Senior Database Administrator and reviewed the query language that the University used to extract the universes we used.  We also queried the National Student Loan Data System to identify the University's students who received Pell and FFEL funds from the University during award year 2006-2007.  We then compared the two sets of data and were able to reconcile any differences.  We used the data provided by University officials to draw the samples that we used to test the University's compliance with student verifications, return of Title IV aid calculations, leaves of absence, and disbursements.  For the enrollment advisor universe that we used for incentive compensation testing, we received a description from the Payroll Manager of how that universe was created.  For this universe, we compared a sample of payroll registers from the Admissions Department with the list of enrollment advisors in the universe.  Based on our analyses and testing, we determined that the data were sufficiently reliable to be used for the purposes of our audit.

We conducted our fieldwork from May 2008 through August 2009 at the University's offices in Clinton, Iowa, and San Diego, California, as well as at our offices.  We discussed the results of our audit with University officials on September 2, 2009, April 29, 2010, and December 17, 2010.

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# APPENDIX A: Enrollment Advisor Evaluation Factors

## Table 8. Evaluation Factors Implemented in April 2007*

| Category | Definition/Rating Criteria | Considered Quantitative or Qualitative by the University | Considered Directly or Indirectly Related to Securing Enrollments by OIG | Maximum Number of Points Available on the Matrix |
|---|---|---|---|---|
| Net Starts | A student who has satisfied the attendance requirement and received a letter grade of A, B, C, D, F, or I for his or her initial course. | Quantitative | Yes | 30 |
| Percentage of Gross Applications to Gross Starts | Number of students who complete the first week of attendance divided by the gross number of applications. | Quantitative | Yes | 12 |
| Percentage of Gross Starts to Net Starts | Number of students who complete their first course divided by the total number of students who complete their first week of attendance. | Quantitative | Yes | 12 |
| Percentage of Gross Applications to Net Starts | Number of students who complete their first course divided by the total number of applications. | Quantitative | Yes | 12 |
| Outbound Calls Per Week (average) | Average number of phone calls made to prospective students per week. Credit is given for making a call, regardless of whether the prospective student actually answers the phone. | Quantitative | No | 2 |
| Percentage of Lead to Contacts | Number of students contacted divided by the total number of prospective students. | Quantitative | No | 2 |
| Percentage of Leads to Applications | Number of applications divided by the total number of prospective students. | Quantitative | Yes | 2 |
| Percentage of Leads to Net Starts | Number of net starts divided by the total number of prospective students. | Quantitative | Yes | 2 |
| Applications Per Week (average) | Average number of enrollment applications per week. | Quantitative | Yes | 2 |
| Total Referrals Per Month | Prospective students who are referred to the University by other prospective students or current students. | Quantitative | No | 2 |
| Administrative/ Organization | Paperwork is completed. | Qualitative | No | 2 |

**Table 8.  Evaluation Factors Implemented in April 2007\***

| Category | Definition/Rating Criteria | Considered Quantitative or Qualitative by the University | Considered Directly or Indirectly Related to Securing Enrollments by OIG | Maximum Number of Points Available on the Matrix |
|---|---|---|---|---|
| Demonstrates Effective Problem Solving Skills | Resolves student issues. | Qualitative | No | 2 |
| Customer Satisfaction | Ratings received on Customer Satisfaction Survey. | Qualitative | No | 2 |
| Reporting/ Forecasting | Completion of weekly and monthly reports. | Qualitative | No | 4 |
| Communicates Effectively-Oral | Contributing during meetings. | Qualitative | No | 4 |
| Communicates Effectively-Writing | Creative use of Contact Management Strategies. | Qualitative | No | 4 |
| Informs Supervisor and Affected Personnel of Status of Current Assignments Relative to the Company Strategic Plan and Goals | Team achievement of performance goals as stated in the company operational plan. | Qualitative | Yes | 2 |
| Shows flexibility by accepting new ideas | Acceptance of Change | Qualitative | No | 2 |
| Total Points | | | | 100 |
| Total Points Directly Related to Securing Enrollments | | | 74 | |
| Total Points Indirectly Related to Securing Enrollments | | | 26 | |

\*The information in the table is based on the enrollment advisor evaluation matrices used from April 2007 through December 2008.  The definitions in this table were provided or confirmed by the University's Vice President of Finance.

# APPENDIX B: University Comments on the Draft Audit Report, July 30, 2010

(The University provided its comments to the draft and several attachments with its,
 July 30, 2010, letter responding to the draft audit report.  Because of the voluminous nature of the
attachments to the University's comments and the personally identifiable information within, we
have not included them in APPENDIX B.  Copies of the attachments to the University's comments,
less the personally identifiable information, are available on request.  All personally identifiable
information mentioned in the University's comments was replaced with brackets.)

# ASHFORD
# UNIVERSITY
### FOUNDED 1918

July 30, 2010


Gary D. Whitman Regional Inspector General for Audit
U.S. Department of Education
Office of Inspector General
Chicago/Kansas City Audit Region Citigroup Center
500 W. Madison, Suite 1414
Chicago. 1L 60661

     Re:  Draft Audit Report, Control Number ED-OIG/A05IO014

Dear Mr. Whitman:

Please find enclosed our response to the draft audit report, Control Number ED-OIG/A05IOOl4. The deadline for submission of this response was extended to July 30, 2010 by e-mail from Lisa Robinson on July 6, 2010. Please let me know if you have questions regarding the response.

Sincerely,

/s/

Jane McAuliffe, Ph.D. President and CEO

Enclosures

## TABLE OF CONTENTS

I.        Introduction...................................................................................................**59**

II.       Procedural History.........................................................................................**61**

    A.          Commencement of audit and conduct of field work.................**61**

    B.          Exception Reports........................................................................**61**

    C.          Exit Interview ...............................................................................**61**

        1.   Tentative findings previously identified ................................. 61
        2.   New tentative finding............................................................... 62
        D.          Draft Audit Report ...................................................................**62**

III.      Draft Finding 1:  Documentation Supporting Enrollment Advisor
          Compensation ................................................................................................**62**

    A.          Summary of OIG position ............................................................**62**

    B.          Summary of the University's response .......................................**63**

    C.          Discussion......................................................................................**65**

        1.   The University did not make bonus, commission, or other incentive payments
             based directly or indirectly on success in securing enrollments ..................... 65
             a.        The plain language of the statute                                    65
             b.        The expressly stated Congressional intent                          66
             c.        DOE's acknowledgement of the statute's meaning                     66
        2.   The burden is on the government to establish a violation, not on the
             University to establish the lack of a violation ..................................... 67
        3.   The University did not base salary solely on the number of students
             recruited, admitted, enrolled or awarded financial aid................................. 68
        4.   The University complies with applicable record-keeping regulations ........... 72
             a.        Quantitative performance factors                                    72
             b.        Qualitative Performance Factors                                     73
             c.        Calculation of Salaries                                             74
             d.        Regulations                                                          75
        D.          Conclusion ...................................................................................**77**

IV.       Draft Finding 2:  Calculation of Return-to-Title-IV Payments..................**77**

    A.          Introduction.................................................................................**77**

    B.          AU Correctly Determined the Last Date of
                Attendance at an Academically Related Activity.....................**79**

1. AU's methodology for calculating withdrawal dates was more conservative – and resulted in larger Title IV refunds – than required by the regulations .. 80

2. The draft finding arbitrarily uses the midpoint analysis for a few students, but uses a methodology more aggressive than required by law for all other students ........................................................................................................ 81

3. AU correctly calculated and substantiated its withdrawal date determinations ...................................................................................................... 82
   i.   AU applied its attendance policy for distance learning students .................. 82
   ii.  AU monitored on-line clicks in its on-line learning environment, but counted only clicks into academically-related activities ............................................. 83
   iii. The University accurately calculated and substantiated the withdrawal dates for each of the students cited in Finding 2 .................................................... 84

4. The auditors' withdrawal calculations are inconsistent with DOE regulations and the University's policy ........................................................................... 85
   i.   AU properly calculated the withdrawal date as the last day of the week with two separate days of attendance ..................................................................... 85
   ii.  The auditors' withdrawal date calculations erroneously disregard dates on which AU documented student attendance .................................................... 87

5. Finding 2 improperly seeks to retroactively enforce a proposed regulation which is yet to be promulgated or to take effect ............................................ 88

C.   AU Correctly Determined Payment Period Lengths ......................................................................................... 89

D.   AU Correctly Projected Tuition Charges In Its Return Calculations ................................................................... 91

E.   OIG Recommendations 2.1 Through 2.5 Must Be Withdrawn ..................................................................................... 93

V.   Draft Finding 3:  Timeliness of Return-to-Title-IV Payments ................... 96

A.   Ashford University Used A Stricter R2T4 Deadline Methodology Than Required By Governing Law .................... 97

B.   OIG Recommendations 3.1 Through 3.3 Must Be Withdrawn ..................................................................................... 98

VI.  Draft Finding 4:  Authorization to Retain Student Credit Balances ........ 100

A.   Introduction ............................................................................... 100

B.   The University's prior authorization form complied with regulations ............................................................ 100

C.   The Department has approved the University's current credit balance authorization form .............................. 101

D.          OIG Recommendations 4.1 Through 4.3 Must Be
            Withdrawn ................................................................. 102

VII.        Draft Finding 5: Disbursements of Title IV Funds ................. 104

A.          Introduction ................................................................. 104

B.          The Draft Finding Does Not Involve Unreturned
            or Unearned Title IV Funds:  The Disbursements
            For All But One of the 90 Students Tested Were
            Fully Earned or Fully Returned to the Title IV
            Programs ....................................................................... 104

C.          The Draft Finding's Results Are Distorted Because
            They Are Not Based On A Random Sample of
            Files And Contain Errors ............................................. 105

D.          Recommendations ........................................................ 106

VIII.       Draft Finding 6:  Leaves of Absence ............................ 107

A.          The Draft Finding concedes that leaves of absence
            did not exceed federal limits ...................................... 107

B.          An institution cannot be sanctioned merely for a
            purported violation of internal policy ....................... 107

C.          The draft finding incorrectly recalculates the
            duration of the leaves of absence ............................. 108

D.          The University correctly calculated R2T4 returns
            for the two cited students ......................................... 108

E.          Institutions cannot be sanctioned for missing LOA
            paperwork for two students ...................................... 109

F.          OIG Recommendations 6.1 through 6.3 Must Be
            Withdrawn .................................................................. 110

**ASHFORD UNIVERSITY'S RESPONSE TO THE DRAFT AUDIT REPORT OF THE
OFFICE OF THE INSPECTOR GENERAL**

## I.    Introduction

Ashford University submits this response to the draft audit report issued by the Office of Inspector General (OIG) on May 24, 2010.[30]

The University wishes to state at the outset its appreciation for the courtesy and professionalism shown by the auditors and OIG officials throughout the course of the audit

This response:

- discusses each of the findings and recommendations in the draft audit report,

- states whether and to what extent the University agrees or disagrees with each finding and recommendation,

- provides the factual basis and legal grounds for the areas of disagreement, and

- describes policies and procedures taken to date by the University to strengthen its performance in certain areas covered by the draft report.

The University's mission is to provide accessible, affordable, innovative, high-quality learning opportunities and degree programs that meet the diverse needs of individuals pursuing integrity in their lives, professions, and communities.

In carrying out that mission, the University understands and is committed to fulfilling its obligations and responsibilities to its students, faculty, staff, accrediting agency, and the U.S. Department of Education, including fostering and maintaining a culture of adherence to the highest ethical standards and regulatory requirements.

The University therefore appreciates this opportunity to respond to the draft audit report, and looks forward to working with the OIG and the U. S. Department of Education's (DOE's) Office of Federal Student Aid (FSA) to resolve the draft audit findings fairly and successfully.

---

[30]  The draft audit report originally set a July 8, 2010 deadline for this response, 45 days after the date of the draft audit report. On July 6, 2010, OIG extended the deadline to July 30, 2010, 30 days after the OIG made certain audit work papers available for review by the University.

Summary of Draft Findings and Responses

**Draft Finding 1:**   The draft report states that the University's compensation plan for Enrollment Advisors rewards success in securing enrollments.  Although it does not find that the plan violated the incentive compensation regulation, it does find that the University failed to maintain sufficient documentation to prove compliance with the regulation.

The University disagrees.  It paid no commissions, bonuses or other incentive payments to its Enrollment Advisors.  Consistent with the statute and regulation, as clearly shown by University records made available to the auditors, as the auditors acknowledged in their work papers, and as the University's expert economic and statistical expert determined from an analysis of salary adjustments, actual salary adjustments were based on successful performance of a variety of job factors and not solely on the number of students recruited.

**Draft Finding 2:**   The draft report states that the University incorrectly calculated returns of Title IV funds when students withdrew, resulting in the University's retaining between $1.2 and $2.3 million in funds during the 2006-2007 award year.

The University disagrees.  It correctly calculated the cited returns of Title IV funds upon student withdrawals with one nominal exception totaling $101.25.  In fact, it used a calculation methodology more stringent than required by law and regulation.  The University's methodology resulted in its retaining fewer funds, and returning more to students and Title IV lenders, than required by the regulations.

**Draft Finding 3:**   The draft report states that the University was late in some of its Title IV refund payments during the 2006-2007 award year.

The University agrees that some returns were late.  The University's 2007 Title IV compliance audit, previously submitted to DOE, disclosed untimely payments during the audit periods, in response to which the University submitted a letter of credit to the DOE and implemented corrective actions.  The success of those corrective actions is demonstrated by the absence of material untimely return findings in the University's Title IV compliance audits for 2008 and 2009.

**Draft Finding 4:**   The draft report states that the University retained student credit balances without having obtained proper authorization from the students.

The University disagrees that its prior credit balance authorization did not comply with DOE regulations.  Nonetheless, the University revised the form, submitted it to DOE for review, and now uses the form as approved by DOE.

**Draft Finding 5:**   The draft report states that Title IV disbursements were not always made in accordance with DOE regulations or University policy.

The University agrees that some disbursements were made before they should have been.  It notes that 89 of the 90 disbursements sampled by the auditors were fully earned through

successful completion of coursework or were returned in full by the University to the Title IV Programs upon learning that the disbursement had not been earned.  The exception, in the amount of $5,520, has since been returned to the Title IV program provider.

**Draft Finding 6:**  The draft report states that the University did not always maintain documentation to support student leaves of absence.

The University agrees that a leave-of-absence form was missing from the file of two of the 40 students the auditors sampled and reviewed.  Other documentation supplied by the University, however, demonstrates that the two students did in fact sign the form, and regulations do not require that the institution maintain such forms.  Additionally, as the draft audit report recognizes, none of the leaves of absence exceeded regulatory time limits.  As a result, none resulted in an over-payment or under-refund of any Title IV program funds.

## II.     Procedural History

### A.  Commencement of audit and conduct of field work

On April 30, 2008 auditors of the U.S. Department of Education's Office of the Inspector General notified Ashford University of the commencement of the audit.  Over the  course of the next sixteen months, the  OIG conducted eight one-week site visits to the University's campus in Clinton, IA, as well as one- and two-week site visits to its administrative offices in San Diego, CA, to interview employees, inspect and copy documents, and electronically access the University's information technology systems.  The University fully cooperated in the investigation, during which the OIG interviewed approximately 49 employees, an unknown number of former employees, state regulators or other third parties, reviewed the personnel files of approximately 79 employees, and were provided copies of thousands of pages of other documents.  OIG personnel were provided full, read-only access to the University's information technology systems, including computer terminals on the University's premises.  On a number of occasions, OIG auditors requested, and the University provided, additional information to supplement what they had obtained during their visits, interviews, and access to electronic information systems.

### B.  Exception Reports

The auditors established a system pursuant to which they would provide a written Exception Report, to which the University would have an opportunity to respond, if and when they identified a tentative audit finding.  During the course of the audit, eight such Exception Reports were provided.  The University promptly responded to each.

### C.  Exit Interview

#### 1.  Tentative findings previously identified

On September 2, 2009, sixteen months after the audit began, the auditors notified the University that field work had been completed, conducted an exit interview to advise University

officials concerning the tentative findings, and advised the officials that a draft audit report would be issued within about 30 days.  The University was pleased to learn at the exit interview that a number of the issues contained in the Exception Reports had been resolved favorably as a result of the University's responses, and were not identified as tentative findings.

### 2.  New tentative finding

Although the auditors had conducted document and electronic data base reviews, as well as employee interviews, concerning the University's compensation of its enrollment advisors and financial aid officers beginning in June 2008 and extending into the summer of 2009, the Exception Reports contained no references or tentative findings concerning compensation.  Nor did the University expect any such exception, having supplied all documents requested and being confident that its compensation plan, developed with the advice of counsel, was compliant with the letter and spirit of the Higher Education Act.

University officials therefore were surprised upon being told at the exit interview of a tentative finding that the compensation plan for enrollment advisors violated the Higher Education Act because salary adjustments were based directly and indirectly on student enrollments.  The University requested, and was granted, an opportunity to review the basis for this tentative finding and to respond in writing.  On September 11, 2009, the University submitted its response.

### D.  Draft Audit Report

The OIG issued its draft audit report approximately nine months later, on May 24, 2010. In all but one respect it is consistent with what the University was told in the Exit Interview.  The exception concerns incentive compensation.  The draft audit report does not contain a finding that the University violated the Higher Education Act or applicable regulations.  Indeed, the draft report acknowledged that it could not determine that salaries were based solely on recruiting success.  Instead, the draft audit report finds that the University did not maintain sufficient documentation to support the performance evaluations upon which salary adjustments were made.  It therefore recommends that the Federal Student Aid office require the University to provide such documentation, and to consider sanctions if further documentation is not provided.

### III.   Draft Finding 1:  Documentation Supporting Enrollment Advisor Compensation

### A.  Summary of OIG position

Draft Finding 1 alleges that the University failed to maintain records demonstrating that its compensation plan for enrollment advisors did not result in salary adjustments based solely on the number of students enrolled.

The draft accordingly would recommend that the Department of Education's Office of Federal Student Aid (FSA) require the University to provide such records, and, if it fails to do so, consider instituting a fine, limitation, suspension, or termination action under Subpart G of Part 668 of the Code of Federal Regulations.

### B.  Summary of the University's response

At the outset, the University notes that, after sixteen months of field work and nine months of analysis, the draft audit report does not contain a finding that the University violated the incentive compensation statute or regulation.   In fact, after performing a study "to analyze enrollment advisor evaluations and determine the relationship between changes in incentive and non-incentive points with changes in salaries," the auditors reached the following conclusion:

> Based on the analysis performed, we determined that there appears to be a much stronger correlation between the changes in incentive points with the changes in salary, but the non-incentive points still have an effect on the salary adjustments. Ashford University's evaluation matrix for enrollment advisors is designed to give incentive points more influence on salary calculation with non-incentive points having a lesser effect on salaries.  Therefore, if Ashford University used the matrix to calculate enrollment advisor salaries, it would likely be in compliance with the Safe Harbor Rule as what drives the salary adjustments does not appear to be based solely on securing enrollments (incentives).[31]

Another study by the auditors, whose purpose was "to analyze Ashford's salary calculations for enrollment advisors and determine what the relationship is between salary adjustments and the movement of incentive and non-incentive points on evaluations," concluded:

> "The non-incentive points did appear to affect the salary adjustments."[32]

Thus, after collecting and analyzing extensive data, the auditors concluded that, in actual practice, the University's enrollment advisors' salaries were in fact not based solely on numbers of students recruited, and were in fact based in part on qualitative, non-incentive factors.  The applicable regulation specifically declares that to be an acceptable compensation practice.  The University respectfully submits that should be the end of the matter with respect to compensation.

Although concluding that Ashford's compensation plan provided for adjustments not based solely on recruiting success, the draft audit nonetheless states that the auditors could not determine whether the plan complied with a regulatory safe harbor because of certain documentation they expected to find, but did not.  It recommends that FSA require the University to produce such documentation, and, if it cannot do so, that it be sanctioned.

---

[31] Emphasis added.  A copy of the OIG audit work papers summarizing their analysis and ending with the above conclusion is submitted herewith as Exhibit 1-1.  It is important to note that the conclusion was based on an analysis of (a) actual salaries as determined by the University based on the matrix versus (b) the quantitative and non-quantitative (or, in the draft report's parlance, incentive and non-incentive) factors.  The auditors' conclusion thus applies to the plan as actually implemented, not simply to its design.

[32] A copy of this study by the OIG auditors is attached as Exhibit 1-2.  This study, too, was based on actual salary determinations, and therefore the conclusion applies to the plan as it was implemented in practice, not just to how it was designed.

The draft report therefore concludes, in essence, that although the auditors could not determine that the University violated the statute (and, indeed, concluded after sixteen months of field work and nine months of analysis, that it appears to be in compliance), the University nonetheless should be required to submit more documents and prove its innocence.

The University disagrees with the finding and recommendation regarding documentation, and with many of the details relied upon in the draft report to support the finding.

First, the compensation plan includes no bonus, commission or other incentive payment for plan participants.  It therefore does not come within the coverage the Higher Education Act's incentive compensation statute, at 20 U.S.C. 1094(a)(20), and there is no justification for shifting the burden of proof to the University to show compliance with a safe harbor.

Second, the University, as a matter of fact, did satisfy the applicable safe harbor because it did not base salary adjustments of enrollment advisors solely on the number of students recruited, and it maintains records to demonstrate that conclusion.  In fact, as evidenced by Exhibit 1-1 and 1-2, the auditors concluded that the University's salary adjustments appear to satisfy the safe harbor based on an analysis of a sample of performance evaluations selected by the auditors.  That conclusion is reinforced by the analysis of an even larger sample of evaluations, performed by the University's independent economic and statistical expert, Constantijn W.A. Panis, Ph.D.[33]

Third, there is no requirement that an institution maintain multiple levels of personnel records to prove a negative, i.e., that its compensation of enrollment counselors did not violate the safe harbor.  Rather, consistent with constitutional notions of fundamental fairness and due process, the burden is on the government to establish a violation.  See, e.g., 34 C.F.R., Part 668, Subpart G.  The draft audit report does not even allege a violation, and the auditors concluded that the plan was compliant.

Fourth, even before learning of the auditors' concerns regarding compensation, the University had instituted procedures to remove some of the discretion of managers in their calculations of salaries in order to provide that all salary adjustments are made completely uniformly, and to ensure that the plan is implemented as it is designed.

---

[33] A copy of Dr. Panis's report, *Compensation of Enrollment Advisors at Ashford University*, is attached as Exhibit 1-3.  His discussion of the expanded sample is in the section titled "Second Analysis File" at pages 14-16 of his report.

### C.  Discussion

1.  **The University did not make bonus, commission, or other incentive payments based directly or indirectly on success in securing enrollments**

The draft audit report finds that the University's compensation plan made "incentive payments" to enrollment advisors because salaries are determined, in part, on success in securing enrollments.[34]  On that basis, the draft report would shift the burden to the University to prove that its compensation complies with the provisions of the regulatory safe harbor permitting salary adjustments based on job performance, provided there are no more than two adjustments per year and that they are not based solely on the number of students recruited.

The finding is erroneous and the burden-switching conclusion falls for that reason alone. The plain statutory language, the contemporaneous expression of Congressional intent in a Conference Committee Report, and the applicable DOE regulation all make clear that salary payments based in part on success in securing enrollments do not constitute a prohibited "bonus, commission or other incentive payment."

a.  **The plain language of the statute**

The Higher Education Act provides that a participating institution

will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities….

20 U.S.C. § 1094(a)(20).

By its plain language, the prohibition does not apply to all forms of compensation.  It applies only to compensation in the form of a "commission, bonus, or other incentive payment." The use of "other" before "incentive payment" means that the statute forbids only incentive payments in the nature of a bonus or commission.[35]

---

[34] The draft argues that, to achieve an annual salary larger than $27,474, an enrollment advisor must earn more than 26 points on the University's 100-point scale, and that cannot be done without scoring at least two points from among the categories that are based directly or indirectly on success in securing enrollments.  It therefore asserts that the paying of  salary amounts to an "incentive payment" in the nature of a commission or bonus. See Draft Audit Report, at pp. 6 - 7 and Enclosure 1 (hereinafter cites as "DAR at __").

[35] *Hall Street Assoc. v. Mattel, Inc*., 552 U.S. 576, 586 (2008) ("Under [the rule of *ejusdem generis*], when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."); *Dolan v. Postal Serv.*, 546 U.S. 481, 487-90 (2006) (rejecting the Government's argument that the phrase "negligent transmission" in the clause "loss, miscarriage, or negligent transmission of letters or postal matter" applied to "all negligence in the course of mail delivery," rather the Court held that "Congress expressed the intent to immunize only a subset of postal wrongdoing," and thus, the phrase was limited to the meaning of the proceeding words "loss" and "miscarriage" which addressed only the timely delivery of the mail to the correct address); *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003) (concluding that under the statutory cannon of construction *ejusdem generis*, the phrase "other legal process" within the clause "execution, levy, attachment, garnishment, or other legal process" must be limited to legal processes of the same nature as the specific items also listed in the clause).

A commission is "a fee paid to an agent or employee for transacting a piece of business or performing a service; *especially*: a percentage of the money received from a total paid to the agent responsible for the business." A bonus is "money or an equivalent given in addition to an employee's usual compensation." A commission is essentially payment for "piece work," i.e., for single transactions. A bonus is a one-time payment. Salary, by contrast, means "fixed compensation paid regularly for services." http://www.merriam-webster.com/dictionary/commission, /bonus, and /salary.

Because the statute, by its plain language, applies to compensation in the nature of a commission or bonus, and because the University's plan indisputably is a salary plan, the salary payments are not an incentive payment prohibited by the statute.

### b.  The expressly stated Congressional intent

The statute's plain language is reinforced by a specific, contemporaneous Congressional expression of intent. According to the report of the Conference Committee that reported the statute as enacted in 1992:

> The conferees wish to clarify, however, that use of the term "indirectly" does not imply that schools cannot base employee salaries on merit. It does imply that such compensation cannot solely be a function of the number of students recruited, admitted, enrolled or awarded financial aid.

H.R. Conf. Rep No. 102-630, at 499 (1992).

It is therefore beyond dispute that, since even if salary adjustments were covered by the statute, they are permissible so long as they are not based solely on the number of students recruited. It necessarily follows that salary adjustments are permissible if they are based in part on factors not based on the number of students recruited. The draft audit report acknowledges that 26 of the possible 100 points are not based on success in securing enrollments. The auditors' work papers acknowledge that actual salaries are determined, in part, by qualitative, non-incentive factors. It follows that the plan, as designed and as implemented, in not prohibited by the statute.

### c.  DOE's acknowledgement of the statute's meaning

The Department of Education clearly recognized the important distinction between incentive payments and fixed salary on November 1, 2002, when it published final regulations implementing the statute and establishing twelve safe harbors that "provide institutions with specific, concrete examples of payments they can make that do not violate the statutory provision." 67 Fed. Reg. 51723 (Aug. 8, 2002).

The Department divided the twelve safe harbors into two categories. "The first category relates to whether a particular compensation payment is an incentive payment." 67 Fed. Reg.

67054 (Nov. 1, 2001).   In the preamble language accompanying the final rule, the Secretary
stressed the distinction that fixed salary is not a commission, bonus or other incentive payment:

> The first category relates to whether a particular compensation payment is an
> incentive payment.  The first safe harbor addresses this category by describing the
> conditions under which an institution may pay compensation without that compensation
> being considered as an incentive payment.

67 Fed.Reg. 67054 (November 1, 2002).

The first safe harbor specifically permits:

> The payment of fixed compensation, such as a fixed annual salary or a
> fixed hourly wage, as long as that compensation is not adjusted up or down more
> than twice during any twelve month period, and any adjustment is not based
> solely on the number of students recruited, admitted, enrolled, or awarded
> financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A)(emphasis added).  The limit of two salary adjustments per year
was intended to distinguish between a fixed salary and variable compensation.  DOE's judgment
was that if salary were adjusted too frequently, it would no longer be fixed compensation and
would come within the statutory prohibition as a "commission, bonus, or other incentive
payment."  DOE drew the line at two adjustments.  So long as no more than two adjustments are
made in each twelve-month period, the adjustments are the payment of salary, not incentive
payments.  It is undisputed that the University's salary plan provided for only two adjustments
per year.  It follows that it is a salary plan, not an incentive payment plan.

The regulation thus reinforces the plain meaning of the statute, and the contemporaneous
expression of Congressional intent, that salary adjustments based in part on success in securing
enrollments are not an incentive payment within the meaning of the Higher Education Act.  The
draft audit report thus is erroneous in concluding that, because salary adjustments are based in
part on success in securing enrollments, they are incentive payments covered by the statute.

### 2. The burden is on the government to establish a violation, not on the University to establish the lack of a violation

As shown in the previous section, the attempt to switch the burden of proof to the
University fails because its premise fails:  the University adjusted salary no more than twice per
year; it did not make incentive payments.

The attempt to switch the burden also runs contrary to well-settled notions of
fundamental fairness and due process, which hold generally that the burden is on the government
to establish a violation. The University recognizes that, in the civil context, the courts have

permitted burden-shifting where Congress so requires by statute. [36]  Here, however, Congress has not shifted the burden to institutions.  Indeed, the attempt at burden-switching runs counter to the very same Department of Education regulation invoked by the draft audit report in its recommendation.  Tentative Finding 1 recommends that FSA initiate an action to fine the University, or to limit, suspend or terminate its eligibility to participate in the Federal Student Aid programs, if it fails to produce further documentation proving its innocence.

Fine, limitation, suspension and termination proceedings are governed by Department regulations appearing at Subpart G of 34 C.F.R. 668.  Among other things, the regulations require:

- that "a designated department official" (i.e., a person with authority within FSA) initiate such a proceeding;

- that the institution is entitled to "a hearing [that] is an orderly presentation of arguments and evidence conducted by a hearing official;" and

- that FSA "has the burden of persuasion in any fine, suspension, limitation or termination proceeding under this subpart."

34 C.F.R. § 668.88(a) and(c)(2) (2009)(emphasis added).

The draft audit report acknowledges that OIG could not determine that the University violated the regulation.  The auditors' work papers conclude that salaries were not based solely on recruiting success and were based in part on qualitative, non-incentive job factors.  On that basis, there can be no successful limitation, suspension, termination or fine action against the University.

The University therefore respectfully submits that the draft finding and recommendation should not be included in the final audit determination.

**3.  The University did not base salary solely on the number of students recruited, admitted, enrolled or awarded financial aid**

As set forth in Section III.D, above, and as is apparent from a fair reading of the draft audit report, the draft audit report contains no finding that the University's salary plan violated the safe harbor. To that extent, the University concurs with the finding.

It is important to note that the auditors' failure to find a violation of the incentive compensation statute followed sixteen months of field work, including numerous interviews of or enrollment advisors, their supervisors, and upper management, as well as review of numerous personnel files and compensation records.  Indeed, as demonstrated in this section, the clear evidence shows, and analyses conducted by the auditors reflected in their work papers but not in

---

[36] *See, e.g., United States v. $250,000 In U.S. Currency,* 808 F.2d 895 (1st Cir.1987) (Congress may generally alter the traditional allocation of the burden of proof without compromising due process unless the statute is criminal in nature.)

the draft audit report, the University's salary adjustments were not based solely on the number of students recruited, and therefore complied with the safe harbor.

The first safe harbor specifically permits:

The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A)(emphasis added).

During the notice and comment portion of the safe harbor rulemaking procedure, the Secretary was asked to provide guidance as to what was meant by the term "solely:"

Many commenters noted that salary adjustments could not be based solely on the number of students recruited, admitted, enrolled, or awarded financial aid, and asked whether the term ''solely'' was being used in its dictionary definition.

67 Fed. Reg. 67055 (Nov. 1, 2001).

The Secretary responded, "In this safe harbor, the word 'solely' is being used in its dictionary definition." *Id.*

The dictionary definition is: "1. without another: singly.  2. to the exclusion of all else http://www.merriam-webster.com/dictionary/solely

The draft audit report specifically acknowledges that 26 of the 100 points upon which salary adjustments are made are not based on the number of students recruited, admitted, enrolled or awarded financial aid.[37]  It therefore is indisputable that, as designed, the salary adjustment does not base salary adjustments solely on the number of students, recruited, admitter, enrolled or awarded financial aid.

The question therefore becomes whether the plan, as implemented, bases salary adjustments solely on the number of students recruited.  The auditors answered that question in the negative.

The auditors performed an analysis "to determine the relationship between changes in incentive and non-incentive points with changes in salaries."[38]  As the work paper makes clear, they were analyzing actual performance evaluations and salary determinations based on those evaluations.  The auditors found that there was a stronger correlation between quantitative performance and salary than between qualitative performance and salary, there was nonetheless a correlation between the qualitative points and salary:

---

[37] See DAR at pp. 6 – 7 and Enclosure 1.
[38] Exhibit 1-1.

Based on the analysis performed, we determined that there appears to be a much stronger correlation between the changes in incentive points with the changes in salary, but the non-incentive points still have an effect on the salary adjustments. Ashford University's evaluation matrix for enrollment advisors is designed to give incentive points more influence on salary calculation with non-incentive points having a lesser effect on salaries. Therefore, if Ashford University used the matrix to calculate enrollment advisor salaries, it would likely be in compliance with the Safe Harbor Rule as what drives the salary adjustments does not appear to be based solely on securing enrollments (incentives).[39]

The conclusion was based on actual salary calculations. Even if managers were exercising discretion given them by the matrix in how they determined actual salary numbers, the fact remains that the salaries they calculated were not based solely on the quantitative factors, but were based in part on the qualitative factors. As such, the salary determinations satisfy law and regulation.

The OIG work papers contain a second, more detailed analysis of the University's salary, submitted herewith as Exhibit 1-2. The purpose was "to analyze Ashford's salary calculations for enrollment advisors and determine what the relationship is between salary adjustments and the movement of incentive and non-incentive points on evaluations." The study concluded:

"The non-incentive points did appear to affect the salary adjustments."[40]

It is undisputed that the plan as designed, i.e. the matrix, based salary in part on the qualitative, non-incentive factors. The auditors acknowledged in their work papers, that actual salary adjustments made pursuant to the plan were based in part on the qualitative, non-incentive points. It follows that the University's compensation of its enrollment advisors satisfies the law and regulations

That conclusion is reinforced by the report of the University's independent expert, Constantijn W.A Panis, Ph.D., who conducted a statistical analysis similar to that of the OIG auditors, but expanded it to include a much larger sample than the OIG's, and concluded among other things that factors other than those based on the number of students recruited were a statistically significant determinant of salary. [41]

Dr. Panis's curriculum vitae is contained at Attachment C to his report. He has a Ph.D. in economics from the University of Southern California, and a law degree and an M.A. in business economics from the University of Groningen, Netherlands. Dr. Panis is an expert in labor markets and econometric modeling. Prior to joining Advanced Analytical Consulting, Dr. Panis led the Economic and Statistical Consulting group of Deloitte & Touche in the Pacific

---

[39] Exhibit 1-1.
[40] Exhibit 1-2.
[41] Exhibit 1-3, Opinion 2 on p. 2; the discussions in the First Analysis section under the title "Qualitative Criteria Co-Determined Salary Adjustments to a Greater Degree than as Designed, at pp. 4-5, and the title "Salary Adjustments Were Not Solely Based on Quantitative  Ratings," at pp. 7-13; and the entire discussion in the Second Analysis section at pp. 14-16s.

Southwest. Before that, he was a senior economist at the RAND Corporation, where his research on employment patterns, wages, and pension entitlements was funded by the U.S. Department of Labor, the Social Security Administration, and other federal agencies. He served on the faculty of the University of Southern California and the University of California at Irvine, teaching undergraduate and graduate statistics and economics courses.

Dr. Panis analyzed performance evaluation and salary adjustments for the same set of enrollment advisors (comprising 12 enrollment advisors with 27 evaluations among them) as was selected by the auditors.  In addition, in order to test his conclusions against a larger sample, Dr. Panis requested and was provided a set of all University's enrollment advisors over the relevant time period, from which he selected a random sample containing 119 evaluations.  As his report also indicates, the larger sample yielded results that are "highly statistically significant" with respect to his conclusions as to the smaller sample.[42]

Dr. Panis also analyzed correlations between (1) the difference between (a) actual salary for each Enrollment Advisor as calculated by the University's Enrollment Managers and (b) salary as the linear interpolation method used by the auditors  and (2) qualitative  and quantitative performance.

Dr. Panis's report speaks for itself, so we simply summarize here some of its key findings:

- o  In practice, University evaluators tend to weight the qualitative factors more highly than the quantitative factors. [43]

- o  "In conclusion, my analysis of salary increases and of new salary levels found that quantitative ratings cannot have been the sole determinant of salary adjustments.  This finding applies to salary increases and new salary levels, in period 0307 and 0407, and for Matrices M1 and M2."[44]

- o  In practice, the observed patterns of qualitative and quantitative evaluations are inconsistent with a hypothesis that managers may have manipulated the qualitative data in order to reward higher quantitative performers.  This conclusion is shown through analysis of numerous counterexamples, through visual analysis of plots of quantitative ratings versus qualitative ratings, through visual analysis of salaries and salary increases versus quantitative and qualitative ratings, and by analysis of the variation of manager evaluations in the eight components that comprise a qualitative rating.[45]

- o  In practice, the qualitative factors, without regard to the quantitative factors, are a statistically significant determinative factor in enrollment advisor salary adjustments.  That is, enrollment advisor compensation is not based solely on

---

[42] Exhibit 1-3 at 16.
[43] Exhibit 1-3 at 4-5.
[44] Exhibit 1-3 at 12.
[45] Exhibit 1-3 at 5-7.

the number of students recruited, admitted, enrolled or awarded financial aid, and it is based in part on the qualitative, non-incentive performance factors.[46]

o   To the extent Enrollment Mangers varied from the matrix or used their discretion given by the matrix to determine salary other than based upon the linear interpolation method used in the auditors' report, that variation, to a statistically significant extent, did not reward quantitative  (i.e., recruiting related) performance. [47]

Accordingly the University's salary plan, as defined and as implemented in practice, falls clearly within the letter and spirit of the Department's first safe harbor because it provides for salary adjustments that are not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. [48]

### 4.   The University complies with applicable record-keeping regulations

The draft audit report cites a regulation requiring that an institution

shall establish and maintain, on a current basis, any application for title IV, HEA program funds and program records that document . . . [i]ts administration of the title IV, HEA programs….in accordance with all applicable requirements . . . ."

34 C.F.R. § 668.24(a)(3).[49]

The draft audit report cites an alleged failure to maintain records in three areas in determining salary adjustments: basis for the quantitative point awards, basis for the qualitative point awards, and formula to translate total points into new salary.

We discuss each of these in turn.

### a.   Quantitative performance factors

The draft audit report acknowledges that certain data relied upon in performance evaluations – net starts, gross starts, and applications – are entered and maintained in the University's CampusVue data base system.[50]   It further states that CampusVue records are static

---

[46] Exhibit 1-3 at 7-13, and 14-16.
[47] Exhibit 1-3 at 16-17.
[48] It is important to note that the regulation also provides that the safe harbors are not an exclusive list of practices that either (1) do not constitute incentive payments, or (2) do constitute incentive payments but are deemed by the Department as not violating the statute and regulation.  Immediately preceding the list of 12 safe harbors, the regulation provides: "Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to…." 34 C.F.R. 668.14(b)(22)(ii)(July 1, 2009)(emphasis added).   Accordingly, even if, for the sake of argument, the University's plan were not within the precise parameters of the safe harbor, that would not mean that it violates the ban against incentive payments.
[49] DAR at p. 10.
[50] DAR at 8.

and remain available.[51]  The auditors were provided full access to the CampusVue system, and had the opportunity to question the basis for any of the documentation contained in the employee evaluation files.

The draft audit report also acknowledges that other quantitative data used in the evaluations – outbound calls, leads, contacts, applications and referrals – are entered and maintained for a period of time on the University's REAP data base system.[52]  It complains, however, that the REAP data are time sensitive and can change over time – e.g., applications may convert to starts (gross starts), starts may convert to starts that complete at least one course (net starts).[53]

The draft audit report complains that the University did not take snapshots of the data base information – CampusVue and REAP – used in evaluating each advisor.[54]  That is the sole basis cited for the alleged failure to keep records supporting the quantitative evaluations.  Yet, the draft report also acknowledges, and it undeniably is the case, that the data from the data base systems is recorded on the completed evaluation matrices for each enrollment advisor, and that those matrices are maintained in the employees' permanent record, are available, and were reviewed by the auditors.[55]  We believe it is standard practice in numerous organizations, perhaps including governmental agencies, for raw employee data to be compiled over the course of an evaluation period, to be transferred to evaluation forms, and for the raw data to be discarded after the review.  The back-up data for the evaluation is in the evaluation forms.  The evaluation forms are the snapshot.  Essentially, the report would require permanent retention of the back-up for the back-up.  Here, it is undisputed that the University maintains records, and those records were made available to the auditors, showing the actual data on which the quantitative evaluations were based.  It also is true that much of the back-up for the back-up, i.e. currently existing CampusVue and REAP data, was unchanged since the evaluations and made available to the auditors.

Accordingly, it simply is not the case that the University failed to maintain records showing the data on which the quantitative evaluations were based.

**b.  Qualitative Performance Factors**

With respect to the eight qualitative performance factors, the draft audit report acknowledges that the University provided evaluation matrices that contained descriptions of the performance requirements necessary to obtain an evaluation for each ranking between one and five.  Thus, records describing each of the criteria, and the requirements for each score within each of the criteria, were maintained and provided to the auditors.  The records reflecting the results of the evaluations for each enrollment advisor also were maintained and provided.  Thus, the University maintained and provided records that documented each evaluation criterion.

---

[51] Id.  In fact, CampusVue data can be updated over time as students progress in their education graduate, and so is not necessarily static as to all fields.
[52] Id.
[53] Id.
[54] Id.
[55] Id.

Additionally, as the draft audit report acknowledges, the forms contained fields where the evaluators could supplement the record by giving narrative descriptions supporting the score for each factor, and it was not unusual for the evaluators to complete those fields, thereby "provid[ing] some insight into the judgment management used in evaluating the enrollment advisors for the qualitative categories."[56]

So, again, it simply is not accurate to say that the University failed to maintain records substantiating the managers' evaluation of performance in the qualitative categories.

Finally, we respectfully would direct attention to the portions of Dr. Panis's report where he investigates the correlations between quantitative and qualitative scores, and the variation in scores for the various qualitative, non-incentive factors, and concludes there is no evidence to suggest that the qualitative data was ignored or manipulated in a way to reward successful recruiting performance. So, even if there were a lack of documentation, which there isn't, the fact remains that there is no evidence qualitative scores were ignored or manipulated.

### c.  Calculation of Salaries

Finally, the draft audit report complains that the compensation plan did not dictate a formula to be used by managers to convert the total score – qualitative plus quantitative – into an adjusted salary.

Significantly, the draft audit report does not find that salaries were calculated so as to undermine the salary plan's design of a 76%/24% division between dependence on factors based on numbers of students recruited (quantitative) and factors not based on numbers of students recruited (qualitative). Nor does the draft audit report find that enrollment managers calculated salaries in violation of the plan. Nor does the draft report find that the salaries, as actually calculated, were based solely on the number of students recruited. Rather, the draft audit report simply says that some performance evaluations resulted in salaries that vary from how two employees told the OIG they calculated salaries.

The simple fact is that the regulation does not require that institutions use a formula to calculate salary. It simply requires that the calculation not be based solely on the number of students recruited. Here, as the University made clear to the auditors, managers had some discretion, within the parameters of the plan, in translating total points into an actual salary adjustment.

The draft audit report contains an attachment comparing (a) total points received, (b) actual salary received, and (c) what the auditors think the salary should have been, based on what two people told them.

The University's plan, during the time reviewed by the auditors, did not specify how managers should determine salary within each range.[57] There are a number of ways one could

---

[56] DAR at 8 – 9.
[57] After the audit commenced, but before the exit interview or receipt of the draft audit report, the University instituted new procedures that, among other things, removed discretion from managers with respect to the translation

translate the points to a salary, within the discretion allowed managers, consistent with the University's salary plan. One of those is the ways used by OIG in its analysis. As shown in Dr. Panis' report, the difference between the salary as calculated by the OIG methodology and the actual salary is not a function of quantitative score. In fact, it is, to a statistically significant degree, the opposite. To the extent managers exercised discretion to vary from a straight linear interpolation of points to salary, they did not reward quantitative, recruiting-based performance. In fact his analysis found exactly the opposite.

> "The cloud of points and its fitted line demonstrate a negative relationship: the higher the qualitative rating, the smaller or more negative the difference between actual and expected salary. In other words given a certain total points rating, supervisors were more generous toward enrollment advisors with lower quantitative ratings than to advisors with higher quantitative ratings….The negative relationship is statistically significant." [58]

There is accordingly no basis to conclude that University employees were manipulating the system to reward quantitative performance and ignore qualitative performance.

### d. Regulations

Finally, DOE regulations do not require that institutions maintain back-up documentation for the back-up documentation for their salary determinations.

As noted in Section III.C.5.b, above, the record-keeping regulation cited in the Draft Audit Report requires that "title IV, HEA program records" be maintained relating to the institution's "administration of the title IV, HEA programs."

The title IV program records required to be maintained are defined thus in the regulation:

> (c) *Required records.* (1) The records that an institution must maintain in order to comply with the provisions of this section include but are not limited to—
>
> (i) The Student Aid Report (SAR) or Institutional Student Information Record (ISIR) used to determine eligibility for title IV, HEA program funds;
>
> (ii) Application data submitted to the Secretary, lender, or guaranty agency by the institution on behalf of the student or parent;
>
> (iii) Documentation of each student's or parent borrower's eligibility for title IV, HEA program funds;

---

of performance evaluation points into salary adjustments. Since then, points have translated to salary in the same manner as described to OIG in the interviews referenced in the draft audit report. In addition, enrollment managers now are required to complete and return to Human Resources management their qualitative evaluations for employees before being provided the quantitative data on the basis of which the quantitative score is decided. So the managers are not aware of the quantitative performance when they complete the qualitative evaluation.
[58] Exhibit 1-3, page 17.

(iv) Documentation relating to each student's or parent borrower's receipt of title IV, HEA program funds, including but not limited to documentation of—

(A) The amount of the grant, loan, or FWS award; its payment period; its loan period, if appropriate; and the calculations used to determine the amount of the grant, loan, or FWS award;

(B) The date and amount of each disbursement or delivery of grant or loan funds, and the date and amount of each payment of FWS wages;

(C) The amount, date, and basis of the institution's calculation of any refunds or overpayments due to or on behalf of the student, or the treatment of title IV, HEA program funds when a student withdraws; and

(D) The payment of any overpayment or the return of any title IV, HEA program funds to the title IV, HEA program fund, a lender, or the Secretary, as appropriate;

(v) Documentation of and information collected at any initial or exit loan counseling required by applicable program regulations;

(vi) Reports and forms used by the institution in its participation in a title IV, HEA program, and any records needed to verify data that appear in those reports and forms; and

(vii) Documentation supporting the institution's calculations of its completion or graduation rates under §§668.46 and 668.49.

(2) In addition to the records required under this part—

(i) Participants in the Federal Perkins Loan Program shall follow procedures established in 34 CFR 674.19 for documentation of repayment history for that program;

(ii) Participants in the FWS Program shall follow procedures established in 34 CFR 675.19 for documentation of work, earnings, and payroll transactions for that program; and

(iii) Participants in the FFEL Program shall follow procedures established in 34 CFR 682.610 for documentation of additional loan record requirements for that program.

34 C.F.R. 668.23(c)(2009).

Although the above list is non-exclusive, it is quite lengthy and detailed.  It is instructive that all of the records apply to the administration of the Federal Student Aid programs.  None of

them is remotely related to detailed personnel and productivity records to back up evaluation records that already include the productivity and qualitative judgment information on which the evaluations were based.

Accordingly, the University was under no regulatory obligation to maintain the sort of detailed personnel records as suggested in the draft audit report, and, at any rate, that University did in fact maintain records supporting the evaluation reports and the results of the salary calculations.

Finally, we respectfully point out that the entire issue of documentation is a red herring. It is undisputed by the auditors, and reinforced by Dr. Panis's report, that salaries of enrollment advisors are not based solely on the number of students recruited, and that salaries are based in part on qualitative, non-incentive factors. Both in design and in practice, the University's plan complies with the letter and spirit of the Higher Education Act and the Department's regulations.

### D. Conclusion

For the above reasons, the University disagrees with the finding. The University has maintained records showing the bases for the semi-annual salary adjustments made in the case of its enrollment advisors. The evaluations and adjustments are made no more than twice annually and are not based solely on the number of students recruited, admitted, enrolled or awarded financial aid.

Because of its disagreement with the finding, the University also disagrees with the recommendation, viz., that FSA require the University to submit documentation demonstrating its compliance with the safe harbor and, if it fails to do so, that corrective action be instituted. The University respectfully submits that it already has submitted such documentation, the OIG has reviewed it, and the OIG has not found there to be a violations. In fact, the OIG auditors have determined that the non-recruiting factors are a determinant, albeit not the only one, of salary. That is what the law requires, and that should be the end of the matter.

## IV.    Draft Finding 2:  Calculation of Return-to-Title-IV Payments

### A. Introduction

The University respectfully disagrees with each of the three categories of alleged noncompliance described in draft finding 2. The draft finding contends that the University miscalculated certain return calculations for one of the following reasons:

- AU purportedly used an incorrect last date of attendance at an academically related activity as the withdrawal date;

- AU purportedly did not revise the payment period end date for certain students who did not complete their credits according to the student's schedule;

- AU purportedly incorrectly projected the tuition charges that would have been charged to the students if they had completed the credits for the semester.

Our response demonstrates that AU correctly calculated the cited return calculations in each of these three categories with one nominal exception totaling $101.25. We address each category separately below. We then address each of the finding's recommendations at the conclusion of this response.

Before explaining the basis for our disagreement with draft finding 2, we explain our disagreement with the draft finding's unsupported speculation regarding the purported harm to the Title IV programs associated with this draft finding. Specifically, the draft finding contends that AU's return calculations resulted in AU retaining $35,989 more in Title IV funds than permitted by the governing regulation. The draft finding then attempts to estimate the total amount of excess Title IV funds AU may have retained by speculating that this amount might equal somewhere between $1.2 million and $2.3 million across the entire population of students for the 2006-2007 award year. The draft finding's speculation is incorrect and inappropriate for inclusion in the audit report for the following reasons:

- **AU's return calculations are in fact more conservative, and result in the University returning more Title IV funds to the Title IV programs, than required by the governing regulation.** Draft finding 2 concedes that the University is not required to take attendance. Draft finding 2 also concedes that the governing regulation authorizes such institutions to use the midpoint of the payment period as the withdrawal date for students who withdraw without notifying the University. If AU used the midpoint as the withdrawal date, AU would be entitled to retain substantially more Title IV funds than it typically retains.[59] Therefore, the draft finding's conclusion that the Title IV programs were harmed by AU's calculations is incorrect. AU's calculations were more generous to the Title IV programs and resulted in AU returning more Title IV funds than required by DOE regulations.

- **The audit workpapers reveal that the auditors actually used the midpoint analysis to recalculate returns for certain students, but used a methodology more aggressive than required by law for all other students.** This arbitrary and selective use of the midpoint analysis distorted the results of the draft finding's assessment of purported harm to the Title IV programs. In order to calculate the purported harm to the Title IV programs, the auditors would have to use the midpoint analysis for all students. If the auditors had used the midpoint analysis for all students – not just the few it arbitrarily selected – it would have concluded that AU's calculations resulted in larger returns to the Title IV programs than required by law. The draft finding's conclusion that the Title IV programs were harmed by AU's calculations is incorrect.

- **The draft finding is unlawfully and retroactively imposing a rule found not in the governing regulations, but in a proposed DOE regulation which is not in effect.** The DOE has proposed regulations which would require institutions like AU

---

[59] AU substantiates this conclusion in Section V.B.1 below.

to use their attendance records to calculate withdrawal dates instead of using the mid-point of the payment period.[60]  However, these regulations are not final, remain subject to notice and comment until a final regulation is published, and, if adopted as currently proposed, would not take effect until July 1, 2011.  Until that time, an institution is only required to return amounts that are at least equal to the amount calculated under the current mid-point regulation.  While AU did calculate its withdrawal dates based on its attendance records (and disagrees with the draft finding's contention that these calculations were incorrect), the law does not require AU to refund amounts greater than those required under the mid-point regulation.

- **The draft finding's estimated calculations of improperly retained Title IV funds are not only incorrect, but also distorted because they are based on non-random file samples.**  The draft finding did not test files randomly selected from the entire universe of AU students.  Instead, the auditors drew three samples from two groups limited to Title IV recipients who withdrew, had a zero grade point average, or were on a leave of absence.  These targeted and judgmental samples are not representative of AU's total student population.  The alleged error rates and dollar estimates are distorted because they do not measure AU's compliance across its entire student population.  We respectfully submit that no sanctions or other recommendations should be imposed on the basis of erroneous and distorted results derived from non-random samples.

- **The draft finding's results are also distorted because they include purported discrepancies which, even if correct, would not have changed AU's calculations or would have resulted in AU returning less money to the Title IV programs.**  For example, the draft finding contends that AU incorrectly calculated the withdrawal date for 58 students.  Yet, the audit workpapers show that the auditors contend that AU retained excess Title IV funds for only 37 of the 58 students.  In the other 21 cases, the auditors agreed with the amounts returned by AU or concluded that AU returned more money than required by regulation.  Consequently, the draft finding's reference to "58" instances of purported noncompliance is inflated and overstates the scope of the draft finding.  The figures are similarly overstated for the other two categories relating to payment period calculations and institutional charge calculations.

For the reasons discussed in this response, the draft finding and its recommendations should be withdrawn in their entirety.

### B.  AU Correctly Determined the Last Date of Attendance at an Academically Related Activity

The draft finding contends that AU did not use the correct withdrawal date when it performed R2T4 calculations for cited students.  However, the draft finding incorrectly recalculates the withdrawal dates for these students based on a methodology which misstates

---

[60] See Section V.B.5 below.

AU's attendance policy and incorrectly interprets AU attendance records. AU's calculation of withdrawal dates complied with – and, in fact, was far more conservative than required by – the governing regulations.

1. **AU's methodology for calculating withdrawal dates was more conservative – and resulted in larger Title IV refunds – than required by the regulations**

Institutions are required to conduct R2T4 calculations for students who withdraw from school during a payment period. The R2T4 calculation determines the portion of Title IV funds earned by the student before withdrawing from school. The institution (and, in some cases, the student) is required to return the unearned portion of Title IV funds to the Title IV programs. The amounts of earned and unearned Title IV funds are calculated based on the percentage of the payment period the student completed before withdrawing from school.[61] This percentage is calculated using the student's withdrawal date.[62] Therefore, the withdrawal date dictates the amounts of Title IV funds retained by the institution and student and the amount returned to the Title IV programs.

The regulations provide separate withdrawal date definitions depending upon whether or not a school is required to take attendance. For schools required to take attendance, the withdrawal date is the last date of academic attendance as determined by the institution from its attendance records. For schools not required to take attendance, the institution generally may assume that the withdrawal date is the mid-point of the payment period unless the student provides notice of the student's intent to withdraw.[63] Consequently, the latter withdrawal date definition generally results in a later withdrawal date and thereby results in the institution and student earning and retaining a larger percentage of Title IV funds.

Draft finding 2 concedes that AU is an institution which is not required to take attendance.[64] Under the law described above, AU would be entitled to use the more lenient withdrawal date definition and to assume that all students who withdrew without notice completed at least half of their payment periods. However, AU took a more conservative approach which resulted in the University returning more Title IV funds than required under the applicable regulation.

Exhibit 2-1 contains a chart listing each of the 37 students cited in draft finding 2 for a purportedly incorrect last date of attendance and for which the finding contends AU retained excess Title IV funds.[65] The chart also includes the results of a separate R2T4 calculation for each student using 1) AU's LDA, 2) draft finding 2's LDA, and 3) the midpoint. The chart shows that the midpoint calculation would have resulted in a later LDA for all but 9 of the 37 cited students. Moreover, the regulations would have allowed AU to use a later LDA beyond the midpoint for each of these 9 students because, as shown on the chart, AU documented attendance

---

[61] 34 C.F.R. § 668.22(e).
[62] 34 C.F.R. § 668.22(f).
[63] 34 C.F.R. § 668.22(c).
[64] See Draft Audit Report at 11.
[65] Draft finding 2 alleges that AU miscalculated LDAs for 58 students. Draft finding 2 does not contend that additional funds are owed for 21 students. This leaves 37 students at issue.

beyond the midpoint for each of the 9 students.[66]  See 34 C.F.R. § 668.22(c)(3).  Consequently, the chart shows that the midpoint calculation methodology would have resulted in less Title IV funds returned to the Title IV Programs.[67]  The chart confirms that AU's withdrawal date calculations did not harm the Title IV Programs and, in fact, yielded larger refunds to the Title IV Programs than required by law.[68]

> **2.  The draft finding arbitrarily uses the midpoint analysis for a few students, but uses a methodology more aggressive than required by law for all other students**

Moreover, we note that the auditors used the midpoint to recalculate the withdrawal date for a few students, but not for other students.  See, e.g., Audit Workpaper J-2-3, "Refund, Attendance & Withdrawal" tab at column CH.  For example, in five instances, the auditors stated "we could not determine the last date of attendance to perform the refund calculation.  Because the school was not required to take attendance, we used 50 percent as the completion rate."  Yet, in the vast majority of instances, the auditors did not use the midpoint calculation and instead used its erroneous determinations of the students' last date of attendance.

The auditors' reliance upon the midpoint analysis for some students, but not others, is arbitrary and contrary to the applicable regulation.  The auditors concede in the audit workpapers that the midpoint is an appropriate withdrawal date measure for institutions not required to take attendance.  The auditors arbitrarily used the midpoint methodology in the few cases it served the purpose of advocating for a larger return calculation, but failed to use the same methodology in the vast majority of cases when it would have supported a smaller return.  To perform a genuine comparison between AU's return calculations and those permitted under the regulations, the draft finding was required to use the midpoint or a later documented date of attendance for all students, not just the few it selected.  As discussed above, the comparative analysis shows that the Title IV programs were not harmed by AU's return calculations.

---

[66] In some of the 9 cases, AU documented a later LDA which resulted in completion of 60% or more of the payment period and, therefore, no R2T4 obligation.  In the remainder of the 9 cases, AU documented a later LDA which resulted in completion of between 50% and 60% of the program and an R2T4 obligation equal to that already paid by AU.
[67] For example, the chart shows that AU originally calculated an R2T4 return of $1,607.87 for student 99729 based on a last date of attendance of February 5, 2007.  The draft finding contends that the return should have been $1,728.01, based on an LDA of February 2, 2007.  If AU had used the midpoint calculation permitted by DOE regulations, AU would only have returned $356.50 to the Title IV Programs.  Similarly, for student 61742, AU calculated a post-withdrawal disbursement of $486 based on a last date of attendance of June 5, 2006.  The draft finding contends that the post-withdrawal disbursement should have been $143.78 based on an LDA of May 4, 2006.  Yet, if AU had used the midpoint calculation permitted by DOE regulations, the post-withdrawal disbursement would have been $1,012.50, resulting in less Title IV funds returned to the Title IV Programs.
[68] Exhibit 2-2 contains copies of the individual return calculations for each student on the chart in Exhibit 2-1 using the midpoint methodology for calculating the withdrawal date for each student.

### 3. AU correctly calculated and substantiated its withdrawal date determinations

Although it could have used the more lenient midpoint definition, AU calculated its withdrawal dates based on the student's last date of attendance at an academically related activity.  Under the regulation:

> ". . . an institution that is not required to take attendance may use as the student's withdrawal date a student's last date of attendance at an academically related activity provided that the institution documents that the activity is academically related and documents the student's attendance at the activity."

34 C.F.R. § 668.22(c)(3).  The University determined the student's last date of attendance at an academically related activity by 1) applying its attendance policy for distance learning students and 2) monitoring those students' attendance at certain activities within the University's learning site.[69]  As explained below, [70] the University correctly calculated the withdrawal date for each of the cited students with one exception totaling $101.25.

### i. AU applied its attendance policy for distance learning students

AU's attendance policy for distance learning students requires their class attendance on at least two days within a week in order to be counted as present for that week.  A student who is absent for two weeks within a course is dropped from the course.  The student's withdrawal date under AU's attendance policy is the last day of the week in which the student attended class for at least two days during the week.

This attendance policy recognizes the distinction between traditional on-campus classes and on-line classes.  Unlike traditional on-campus classes which meet at prescribed times and places each week, AU's on-line classes permit students to select the days and times on which the student will attend the course within each weekly period.  Therefore, attendance is not measured on a daily basis, but on whether a student has met the two-day minimum for the week from Tuesday to Monday. [71]

Lastly, the attendance policy deemed an active student to be in attendance for the remainder of the course if the student completed and received a grade in the course.  This component of the policy is consistent with DOE guidance which states:  "If a student earns a passing grade in one or more of his or her classes over an entire period, for the class, an institution is permitted to make the presumption that the student completed the course and thus

---

[69] See subsections V.B.3.i and ii immediately below.
[70] See subsection V.B.3.iii below.
[71] For students who withdraw without notice and require the R2T4 process to be performed, the LDA will always be a Monday provided the student logged in twice that week.  For students who did not log in twice in a week, the LDA would be the most recent Monday for which the student met the attendance requirements.

completed the period."[72]  Accordingly, in certain instances,[73] a student established his or her attendance through the completion of the course if the student was active and completed and received a grade in the course.

### ii.  AU monitored on-line clicks in its on-line learning environment, but counted only clicks into academically-related activities

The University determined student dates of attendance by monitoring their attendance via on-line clicks within the University's learning site.  Consistent with the regulations, the University counted only academic clicks to make this determination.  The regulation defines "academically-related activity" to include, but not be limited to:

> "an exam, a tutorial, computer-assisted instruction, academic counseling, academic advisement, turning in a class assignment or attending a study group that is assigned by the institution."

34 C.F.R. § 668.22(c)(3)(ii).  Accordingly, as explained below, the University only considered academically related clicks for attendance purposes if they resulted in attendance within an online Learning Block in the student's program.

Students access the University by logging into the Ashford learning environment on the Blackboard system.  When a student logs in, the student is directed to his or her online Homeroom.  The Homeroom contains announcements and information of general interest and lists the course(s) in which the student currently is participating.  If the student clicks on a course in which s/he is enrolled, s/he is directed to the entry screen for that course.  At this point, no "clicks" have been registered for attendance purposes.

From the course entry screen the student may enter, among other things, the Learning Blocks representing the activities for each of the weeks of the course, as well as a page describing the research paper required for the course, where applicable.  The first click is recorded when the student first enters a Learning Block, which is the online analogue to a resident student entering the classroom.

Once in the Learning Block, a variety of information and options are displayed to the student.  The information and options include, for example, a list of assignments and tests for the week and the due date for each; a list of required readings for the week and links to various readings; a list of the required discussion group activities for the week and a link to open

---

[72] See 2006-2007 FSA Handbook at 5-60.  The guidance also permits an institution to count a failing grade as evidence that the student completed the class if, for example, the grade is awarded to students who complete the course, but fail to achieve the course objectives.  See *id.* at 5-61.

[73] For example, student 107104 last attended on July 2, 2007.  However, the student also received a grade for his course.  Therefore, AU determined the student's LDA to be the end of the final week of the course (July 9, 2007) based on its attendance policy and the student's successful completion of the course.

discussion groups; an explanation of written paper assignments required to apply one's newly gained understanding of topical matter; and a link to the assessment or test required to demonstrate mastery of the week's material.

Attendance is counted based on students entering and participating in their classroom, i.e., the Learning Block, since that means students are physically present and actively engaged in their course-specific materials and participation requirements necessary to complete their courses. While in the Learning Block, some clicks are accompanied by a recorded posting or submission, e.g., reading a discussion group thread and posting one or more responses; submitting an assignment; taking and submitting a test; submitting material pertaining to or corresponding with one's instructor regarding one's research paper or actually submitting the paper. Other clicks within the Learning Block can result in no submission or posting: e.g., reading a discussion group thread but not yet posting a response; accessing the source material for the reading assignment through a link and reading it on line; accessing the material online then downloading and studying it at home.

It is only at this point when the student enters the Learning Block, or classroom, that AU deems the student in attendance in the classroom and, therefore, in an academically-related activity. This concept of attendance in an electronic classroom is consistent with the regulatory definition discussed above which includes, among other things, attendance at computer-assisted instruction, a tutorial, a study group, or counseling or advisement sessions.

### iii. The University accurately calculated and substantiated the withdrawal dates for each of the students cited in Finding 2

Draft finding 2 contends that AU improperly calculated the withdrawal date for 58 students. However, as noted previously, only 37 of these students are at issue because the auditors concluded that AU did not retain or over-disburse Title IV for the other 21 students even under the draft finding's recalculations. Accordingly, while we respectfully disagree with the draft finding's recalculations, the return calculations for these 21 students are not at issue.

Exhibit 2-3 contains a spreadsheet summarizing the data supporting AU's withdrawal date calculations for the remaining 37 students cited for withdrawal date calculations in draft finding 2. Exhibit 2-4 contains select back-up data for each student retained and obtained from our CampusVue and Blackboard systems which monitor and record on-line attendance activity. The two Exhibits demonstrate on a student-by-student basis that AU correctly calculated the withdrawal dates in accordance with its attendance policy, its records of on-line academic activity, and the governing regulation with one isolated exception.

For example, Exhibit 2-3 shows that AU calculated a withdrawal date of August 20, 2007 for student 120806. Exhibit 2-4 contains the CampusVue and Blackboard data for this student. The Blackboard records show a daily listing of on-line click activity for the last course attended by the student. The records show that student 120806 engaged in on-line click activity at least

two days per week until the week ending August 20, 2007.  During that last week, the student clicked in three times on August 14 and two times on August 15.  The student did attend after that date as shown by the 11 clicks on August 21, 2007.  However, the student did not attend for a second day during that week.  Consequently, AU disregarded the attendance on this day under its above-described attendance policy.  The CampusVue record for this student in Exhibit 2-4 shows under the category "Student Attendance" that AU determined that the student was present as of August 20, 2007 and absent in subsequent weeks, which is consistent with the Blackboard data.

Exhibits 2-3 and 2-4 provide similar data for all of the 37 students at issue in draft Finding 2.  The data confirms that AU correctly calculated and documented the withdrawal dates for each student consistent with its attendance policy and the regulation with one isolated exception.[74]

### 4. The auditors' withdrawal calculations are inconsistent with DOE regulations and the University's policy

Draft finding 2 contends that AU used a withdrawal date based on a last date of attendance at an academically related activity which differed from the one recalculated by the auditors.  The draft finding reached these erroneous results based on two assumptions:  1) it used the last day of attendance as the withdrawal date, rather than the last date of the week in which the student visited a course website on two separate days in the week and 2) it excluded certain clicks based on its incorrect assumption that these clicks did not constitute academic activity.  We respectfully disagree with the draft finding because it is inconsistent with DOE regulations and the University's attendance policy.

#### i. AU properly calculated the withdrawal date as the last day of the week with two separate days of attendance

AU correctly calculated the withdrawal as the last date of the week in which a student attended on at least two separate days.  We respectfully disagree with the draft finding's position that AU was required to use the last day of attendance within that week for several reasons.

First, unlike on-campus classes which meet on a prescribed date and time, AU students select the days and times in which they will attend the course for the week.  If the student has attended on Wednesday and Friday, then the student has fulfilled his or her attendance obligation for the remainder of the University's week through Monday.  Therefore, the student is not absent on Saturday, Sunday, or Monday even if he or she does not click into the University.  The student is still in attendance and is active in his or her coursework as of the end of the week on Monday based on his or her fulfillment of attendance requirements for that week's session.

---

[74] For student 88429, AU originally paid a post-withdrawal disbursement of $202.50.  The draft finding contends that no post-withdrawal disbursement should have been paid.  AU respectfully disagrees as shown on Exhibit 2-3, but determined upon further review that the post-withdrawal disbursement should have been $101.25, creating an overdisbursement of $101.25.

Second, AU's calculation is consistent with the regulation allowing institutions to measure the withdrawal date based on the last date of attendance at an academically-related activity. The finding misconstrues the last "date" as the last day on which the activity occurred. That approach would be appropriate for an on-ground campus with classes at established dates and times. However, in the on-line classroom at AU, classes are open each week from Tuesday through Monday with the requirement that the student attend class on at least two separate days before the weekly session ends on Monday.

To that end, AU does not count attendance in a subsequent week if the student does not attend on at least two separate days in the week because the student would not have attended the entire weekly session as required. AU takes this position even though it may result in an earlier withdrawal date (and require a larger refund) than under the OIG draft finding's approach. Accordingly, the last "date" is the last date of the week in which two days are attended.

Third, Exhibit 2-5 demonstrates that the AU approach frequently resulted in a larger refund than requiring AU to use the last day of click attendance regardless of whether a second click occurred in that week. Exhibit 2-5 contains a chart summarizing the R2T4 calculations for each of the 37 students using AU's LDA and using the LDA based on the last day of click attendance. The chart shows that the latter LDA would have resulted in AU returning less or the same amount of Title IV funds than it did under its policy for 28 of the 37 students. The differences in days for the remaining 9 students are only 1-5 days. Consequently, this data shows that AU's methodology typically resulted in larger refunds than would have resulted from a less stringent approach of counting all days of click attendance.

Fourth, AU's calculation is consistent with the purpose of the R2T4 regulations which are intended to identify the amount of earned Title IV funds based on the percentage of the payment period completed. The regulation defines the percentage of the payment period completed as the total number of calendar days in the payment period divided into "the number of calendar days completed in that payment period as of the withdrawal date." 34 C.F.R. § 668.22(f)(1)(i). The regulation is focused on calendar days completed by the student because it is designed to provide Title IV funds for the portion of the payment period completed by the student.

Students attending at least two separate days during each weekly segment of the course have completed all of the calendar days in that week's session and remain active as of the end of the week. Accordingly, AU recognizes that the student has completed all of the work required for the days in that week. Finding 2 would arbitrarily and incorrectly disregard the student's completion of the week by not allowing a student to earn Title IV funds during a portion of the week he or she completed.

Similarly, AU does not count any calendar days in the week if the student does not attend at least two separate days in the week. AU recognizes that these students have not completed the calendar days in that week because the student did not complete the weekly segment of the course. In these instances, AU correctly – and consistent with the regulation and its policy – defines the withdrawal date as the last day of the last completed week of the course. Draft finding 2 would arbitrarily and incorrectly count the days in the uncompleted week and allow the student to earn Title IV funds during a period of the week he or she did not complete.

For all of these reasons, the draft finding's redefinition of student withdrawal dates is incorrect and must be removed from the final audit report.

### ii. The auditors' withdrawal date calculations erroneously disregard dates on which AU documented student attendance

Finding 2 incorrectly disregards certain clicks counted by AU in determining student withdrawal dates.  The finding contends that AU does not review Blackboard to confirm attendance and instead reviews a log generated from the system for how many times each student clicked into his or her course each day on Blackboard.  The finding concludes that the click generated on the log might or might not have been related to academic activity.

First, as discussed above, AU's LDAs are calculated in accordance with Blackboard data. Exhibit 2-4 contains Blackboard data for each of the 37 cited students.  The chart in Exhibit 2-3 shows that the Blackboard data supports AU's LDA calculation.

Second, as discussed above, AU does not count each and every click by a student.  AU does not count initial clicks into the University's online learning environment, or the clicks directing students into their Online Homerooms, or the clicks in which the student selects one of the courses in which they are enrolled.  AU only counts clicks for attendance purposes once students actually have clicked into their Learning Blocks for the course.  These clicks constitute the online equivalent of entering the classroom.  AU does not count the preceding clicks leading up to this point and disagrees with any suggestion that it counts any clicks without determining whether they are related to academic activity in the program.

Third, the clicks into the online Learning Blocks for the course do constitute attendance at an academically-related activity under the regulations. Section V.B.3.ii above demonstrates why this online activity constitutes attendance academically-related activity.

Fourth, the draft finding's apparent contention that the academic activity must entail submission of an assignment is inconsistent with the regulation.[75]  The definition of "attendance at an academically-related activity" in section 668.22 does not limit academic activities to those involving completion of an exam or submission of an assignment.  As shown in Section V.B.3.ii above, the regulation includes passive activities such as attendance at computer-assisted instruction, a tutorial, a study group, or counseling or advisement sessions.[76]  The regulation does not require completion of an activity or an assignment, but only attendance at the activity.

As in the traditional classroom setting, students in the online environment are not required to submit assignments each time they enter the classroom, even though each session contributes to some degree to the learning exchange and educational growth processes.  Without the student's presence in their Learning Block, they would not be able to: learn, reflect on, understand and respond to the requirements of their courses; launch, read and download research and reading materials provided; interact with their instructors; interact with other students in

---

[75] The draft finding does not adequately explain or substantiate which clicks it recognizes as academic activities and which it does not (i.e., whether an assignment or other activity must be submitted or completed, etc.).

[76] The regulation also makes clear that the list of activities is not limited to those listed in the regulation.

their classrooms; question, challenge, assimilate or participate in the coursework assignments
and submission processes.  In short, students must attend their Learning Block classroom
sessions in order to be successfully engaged in their coursework.[77]  However, the regulations do
not require the submission of an assignment for this engagement to constitute attendance in an
academically-related activity.

   5.  **Finding 2 improperly seeks to retroactively enforce a proposed regulation
       which is yet to be promulgated or to take effect**

       The University respectfully disagrees with the draft finding's assertion that AU's R2T4
calculations purportedly resulted in losses to the Title IV programs.  As discussed above, the
regulations permit AU to establish the withdrawal date at the mid-point of the payment period
for all of its students who withdrew without notice.  In order to determine purported losses to the
Title IV programs, the finding would have to compare AU's calculations against the mid-point
methodology, not against its erroneous recalculations under AU's methodology.  As shown
above, this analysis demonstrated that the University refunded substantially more to the Title IV
programs than it was required to submit under the regulations.

       Moreover, both the OIG and the DOE lack the authority to recalculate refunds using
University attendance records and to sanction the University based on these erroneous
recalculations.  The University was not required to use its attendance records to calculate
withdrawal dates or student refunds.  Current law only obligates the University to use the mid-
point of the payment period or a later date of documented attendance.

       The DOE has proposed regulations which, for the first time, would require institutions
which are not required to take attendance to use their attendance records to calculate withdrawal
dates if they voluntarily take attendance.[78]  However, those rules are subject to notice and
comment procedures and have not been published in final form.  Moreover, such regulations
would not take effect until July 1, 2011.

       The effect of draft finding 2 is to retroactively apply these proposed regulations to AU
and to its R2T4 calculations during the audit period.  Yet, the OIG and the DOE lack the
authority to impose these recalculations based on attendance records which the law does not
require AU to use for R2T4 purposes.  Indeed, the DOE conceded during negotiated rulemaking
that "[p]ursuant to the statute, we cannot require the school to use its attendance records if it is
not 'required to take attendance.'"[79]  Accordingly, draft finding 2 must be withdrawn.

---

[77] As in any classroom, the student's engagement is as unique and diverse as the students themselves.  Some
students are very engaged, while others may be less engaged. As research shows, learning styles vary considerably
from individual to individual from the concrete to the abstract and from the active to the reflective.  AU can support,
encourage, remind, provide additional help for all learning styles in the online environment, but, ultimately, active or
passive engagement in classroom activities are the responsibility of the learner.
[78] See 75 Fed.Reg. 34806, 34875 (June 18, 2010) (proposed 34 C.F.R. § 668.22(b)(3)).
[79] See DOE comments in Issue Paper #13 from Team 1 Negotiated Rulemaking team at
http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/integrity-session3-issues.pdf.

### C.  AU Correctly Determined Payment Period Lengths

We now proceed from draft finding 2's first contention (withdrawal date calculations) to its second contention (payment period calculations).  Draft finding 2 alleges that AU did not revise the payment period end date for students who did not complete their credits according to the student's schedule.  We respectfully disagree for the reasons discussed below.

The R2T4 regulations base the return calculation in part on the total number of days in the payment period.[80]  AU's distance students are enrolled in non-term, credit-hour programs.  The students' payment periods do not end until the student has successfully completed the credits in the payment period.[81]  Typically, this is 12 credits for undergraduate programs and 9 credits for graduate programs.[82]  The students' payment periods could take longer to complete if the student does not successfully complete a course.

The DOE issued guidance stating that institutions with non-term, credit-hour programs are required to project the completion date of the payment period based on the student's progress as of his or her withdrawal date in order to determine the total number of calendar days in the period.[83]  Draft finding 2 alleges that AU did not revise the payment period end date for 57 students and purportedly overestimated the percentage of the days the students completed in the period.[84]

The draft finding's contention that 57 students are at issue is overstated for three reasons:

- First, the auditors determined that no return was due for 22 students even under the auditors' calculation methodology.  The auditors determined that twenty-one of these students completed at least 60 percent of the payment period and, therefore, that no return was required.  The auditors also determined that no return was due for a 22nd student because the student re-entered the program.  Accordingly, these students are not at issue.[85]

- Second, the auditors determined that the payment period was shorter for 11 of the cited students.  While we disagree with the auditors' recalculation methodology, we note that a shorter payment period would result in a smaller return of funds than calculated by AU.  Accordingly, these students are not at issue.

---

[80] 34 C.F.R. § 668.22(f)(2).

[81] 34 C.F.R. § 668.4(c).

[82] Bachelor and graduate students generally take one course at a time with each course typically measuring 5-6 weeks in length.  Associate students generally take two courses at a time with each course typically measuring 8 weeks in length.

[83] Dear Colleague Letter GEN-04-03, November 2004.

[84] We note that the group of 57 students discussed in this section V.C regarding payment period calculations are different from the group of 58 students discussed in the previous section V.B regarding withdrawal date calculations.  There is significant overlap between the two groups of students.

[85] We note that AU objects to the inclusion of these students in the draft finding for one or more of the other grounds described in the categories described below.  Consequently, AU respectfully disagrees with the conclusion that it purportedly miscalculated the payment period lengths for these students.  However, the finding is moot because it concludes that no returns were due for these students.

- Third, the auditors incorrectly sought to recalculate the payment period for 2 of the cited students who were enrolled in a term program (i.e., an "AAB program"). The DOE guidance for projecting payment periods applies only to non-term, credit hour programs, not to term programs. Accordingly, these two students are not at issue.

Accordingly, the students in each of the three categories above – 35 students in total – are not at issue because the draft finding does not contend that AU retained additional Title IV funds in these instances. Therefore, only 22 students remain (i.e., the original 57 students cited minus the 35 students discussed above).

We respectfully disagree with the draft finding's recalculation of payment periods for the 22 remaining students for two reasons. First, AU was not required to adjust the payment periods for 12 of these 22 students because the students did not fail to complete any of the courses in the payment period prior to the course in which they withdrew. DOE guidance on this topic during the audit period stated as follows:

> "Consider a nonterm credit-hour program offered in modules where some or all courses are offered sequentially and all students begin and end the modules at the same time. For a student who successfully completed all modules attempted up to the time the student withdrew, the completion date (and the corresponding number of days in the Return calculation) will be the number of days between the start of the first module and the originally scheduled end of the last module."[86]

This guidance makes clear that the institution uses the originally scheduled number of days in the payment period – i.e., no recalculation is required – if the student has successfully completed the courses in the payment period until the student withdrew. Exhibit 2-6 includes a summary of the data for each of these 12 students demonstrating that no payment period recalculation was required.[87]

Second, AU did in fact adjust the payment periods for the remaining 10 of 22 students and did so in accordance with DOE's guidance on this subject. Exhibit 2-6 also summarizes the calculations made for these 10 students and substantiates that these calculations complied with DOE guidance. The FSA Handbook during the audit period stated:

> "However, an institution must take into consideration any credits that a student has attempted, but not successfully completed before withdrawing. (Those credits must be successfully completed before the student is considered to have completed the period.)"[88]

---

[86] 2006-2007 FSA Handbook at 5-68 to 5-69.
[87] For example, draft finding 2 contends that AU did not properly recalculate the length of the payment period for student 108489. The spreadsheet in Exhibit 2-6 shows that the student withdrew during a payment period which was scheduled to run for 168 calendar days. The student successfully completed one course in the payment period and withdrew from the second course, but did not successfully complete two courses in the payment period. The spreadsheet shows that AU included the remainder of the days in the course in which the student withdrew plus the two remaining courses in the payment period. AU was not required to add any additional courses to the payment period because the student had not failed to complete any of the prior courses in the payment period.
[88] 2006-2007 FSA Handbook at 5-69.

Under the AU approach, if a student failed or otherwise did not successfully complete a course in the payment period, AU recalculated the payment period end date to take into consideration that the student would have to successfully complete the failed course to complete the payment period. Typically, this entailed extending the payment period by the number of days required to complete the course starting consecutively after the end date of the class where the withdrawal date occurred. Exhibit 2-6 demonstrates that AU made these calculations for each of these 10 remaining students.

We note that the draft audit report does not explain or justify the apparently different methodology it used to calculate payment period lengths. However, we note that neither the Dear Colleague Letter nor the FSA Handbook dictate a precise methodology for conducting these calculations. The Dear Colleague letter offers a recalculation example, but makes clear that the institution has discretion to adopt a reasonable methodology:

> "For credit-hour nonterm programs where the student does not earn credits or complete lessons as he or she progresses through the program, the institution must have a reasonable procedure for projecting the completion date of the period based on the student's progress before withdrawal."[89]

AU's methodology was reasonable and accounted for the student's progress. As suggested in the above-quoted passage from the Handbook, the institution took into consideration the credits needed to complete the period by adding additional days to complete a failed course. The methodology accounted for the student's progress. For example, in those instances in which a student failed to complete two or more courses in a period, AU added additional days sufficient to complete the applicable number of additional courses.[90]

Accordingly, for the reasons discussed above, we respectfully disagree with the draft finding's contentions regarding payment period calculations.

### D.  AU Correctly Projected Tuition Charges In Its Return Calculations

We now proceed from draft finding 2's second contention (payment period calculation) to its third contention (institutional charge calculation). Finding 2 contends that AU did not correctly project tuition charges in the R2T4 calculations performed for 19 students. Students were charged tuition for one course at a time rather than for all of the courses at the beginning of the payment period. The R2T4 regulations require an institution to base its R2T4 calculations on the tuition charges for the entire payment period.[91] Therefore, the University projected the additional courses the student would have completed had the student remained enrolled for the

---

[89] Dear Colleague Letter GEN-04-03, November 2004.
[90] AU complied with the applicable guidance regarding payment period recalculations. However, we note that the suggestions contained in the Dear Colleague Letter and reiterated in the FSA Handbook are not recited in the governing regulation. See 34 C.F.R. § 668.22. As a matter of law, Dear Colleague letters and the FSA Handbook cannot serve as basis for a regulatory violation. Moreover, any such rule in these letters must be subject to the negotiated rulemaking process (20 U.S.C. § 1098a) and promulgated under the notice and comment provisions of the Administrative Procedure Act before it can be enforced (5 U.S.C. § 553; see also 20 U.S.C. § 1221e-4).
[91] See 34 CFR § 668.22(g)(institution must return the lesser of unearned Title IV funds or total institutional charges incurred by the student for the payment period).

entire semester.  The auditors conducted their own calculations and reached different results for 19 students.  We respectfully disagree with those calculations.

We note that the draft finding is overstated because the audit workpapers shows that the auditors concluded that AU did not retain or over-disburse Title IV funds for four of the 19 students cited.  In addition, the workpapers also show that the auditors concluded that institutional charges were less than those calculated by AU for two other students among the 19 cited which would have resulted in smaller refunds than those actually made by AU.  Accordingly, these six students are not at issue in this draft finding.  This leaves 13 students at issue.

Exhibit 2-7 includes a spreadsheet which analyzes the AU institutional charge calculations for the 13 students at issue and compares them to the OIG's calculations.  The spreadsheet shows that AU followed a defined procedure for projecting the tuition charges for the entire payment period.  Specifically, AU identified charges for classes that would be needed to complete the payment period by projecting at the rate that would be charged on the start date for each projected class.

For example, student 115871 withdrew after the first course in her 4-course payment period.  The student had incurred $711 in charges for the first course.  In order to calculate institutional charges for the entire payment period, AU added charges for the three remaining courses in the payment period.  The first course on the student's schedule was a level 100 three credit course per the student's grade level (grade level 1).  Accordingly, AU added charges for three additional courses at the 100 level:  $711 for two of these courses beginning prior to June 30, 2007 and $771 for the third course beginning after June 30, 2007 under slightly higher rates (i.e., $257 per credit instead of $237 per credit).  AU correctly calculated institutional charges of $2,904 for the payment period.  Exhibit 2-7 explains the institutional charge calculations for each of the 13 students at issue and shows that AU correctly calculated those charges.

The draft finding does not explain or justify why it arrived at different charges than those calculated by AU.  However, the audit workpapers show that the auditors may have projected higher charges because it identified one or more higher level courses on the student's schedule at the time of its audit.  The auditor's calculations are incorrect for two reasons.

First, the AU methodology constituted a reasonable approach to projecting institutional charges which was consistent with available DOE guidance during the audit period.  We note that the FSA Handbook fails to provide explicit guidance for calculating institutional charges for institutions like AU that charge students by the course instead of the payment period.[92]  However, AU did adopt a methodology which complied with then-existing guidance:

---

[92] Indeed, the applicable regulation only states the institutions should include institutional charges "incurred" during the payment period.  The cited students only "incurred" charges for the courses they took before withdrawal, not the remaining courses.  Consequently, AU could have excluded the charges for these remaining courses which would have resulted in a smaller return obligation for AU.  AU instead followed the more conservative approach of projecting charges for all courses in the payment period.  However, AU cannot be sanctioned for the implementation of this methodology because the regulations do not explicitly require it.

"The institutional charges used in the calculation usually are the charges that were
initially assessed the student for the entire payment period or period of enrollment as
applicable.  Initial charges may only be adjusted by those changes the institution made
prior to the student's withdrawal (for example, for a change in enrollment status).  If,
after a student withdraws, the institution changes the amount of institutional charges it is
assessing a student, or decides to eliminate all institutional charges, those changes affect
neither the charges nor aid earned in the calculation."

2006-2007 FSA Handbook at 5-24 (emphasis added).

The Handbook advises institutions to use charges based on charges initially assessed for
the payment period.  As discussed above, AU does not charge for all courses at the beginning of
the payment period.  AU does certify the student at a grade level for the payment period, but only
charges tuition by the course after the start of each class.  Accordingly, AU included 1) actual
charges for the courses for which AU charged the student and 2) charges for courses for which the
student's certified grade level for the remaining courses for which AU did not charge the student.
This approach is consistent with the above guidance and is based on the student's initial grade
level and charges initially assessed.  The Handbook explicitly states that institutions are not
required to account for the prospect that the charges after the student's withdrawal might have
been different if the student had taken a course at a level higher than that for which the student
was initially certified.

Second, the AU approach ensures consistency in treatment of all students.  Students
frequently do not have a complete schedule for the payment period because a complete schedule
is not required to begin attendance.  In other cases, a student's schedule may show various
potential future courses based on future class availability or may show future courses for a
student re-entering the school.  Ultimately, students have flexibility in establishing their schedule
and, therefore, the actual courses they will take are not determined until they start and are
charged for each sequential course.  For these reasons, it would be inaccurate (as well as
inconsistent with the above-quoted guidance) to base projected charge calculations on data
available for some students – but not others – on courses which the student might or might not
take in the future.  Instead, AU appropriately and correctly used charges for courses actually
taken and the grade level initially certified for all other courses in the payment period.

Accordingly, for the reasons discussed above, we respectfully disagree with the draft
finding's contentions regarding institutional charge calculations.

### E.  OIG Recommendations 2.1 Through 2.5 Must Be Withdrawn

The University respectfully disagrees with each of the five recommendations in Finding 2
for the reasons discussed below.

OIG recommendation 2.1 requests the DOE to return $35,989 resulting from the
purportedly improper R2T4 calculations identified in the finding.  For the reasons discussed in
this response, the University respectfully disagrees with the draft finding's R2T4 recalculations
for all but one of the cited students in the amount of $101.25.

OIG recommendation 2.2 requests the DOE to require AU to conduct a 4-year file review of all R2T4 calculations for all students who withdrew during the 2005-2006 through 2008-2009 award years to identify improperly retained Title IV funds.  The finding does not provide a basis for this file review requirement.

First, AU has demonstrated that all of the draft finding's recalculations are incorrect and that the error rate for this finding is near 0 percent (i.e., one student out of 114 sampled in three audit samples).  Under DOE's long-standing practice, an error rate of less than 10 percent does not support the imposition of a 100 percent file review.  The error rate of less than one percent is insufficient to warrant a file review.

Second, the finding is premised on a review of files from only one award year (2006-2007) and does not provide any basis for expanding the review to cover a 4-year period.

Third, the finding's estimated calculations of improperly retained Title IV funds are distorted.  We note that the finding did not test files randomly selected from the entire universe of AU students.  Instead, the auditors drew three samples from two groups limited to Title IV recipients who withdrew, had a zero grade point average, or were on a leave of absence.  These targeted and judgmental samples are not representative of AU's total student population.  For that reason, the alleged error rates and dollar estimates are distorted because they do not measure AU's compliance across its entire student population.

OIG recommendation 2.3 requests the DOE to recommend that AU develop written policies and procedures to:  (a) require a student's withdrawal date to be based on last date of academically related activity as supported by the distance education students' coursework; (b) correctly determine the end of the payment period for refund calculations; and (c) provide reasonable assurance that tuition charges are accurately determined for refund calculations.

With respect to 2.3(a), the University already has policies and procedures in place for determining a student's last date of attendance at an academically related activity.  The University disagrees with the Finding's proposed methodology for calculating this date for the reasons already articulated in this response.

With respect to 2.3(b) and 2.3(c), the University also has written policies and procedures in place to determine the end of the payment period and to calculate tuition charges.  The University disagrees with the Finding's assertions of purported noncompliance in both of these areas for the reasons already discussed above.  Accordingly, the finding does not warrant further revisions or updates in the University's policies in any of the areas in 2.3(a) through (c).

OIG recommendation 2.4 requests the DOE to consider a fine or other subpart G proceeding based on the University's purported failure to perform R2T4 calculations correctly.  The University's response demonstrates that it did perform correctly all of the return calculations cited in draft finding 2 with one nominal exception.  The presence of even isolated miscalculations would not support any fine or other action under subpart G.

OIG recommendation 2.5 requests the DOE to request a letter of credit from AU because it purportedly exceeded the refund reserve standard's compliance threshold under 34 C.F.R. § 668.173(c). We respectfully disagree for several reasons.

First, the regulation does not apply here because it pertains to untimely returns, not to miscalculated returns. The compliance threshold in section 668.173(c) requires:

"In the sample of student records audited or reviewed that the institution did not return unearned title IV, HEA program funds within the timeframes described in paragraph (b) of this section for 5% or more of the students in the sample."

34 C.F.R. § 668.173(c)(1)(i)(emphasis added).

The compliance threshold is based on timeliness of the Title IV returns. However, Finding 2 is focused not on timeliness of returns, but rather on whether AU correctly calculated the returns it made. Therefore, the regulation does not apply to this finding.

Second, in any event, the regulation would not apply because it pertains only to findings in either of an institution's two most recently completed fiscal years. The regulation states:

"[A]n institution … must submit an irrevocable letter of credit acceptable and payable to the Secretary if a finding in an audit or review shows that the institution exceeded the compliance thresholds in paragraph (c) of this section for either of its two most recently completed fiscal years."

34 C.F.R. § 668.173(d)(1)(emphasis added).

The letter of credit requirement is triggered only by a finding in the two most recently completed fiscal years. For AU, those two years are 2008 and 2009. However, draft finding 2 covers only the one-year audit period ending June 30, 2007, not on the 2008 and 2009 fiscal years. Therefore, the regulation does not apply to this finding.

Third, the University's compliance audits for its two most recently completed fiscal years did not report late returns in excess of the compliance thresholds. Exhibit 2-8 contains copies of the University's annual Title IV compliance audits prepared by an independent third party accounting firm for the 2008 and 2009 fiscal years. Neither audit contains a late return of title IV funds finding in excess of the compliance thresholds. Accordingly, there is no basis for a letter of credit requirement under the regulation.

Finally, as discussed above, the draft finding is not based on randomly selected files from the entire universe of AU students to whom returns were due. Instead, the auditors drew a judgmental sample and drew other samples from populations which includes not only students who withdrew, but also students with zero grade point averages and leaves of absence. These samples do not comply with the regulation which requires that "[f]or purposes of determining this percentage [i.e., the compliance threshold], the sample includes only students for whom the institution was required to return unearned funds during its most recently completed fiscal year."

34 C.F.R. § 668.173(c)(1)(i).  Moreover, the OIG's audit guide requires that the sample used to test returns of title IV funds be drawn at random from a population of students who withdrew during the compliance period.[93]  The judgmental sample and the targeted universes from which samples were drawn do not comply with this standard.  For all of these reasons, OIG recommendation 2.5 must be withdrawn.

## V.     Draft Finding 3:  Timeliness of Return-to-Title-IV Payments

The University respectfully disagrees with draft finding 3 and with its recommendations. The draft finding contends that the University did not return Title IV funds timely for certain students who withdrew during the 2006-2007 timeframe.  However, as discussed below:

- The draft finding fails to recognize that AU used a stricter methodology for calculating the deadline for an R2T4 calculation than it could have adopted under DOE regulations.  AU's returns were routinely paid weeks and even months in advance of the deadlines it could have used as discussed in Section VI.A below. Therefore, the draft finding's suggestion that the purported lateness of AU refunds harmed the Title IV programs is incorrect.

- The draft finding addresses a topic already identified in AU's compliance audits from the audit period and already addressed by AU as evidenced by its subsequent compliance audits.  AU previously reported the occurrence of untimely returns in findings in its 2007 annual Title IV compliance audit reports and submitted a letter of credit to the DOE.  The draft finding acknowledges that AU subsequently took corrective actions.  AU has demonstrated the success of those corrective actions by the absence of a material R2T4 timeliness finding in its compliance audits for 2008 and 2009.  As discussed in Section VI.B., the absence of such findings justify the release of the letter of credit under DOE regulations.

- The draft finding's results are distorted.  The draft finding contends that returns were as many as 273 days late.  Yet, the actual results show that, even under the stricter methodology adopted by AU, only four of the cited returns were greater than 40 days late.  As noted in Section VI.B below, the alleged periods of lateness for the other returns were shorter and at least one-third were less than seven days late (i.e., seven of the 21 cited) under the more stringent methodology adopted by AU.

For the reasons discussed in this response, the finding and its recommendations should be withdrawn in their entirety.

---

[93] See OIG Audit Guide at I-14 to I-15.

### A. Ashford University Used A Stricter R2T4 Deadline Methodology Than Required By Governing Law

At the outset, we note that AU returns Title IV funds to the Title IV Programs earlier than would be required under the most lenient methodology it could adopt under the applicable regulations. Draft finding 3 does not recognize this point in its discussion of refund timeliness. Accordingly, its suggestion that the timing of cited refunds purportedly resulted in losses to the Title IV Programs is incorrect.

The R2T4 regulations require an institution to return Title IV funds for which it is responsible under the R2T4 calculation "no later than 45 days after the date of the institution's determination that the student withdrew as defined in paragraph (l)(3) of this section." 34 C.F.R. § 668.22(j).

Paragraph (l)(3) defines the "date of the institution's determination that the student withdrew" for a student who does not provide notification of his or her withdrawal as "the date that the institution becomes aware that the student ceased attendance." 34 C.F.R. § 668.22(l)(3).

However, the regulations do not require an institution to determine the withdrawal date of a student until 30 days after the end of the earlier of the student's payment period, the student's academic year, or the student's program.[94]

In effect, the regulations permit institutions which are not required to take attendance to wait until well after a payment period is over to determine a student's withdrawal date. This 30-day timeframe, coupled with the 45-day return deadline, means that such institutions are not required to make Title IV returns until as many as 2 ½ months after the student's payment period ends. This would be the case even if the student had withdrawn without notice within a few days of starting the payment period.

However, AU did not take this lenient approach to its return calculations that many other institutions across the country take advantage of. Instead, AU voluntarily monitors attendance and makes determinations of student withdrawals throughout the payment period. As a result, AU routinely makes its return calculations and refunds during the payment period rather than weeks or months after its conclusion. This results in AU routinely restoring Title IV funds to the Title IV Programs weeks or even months in advance of the deadline that would apply if AU followed the approach taken by other institutions.

---

[94] The regulation states:

"An institution must determine the withdrawal date for a student who withdraws without providing notification to the institution no later than 30 days after the end of the earlier of the—
    (i)      Payment period or period of enrollment, as appropriate, in accordance with paragraph (e)(5) of this section;
    (ii)     Academic year in which the student withdrew; or
    (iii)    Educational program from which the student withdrew."

34 C.F.R. § 668.22(j)(2).

Consequently, AU objects to the draft finding's assertion regarding the impact of this finding on the Title IV Programs.  AU returned the cited refunds well in advance of the deadline that would have applied had it chosen not to take attendance and not to make withdrawal date determinations until after the end of a payment period.  The draft finding's assertion should be withdrawn.

## B.  OIG Recommendations 3.1 Through 3.3 Must Be Withdrawn

OIG Recommendation 3.1 requests that FSA require AU to develop and implement written policies and procedures that provide reasonable assurance that unearned Title IV funds are returned timely.  The recommendation should be withdrawn because the University already has successfully implemented such policies and procedures.

AU, in conjunction with ACS, which processes the University's return of Title IV aid calculations, already has developed written policies and procedures to address this issue.  The draft finding references enhancements made by ACS to provide better measurement of the timing of payments, additional staffing deployed by ACS, and the assignment of a senior processor by ACS to ensure that calculations and payments are completed in a timely manner.[95]

The success of these efforts is demonstrated in the two most recently completed annual Title IV compliance audits of the University conducted by an independent certified public accounting firm.  The audits covered the 2008 and 2009 fiscal years, which took place after the timeframe reviewed in the draft finding (i.e., the award year ending June 30, 2007).  Both audits examined timeliness of return of Title IV payments within a random sample of student files for the pertinent fiscal year and concluded that the University complied with the timeliness thresholds in 34 C.F.R. § 668.173(c).  The regulation states as follows:

"(c) *Compliance thresholds*.  (1) An institution does not comply with the reserve standard under § 668.173(a)(3) if, in a compliance audit conducted under § 668.23, an audit conducted by the Office of Inspector General, or a program review conducted by the Department or guaranty agency, the auditor or reviewer findings—

    i.  In the sample of student records audited or reviewed that the institution did not return unearned title IV, HEA program funds within the timeframes described in paragraph (b) of this section for 5% or more of the students in the sample.  (For purposes of determining this percentage, the sample includes only students for whom the institution was required to return unearned funds during its most recently completed fiscal year.); or

    ii.  A material weakness or reportable condition in the institution's report on internal controls relating to the return of unearned title IV, HEA program funds.

(2)    The Secretary does not consider an institution to be out of compliance with the reserve standard under § 668.173(a) if the institution is cited in any audit or review report

---

[95] See Draft Audit Report at 19.

because it did not return unearned funds in a timely manner for one or two students, or for less than 5% of the students in the sample referred to in paragraph (c)(1)(i) of this section."

34 C.F.R. § 668.173(c).  Exhibit 2-8 contains copies of the University's Title IV compliance audit reports for the 2008 and 2009 fiscal years.  Neither audit report contains a late return finding in excess of the 5 percent threshold.  These reports demonstrate that AU meets the regulatory standard for both years.

Accordingly, we respectfully submit that recommendation 3.1 is moot and must be withdrawn.  Ashford successfully implemented written policies and procedures which addressed the concerns raised in Finding 3 as evidenced by the University's compliance audits for the two most recently completed fiscal years.

OIG Recommendation 3.2 recommends that FSA consider a fine or other Subpart G proceeding based on this finding.  We disagree and respectfully submit that the finding does not warrant such action for several reasons.

First, as discussed above, the University's two most recent compliance audits demonstrate that the University has successfully and promptly addressed the issues raised in the finding.  The finding itself concerns an older time period (i.e., the award year ended June 30, 2007) and did not examine the time periods reviewed and reported on by an independent auditor in AU's more recent annual Title IV compliance audits.

Second, the scope of the draft finding is distorted because it is not premised on a random selection of files.  As discussed in response to draft finding 2, which used the same samples as draft finding 3, the auditors did not test files randomly selected from the entire universe of AU students.  Instead, the auditors drew three samples from two groups limited to Title IV recipients who withdrew, had a zero grade point average, or were on a leave of absence.  These targeted and judgmental samples are not representative of AU's total student population.  For that reason, the alleged error rates are distorted because they do not measure AU's compliance across its entire student population.

Third, the draft finding overstates the extent of the alleged untimeliness of refunds.  The draft finding contends that the range of lateness extended up to 273 days late.  Yet, only 4 of the cited returns were greater than 40 days late.  The alleged periods of lateness for the other returns were shorter and at least one-third were less than seven days late (i.e., seven of the 21 cited).

Lastly, the draft finding does not dispute that Ashford did in fact pay the required returns to each of the cited students.  The draft finding does not involve any instances of unpaid returns or any failure by the University to return Title IV funds for these students.  The draft finding instead involves instances of lateness which in some cases were alleged to be as little as two days late.  For all of these reasons, recommendation 3.2 must be withdrawn.

OIG recommendation 3.3 recommends that FSA request a letter of credit from the University because it purportedly exceeded the refund reserve standard's compliance threshold under 34 C.F.R. § 668.173(c). The recommendation must be withdrawn for at least two reasons.

First, the recommendation is moot because AU already has submitted a letter of credit to the Department based on late returns previously reported in its Title IV compliance audit for the 2007 fiscal year. This time period overlaps with the 2006-2007 timeframe covered by finding 3.

Second, the regulations no longer require the University to maintain a letter of credit based on timeliness of returns. The regulation provides as follows:

> "[A]n institution … must submit an irrevocable letter of credit acceptable and payable to the Secretary if a finding in an audit or review shows that the institution exceeded the compliance thresholds in paragraph (c) of this section <u>for either of its two most recently completed fiscal years</u>."

34 C.F.R. § 668.173(d)(1)(emphasis added).

The regulation makes clear that the requirement to submit a letter of credit only applies if the compliance threshold is exceeded "for either of its two most recently completed fiscal years." The institution's two most recently completed fiscal years are 2008 and 2009. Draft finding 3 covered a prior time period (i.e., the award year ended June 30, 2007). As discussed above, the institution's Title IV compliance audit reports for the two most recently completed fiscal years – 2008 and 2009 – did not contain late return findings in excess of regulatory maximums. These most recent findings warrant the <u>removal</u> of the requirement to submit a letter of credit, not the imposition of such a requirement. Accordingly, the recommendation to submit a letter of credit should be withdrawn.

## VI.    Draft Finding 4:  Authorization to Retain Student Credit Balances

### A.  Introduction

Draft finding 4 alleges that the University's credit balance authorization form did not comply with regulations and recommends that the DOE require the University to revise its authorization form. Although we respectfully disagree with the draft finding and note that it does not cite any instances of failing to pay credit balances to students, the draft finding is moot because 1) the University already has revised its authorization form and 2) the DOE already has approved the revised form. The draft finding should be withdrawn because no further action by AU is required.

### B.  The University's prior authorization form complied with regulations

We respectfully disagree with the draft finding's objections to our prior credit balance authorization form. The draft finding alleges that 1) the prior form was not voluntary because it was included on the University's financial aid application which the student was required to sign; 2) the prior form does not clearly state that the student or parent has given the University the

authorization to hold credit balances for the student or parent; and 3) the prior form does not provide a student or parent the option not to authorize the University to retain a credit balance (the only yes or no options pertain to what the balance may be applied to other than tuition and fees).

However, by giving "Yes" and "No" options, the prior form clearly notified the student or parent that he or she either may give or not give authorization to hold credit balances to pay for 1) educationally related activities other than tuition and fees for the payment period covered by the award or 2) minor charges for the prior period. The form also clearly notifies the student or parent of his or her right to withdraw any authorization or consent at any time by contacting the financial aid office. Specifically, the form states that "I (We) may withdraw my approval for any one or all of the above authorizations at any time. This may be accomplished by contacting the financial aid office."

While there is not a "Yes" or "No" option just preceding the first statement regarding the "crediting of federal financial aid funds directly to the student's account to cover educational costs for the payment period covered by the awards," no such option is required. First, if the student did not want to give such a consent, he or she could refuse to sign the acknowledgement form. Second, as noted above, the student was informed that he or she had the right at any time to withdraw any or all of the authorizations. Third, and more fundamentally, the student has no right to refuse to permit the institution to apply federal student aid funds toward payment of the tuition and fees for which the aid was awarded. The regulations specifically provide that no consent is required in order to use federal student aid funds to pay tuition and fees for which the aid was awarded.[96] For these reasons, we respectfully disagree with the draft finding's assertions regarding the prior authorization form.

### C. The Department has approved the University's current credit balance authorization form

Draft finding 4 recommends that the DOE require AU to modify its credit balance authorization form to comply with applicable requirements. Notwithstanding our disagreement with the draft finding, we already have revised our credit balance authorization form. Moreover, the DOE has reviewed and approved the new form. Accordingly, the draft finding and its recommendations are moot and must be withdrawn.

The revised form entitled "Authorization for Ashford University to Hold a Federal Student Aid Credit Balance" is attached as Exhibit 4-1. The form addresses each of the stated concerns in draft finding 4. First, the form is voluntary and does not require the student or parent to sign the form. The form contains multiple references to the student and parent not being required to sign (e.g., "This form, if signed by the student…"; "If you elect not to sign this form…"; etc.).

---

[96] See 34 C.F.R. § 668.164(d)("Without obtaining the student's or parent's authorization under § 668.165, an institution may use title IV, HEA program funds to credit a student's account at the institution to satisfy current charges for – (i) Tuition and fees; (ii) Board, if the student contracts with the institution for board; and (iii) Room, if the student contracts with the institution for room.")(emphasis added).

Second, the form makes clear that the student is authorizing AU to hold credit balances. The opening paragraph explains what a credit balance is and explains that the credit balance must be paid to the student within 14 days unless the student authorizes AU to hold the credit balance. The form then states that: "This form, if signed by the student (or parent in the case of a PLUS loan), authorizes Ashford University to hold any Federal student aid credit balance beyond the 14 day period."

Third, the form also notifies the student of the option to withdraw the authorization and how to exercise that option. The form states: "This authorization may be withdrawn at any time by providing a written request to Revocations@ashford.edu or to the following mailing address…"

Finally, the DOE has reviewed and approved the revised credit balance authorization form. Exhibit 4-2 contains e-mail correspondence between AU and the DOE regarding the revised form between August and November 2009. AU provided a copy of its authorization form to the DOE and revised the form in response to recommendations received from the DOE. The follow-up correspondence from November 5th indicates that the DOE review included recommendations from DOE policy personnel as well as earlier recommendations from the DOE's regional office in Kansas City. AU updated the form to respond to the comments from the DOE. The correspondence culminated in a November 13, 2009 e-mail from the DOE notifying AU that it had reviewed the form, concluded that it appeared to be in compliance with Title IV requirements, and instructing AU to start using the form. AU subsequently implemented the new credit balance authorization form reviewed and approved by the DOE.

### D.  OIG Recommendations 4.1 Through 4.3 Must Be Withdrawn

OIG recommendation 4.1 must be withdrawn. The recommendation requests FSA to require AU to revise its authorization form to comply with applicable requirements. As discussed above, AU already has revised its form, and the DOE already has reviewed and approved the revised form.

OIG recommendation 4.2 must be withdrawn. The recommendation requests FSA to require AU to provide its students and parents the opportunity to sign or refuse to sign the authorization form and to pay credit balances to any student or parent who chooses not to sign the revised form. For the reasons discussed above, both the current and prior forms provide students and parents with this authority. The DOE has reviewed and approved AU's current credit balance authorization form.

OIG recommendation 4.3 is based on an incorrect statement of law and must be withdrawn. The recommendation requests that FSA require AU to cease drawing, disbursing and holding credit balances for which there are no charges. The recommendation is premised on the position that the "University may make multiple disbursements during a payment period, but it must draw and disburse Title IV funds only when they are needed to pay allowable charges. We respectfully disagree.

First, the regulation explicitly requires an institution to make disbursements on a payment period basis:

> "(b) Disbursements by payment period.  (1) Except as provided in paragraph (b)(2) of this section,[97] an institution must disburse title IV, HEA program funds on a payment period basis.

34 C.F.R. § 668.164(b)(1).  The regulation clearly states that an institution "must" disburse Title IV on a payment period basis, not on a course-by-course basis, a modular basis, or some other basis.[98]

Second, the regulation does not require an institution to make multiple disbursements within a payment period basis.  Indeed, the regulation generally requires an institution to disburse Title IV funds once each payment period:

> "An institution must disburse title IV, HEA program funds once each payment period unless—
> | (i) | For FFEL and Direct Loan funds, 34 CFR 682.604(c)(6)(ii) or 34 CFR 685.301(b)(3) applies; |
> | (ii) | For Federal Perkins Loan, FSEOG, Federal Pell Grant, ACG, and National SMART Grant Funds, an institution <u>chooses</u> to make more than one disbursement in each payment period in accordance with 34 CFR 674.16(b)(3), 34 CFR 676.16(a)(3), 34 CFR 690.76, or 34 CFR 691.76, as applicable; or |
> | (iii) | Other program regulations allow or require otherwise. |

34 C.F.R. § 668.164(b)(1) (emphasis added).  The regulation makes clear that the decision to make more than one disbursement during the payment period is a matter of institutional choice, not a requirement.[99]

Third, the disbursement regulations explicitly anticipate that Title IV disbursements may exceed charges assessed by the institution.  The regulations do not prohibit these disbursements from occurring.  As noted above, the regulations require disbursements to be made on a payment period basis.  Instead, the regulations recognize the difference as a credit balance and prescribe requirements for handing these balances.

Fourth, the draft finding contends that sections 668.164(d)(1) and (4) do not permit institutions to disburse funds in excess of charges assessed as of the date of disbursement.  This is incorrect.  Section 668.164(d)(1) states that an institution may use Title IV funds to credit a

---

[97] Paragraph (b)(2) refers to the FWS program.
[98] This is consistent with the R2T4 regulations which require institutions to calculate returns based on institutional charges for the entire payment period, not just the institutional charges actually assessed for the payment period. See 34 CFR § 668.22 and our response to draft finding 2.
[99] See also FSA 2009-2010 FSA Handbook at 4-33 ("When scheduling loan disbursements, you <u>can request</u> multiple disbursements of a loan within a payment period or loan period, as long as the disbursements are substantially equal installments.").  The Handbook says an institution "can" request, not "is required" to request.

student's account at the institution to satisfy current charges (i.e., charges assessed for the current award year or loan period).  However, the provision does not prohibit institutions from disbursing funds in excess of current charges.

The regulations discussed above anticipate that disbursements may exceed current charges and create a credit balance.  This is why the regulations include rules on credit balances. The credit balance rules require the institution to treat the excess funds as a credit balance until additional charges for the payment period are assessed.  These provisions do not prohibit schools from disbursing funds on a payment period, nor from disbursing funds in excess of current charges.  The rules simply require schools to have an appropriate authorization form to address the handling of excess funds.  As discussed above, the DOE already has reviewed and approved AU's form.  For all of these reasons, OIG Recommendation 4.3 must be withdrawn.

## VII.   Draft Finding 5:  Disbursements of Title IV Funds

### A.  Introduction

The University respectfully disagrees with draft finding 5 and with its recommendations. The draft finding contends that the University made disbursements to certain students before they had become eligible for those disbursements.  For the reasons discussed in this response, the finding and its recommendations should be withdrawn in their entirety.

### B.  The Draft Finding Does Not Involve Unreturned or Unearned Title IV Funds: The Disbursements For All But One of the 90 Students Tested Were Fully Earned or Fully Returned to the Title IV Programs

At the outset, we note that a careful review of draft finding 5 shows that, for all but one of the 90 students tested (89 out of 90 students), the auditors concluded that all of the cited disbursements either were earned in full through successful completion of subsequent coursework or returned in full by the University to the Title IV programs.  Thus, the draft finding is not the product of the University retaining Title IV funds to which it and its students were not entitled.

Specifically, the draft finding tested the disbursements to 90 students comprised of two samples of 50 students and 40 students, respectively.  The draft finding contends that one or more disbursements were made prematurely to 21 of the 50 students in the first sample[100] and to two of the 40 students in the second sample.[101]  Yet, the draft finding concluded that students ultimately became eligible for disbursements in some cases[102] and that the University ultimately returned the disbursements in all but one of the other cases.[103]  The draft finding only identified one student with two disbursements totaling $5,520 which the student did not earn and which the

---

[100] The draft finding contends that these 21 students collectively received 55 allegedly improper disbursements.

[101] The draft finding contends that these two students collectively received three allegedly improper disbursements.

[102] The draft finding contends that students ultimately earned 22 of the 55 disbursements.

[103] The draft finding contends that the University returned the 31 of the 55 disbursements in the first sample and all three of the cited disbursements in the second sample.

institution did not return.  The auditors acknowledged in their workpapers that these two
disbursements have since been repaid.

### C.  The Draft Finding's Results Are Distorted Because They Are Not Based On A Random Sample of Files And Contain Errors

The alleged exceptions in the draft finding are not based on samples drawn from the full
universe of the University's population.  Instead, the auditors drew its 50-student sample from a
universe which the draft finding concedes was selected to target students at risk of receiving
improper disbursements:

> "For the disbursement universe, we analyzed distance education students who we
> considered at risk of receiving improper disbursements.  In a non-term program, a
> payment period is the period of time in which the student completes half the number of
> credit hours in the program and half the number of weeks in the program.  We considered
> the student to be at risk of an improper disbursement if the disbursement were made prior
> to the student completing the prior payment period's hours. …  We randomly selected 50
> distance education students from our targeted universe of 3,521."[104]

Consequently, the draft finding's results do not constitute a representative portrayal of
purported instances of untimely disbursements among the entire population of AU's students.
Instead, the draft finding presents a distorted view by focusing exclusively on "at risk" students.
Even then, the draft finding identified only one student with disbursements which were neither
earned nor returned.

Moreover, we note that the second sample – a randomly selected 40-student sample
drawn from students placed on a leave of absence – yielded an alleged error rate of only five
percent (two out of 40 students).  Even this sample does not constitute a genuine random sample
because it was not drawn from the full population of AU students.  However, this sample does
show that a less targeted population yielded a much smaller incident rate than the judgmental
sample which produced the bulk of the draft finding.

Lastly, the draft finding is overstated because its conclusions with respect to at least 15 of
the cited disbursements are incorrect.  For example, the draft finding contends that AU disbursed
Title IV funds prematurely to student 102365.  However, Exhibit 5-1 shows that the student
entered the second award year on June 12, 2007 and posted attendance in that course so was
eligible for the disbursements received on July 12, 2007.  Exhibit 5-1 also shows that this student
entered the second payment period of the second award year on December 4, 2007 and was
therefore eligible for the disbursements received on December 25, 2007.  Consequently, AU did
not disburse the cited disbursements prematurely as claimed in the draft finding.  Exhibit 5-1
provides similar information demonstrating that AU timely made the disbursements to the other
listed students.

---

[104] Draft Audit Report at 23.

### D. Recommendations

The University respectfully disagrees with each of the three recommendations in Finding 5 for the reasons discussed below.

OIG recommendation 5.1 requests DOE to require the University to review its records for all students who received Title IV, HEA program disbursements over a 4-year period (2005-2006 through 2008-2009 award years); identify all disbursements made to students who were not eligible for them at the time of the disbursement and never became eligible for the disbursements; and return those amounts to the Department or the FFEL Program lenders, as appropriate. The recommendation must be withdrawn for several reasons.

First, the draft finding does not support the file review requirement. The file review is intended to identify disbursements for which students "never became eligible" and which the University did not return. However, as discussed above, the draft finding identified only one such student out of an overall population of 90 students (i.e., less than 2 percent of the population).[105] Under DOE's long-standing practice, an error rate of less than 10 percent does not support the imposition of a 100 percent file review.

Second, the draft finding is premised on a review of files from only one award year (2006-2007) and does not provide any basis for expanding the review to cover a 4-year period.

Third, the draft finding's estimated calculations of improperly retained Title IV funds are distorted. The draft finding did not test files randomly selected from the entire universe of AU students. Instead, the auditors drew a sample from what it admitted was a judgmental sample selected to target students at risk of an improper disbursement. This targeted and judgmental sample is not representative of AU's total student population and does not provide a basis for requiring a file review to test for purported noncompliance across AU's entire student population.

OIG recommendation 5.2 requests DOE to require the University to develop and implement written policies and procedures to provide reasonable assurance that Title IV, HEA program funds are not disbursed until after the University confirms the student's eligibility for the disbursement. Although we believe that there was not a systemic problem with disbursements prior to eligibility the University implemented additional procedures subsequent to the audit period which address the concerns identified in draft finding 5.

OIG recommendation 5.3 requests DOE to consider a fine or other subpart G proceeding due to the University disbursing Title IV funds to students who were allegedly ineligible at the time of the disbursement. We disagree and respectfully submit that the draft finding does not warrant such action.

---

[105] Indeed, when the results are excluded from the 50-student sample – which the draft finding concedes was a targeted, rather than random, sample – the draft finding did not identify any students in its other sample of 40 students.

First, as discussed above, the draft finding overstates the extent of the alleged noncompliance and harm to the Title IV programs.  The disbursements to all but one of the 90 students tested by the auditors were fully earned by the student through subsequent coursework or were returned in full to the Title IV programs by the University.  These disbursements do not involve instances of the University or the student ultimately retaining Title IV funds to which they were not entitled.

Second, the scope of the draft finding is distorted because it is not premised on a random selection of files.  As already discussed above, the auditors drew a sample from a judgmental sample targeted at identifying noncompliance among an at-risk group rather than identifying alleged noncompliance across AU's total population.  Indeed, the error rate is nominal in the more representative yet still targeted second sample of 40 students.  This nominal error rate does not warrant further action.

Accordingly, OIG recommendation 5.3 should be withdrawn.

## VIII.   Draft Finding 6:  Leaves of Absence

We respectfully disagree with the draft finding's contention that AU did not always have documentation to support distance education students' leaves of absence (LOA) during the 2006-2007 award year.  The draft finding is based on a review of a sample of 40 students who were placed on an LOA.  The draft finding contends that it found discrepancies with 20 of these students.

The draft finding is incorrect, however, for several reasons.

### A.  The Draft Finding concedes that leaves of absence did not exceed federal limits

The draft finding contends that there is a risk that distance education students might have been on leaves of absence longer than permitted by Federal regulations.  Yet, as the draft finding concedes, "none of the leaves of absence exceeded 180 days in any 12-month period, the maximum number of days allowed by 34 C.F.R. § 668.22(d)(1)(vi)."[106]  Consequently, the draft finding did not identify even one LOA in excess of federal limits among its 40-student sample. Its suggestion that there is a risk of noncompliance with federal requirements on this issue is unsupported by its own audit sample.

### B.  An institution cannot be sanctioned merely for a purported violation of internal policy

The draft finding contends that eleven of 40 students received an LOA in excess of AU policy.  Although we disagree with this conclusion, the draft finding is alleging noncompliance not with law, but with University policy.  As a matter of law, an institution may not be sanctioned for noncompliance with an internal policy, only with noncompliance with governing

---

[106] See Draft Audit Report at 29.

regulations.[107]  As the draft finding concedes, the LOAs tested by the OIG did comply with federal limits on duration.

### C.  The draft finding incorrectly recalculates the duration of the leaves of absence

The draft finding incorrectly recalculates the length of the LOAs granted by AU based on its improper redefinition of a student's last date of attendance.  Under AU policy, the start date for a student's LOA is the student's last date of documented attendance.  As already discussed in our earlier response to draft finding 2, AU established a student's LDA through examination of attendance clicks in the Blackboard software system and application of its attendance policy which established the LDA as the last day of the week in which the student attended class for at least two days during the week.  As also discussed in response to draft finding 2, AU's LDA calculation process complied with governing regulations.  The draft finding lacks the support to redefine AU's LDA calculations.

Because the duration of an LOA is tied to the student's LDA, the finding's recalculation of the LDA also resulted in a recalculation of the duration of the LOA and the conclusion that 11 of the 40 students sampled received LOAs in excess of AU policy (but not in excess of federal regulations).  We also note that the draft finding's results, even if incorrectly accepted, are distorted.  The finding contends that 19 of the 40 students had purportedly unsupported LDAs, yet concedes that only 11 of the 19 purportedly received LOAs in excess of AU's LOA policy.  We also note that in many cases the purported "discrepancies" are minimal – all but four are seven days or less, four are only one day, and one resulted in a later LDA.

For the reasons already discussed at length in response to draft finding 2, the recalculations of student LDAs in draft finding 6 are incorrect.

### D.  The University correctly calculated R2T4 returns for the two cited students

The finding contends that 2 of the 40 students did not return from their LOAs and that AU did not calculate correct R2T4 calculations for them.  As discussed below, the draft finding recommends that DOE require AU to return the additional funds purportedly owed under these calculations.  However, the draft finding is incorrect.

With respect to the first of the two students (student #113549), the draft finding alleges that the student completed only 50% of the payment period and that the R2T4 calculation would have resulted in a return obligation of $1,768 (rounded up from $1,767.50).  However, the draft finding reached this conclusion by incorrectly recalculating the student's LDA as described above[108] and understating the portion of the payment period completed by the student.  AU correctly concluded that the student completed at least 60% of the payment period and that no return obligation was required.  See Exhibit 6-1.

---

[107] See, e.g., *In the Matter of Southeastern University*, Dkt. No. 93-61-SA (June 22, 1994 (appealed), October 6, 1995 (sustained), February 8, 1996 (remanded on other issues)).

[108] The OIG incorrectly recalculated the student's LDA as April 25th.  The correct LDA was April 30th.

With respect to the second of the two students (student #116492), the draft finding alleges that AU under-calculated the return calculation and owes an additional $1,228 (i.e., $1,657 instead of $429). However, the discrepancy is again the result of the finding's incorrect recalculation of the student's LDA as described above[109] and understating the portion of the payment period completed by the student. AU correctly calculated and paid the return amounts owed. See Exhibit 6-1.

### E.  Institutions cannot be sanctioned for missing LOA paperwork for two students

The draft finding's contentions regarding purportedly missing LOA paperwork are overstated and incorrect. The draft finding only cites two students[110] out of a sample of 40 with purportedly missing LOA documentation, or five percent of the overall sample. The draft finding does not contend that there are any liabilities associated with these students.

In addition, the lack of documentation does not support the draft finding because there is other evidence supporting the LOAs granted to both students. Specifically, the draft finding contends that AU did not provide the auditors with copies of the LOA forms completed by the students. That is correct. The forms signed by these students have been misplaced. The forms were completed and returned to AU by each student, however, as corroborated by the CampusVue entries referred to below and submitted as Exhibit 6-1.

The draft finding states that, because the forms are absent, AU violated the applicable regulations and University policy. We respectfully disagree. The regulations do not require that an institution keep copies of LOA request forms. The regulations provide that a LOA policy must require the student to submit a written, signed, and dated request for a LOA prior to granting a LOA, unless unforeseen circumstances prevent the student from providing a prior written request. It is undisputed that AU's policy so requires. It also is undisputed that, in 38 of the 40 files reviewed, a copy of the signed LOA form was retained in the file.

The regulations do not require that AU keep a copy of the signed and dated request form. Here, although it is AU practice to do so, the forms for two students were misplaced. It is clear from the records on file, however, that the students submitted the forms and properly requested the leave of absence.

In the matter of student 85700, the University received and approved this student's LOA on November 27, 2006. As corroborated in the print-outs from AU's CampusVue system, submitted with this response as Exhibit 6-1, the student began her LOA on November 13, 2006. The student resumed her studies in PSY320 on January 1, 2007, which she completed with an "A" on February 5, 2007. She requested the LOA for immediate medical reasons while still in Active status. As reflected in the Activities entry for November 16, 2007:

"Returned student's call. Student is in hospital at this time and can't attend class."

As reflected in the Activities entry eleven days later, on November 27:

---

[109] The OIG incorrectly recalculated the student's LDA as August 20th. The correct LDA was August 27th.
[110] Students 85700 and 68605.

"Received LOA form. Student's LDA is 11/20/06 with expected re-entry of 1/2/07.
Medical reasons. Approved and passed to [ ] for sig."

Further entries from the CampusVue system are contained in Exhibit 6-1. They
corroborate the fact that the student properly requested, and the University properly approved, an
LOA for medical reasons. AU cannot be faulted for failing to approve the LOA because the
student's unexpected hospitalization prevented her from requesting it further in advance. And,
as the record shows, she returned the signed form to AU and later resumed classes approximately
when expected. We respectfully submit this is an example of precisely how an LOA can be used
to the benefit of the student and the Title IV programs.

The situation with the student 68605 is similar to that of the student above, in that her
LOA began as of the last day of her PSY202 course, which she completed on July 31, 2006 with
an "A-" grade. The CampusVue records submitted as Exhibit 6-1 demonstrated that on July 26,
2006, while in Active status, the student requested and received approval for an LOA for the
period of August 1, 2006 through September 15, 2006. The CampusVue records further
demonstrate that Ashford representatives were in communication with the student on a number
of occasions concerning her request for an LOA, that they sent her the LOA request form, and
that she returned it to them. Accordingly, the records demonstrate that Ashford complied with
regulatory requirements and its own policies regarding the student's LOA. Finally, we note that,
before the expiration of the LOA period, the student withdrew from the program. So, the leave
of absence was converted to a withdrawal, and the return of Title IV calculation was performed,
with the appropriate last date of attendance.

We respectfully submit that, in both instances, the records support the conclusion that the
University followed applicable regulations and its own policies, and that there was no loss to the
Title IV programs.

### F. OIG Recommendations 6.1 through 6.3 Must Be Withdrawn

Draft recommendation 6.1 requests DOE to require repayment of $2,995 for the two
students in the 40-student sample who did not return from their LOA and for whom the finding
alleges AU did not perform correct R2T4 calculations. As discussed above, the finding is
incorrect and based on the auditor's improper redefinition of the students' last dates of
attendance. AU appropriately handled the R2T4 process for both students and no additional
funds are owed. Draft recommendation 6.1 must be withdrawn.

Draft recommendation 6.2 requests DOE to require AU to identify other purportedly
improper payments resulting from LOAs during a 4-year period (2005-2006 through 2008-2009
award years). The draft finding does not provide a basis for this file review requirement. The
draft finding only identified two students out of its 40-student sample with purportedly incorrect
R2T4 payments arising out of LOAs and both allegations are incorrect. Even if correct, the
resulting 5-percent error rate is isolated and well below the 10-percent error rate threshold long
used by the DOE to determine whether a full file review is justified. Moreover, the finding is
premised on a review of files from one award year (2006-2007) and does not provide any basis
for expanding the review to cover a 4-year period. Lastly, the finding itself concedes that <u>none</u>

of the LOAs in its 40-student violated federal limits on LOA duration.  For all of these reasons, recommendation 6.2 must be withdrawn.

Draft recommendation 6.3 requests DOE to require AU to develop written policies and procedures that (a) require attendance to be based on the last date of academic activity as supported by the students' coursework; and (b) provide reasonable assurance that LOA forms are maintained in students' files.  Recommendation 6.3(a) is identical to recommendation 2.3(a) and must be withdrawn for the reasons already discussed in response to draft finding 2. Recommendation 6.3(b) must be withdrawn because 1) the finding identified only two isolated instances of missing LOA paperwork, 2) the law does not require AU to maintain this paperwork, and 3) AU had other evidence demonstrating approval of the LOA.  Draft recommendation 6.3 should be withdrawn.

# APPENDIX C: Consultant's Analysis of Enrollment Advisors' Compensation, July 29, 2010

Case 3:11-cv-00061-WQH -WVG   Document 15-2   Filed 04/04/11   Page 118 of 160

# COMPENSATION OF ENROLLMENT ADVISORS AT ASHFORD UNIVERSITY

**Constantijn W.A. Panis, Ph.D.**
**Advanced Analytical Consulting Group, Inc.**

29 July 2010

## CONTENTS

I.       Introduction ................................................................................................. 1
II.      Scope of Services......................................................................................... 1
III.     Summary of Opinions ................................................................................. 2
IV.      Background................................................................................................... 2
V.       Analysis of Enrollment Advisor Compensation.................................... 4
         First Analysis File ...................................................................................... 4
         Qualitative Criteria Co-Determined Salary Adjustments to a Greater Degree than as
              Designed ................................................................................................ 4
         There Is No Evidence of Systematic Manipulation of Qualitative Ratings to Mute Their
              Effect on Salary Adjustments ............................................................. 5
         Salary Adjustments Were Not Solely Based on Quantitative Ratings ..................... 7
         Second Analysis File ...............................................................................14
VI.      A Comparison of Actual and Expected Salaries....................................16
VII.     Professional Fee Arrangement.................................................................18
ATTACHMENT A. List of Documents Reviewed ............................................19
ATTACHMENT B. Charts Based on the Second Analysis File...........................20
ATTACHMENT C. Curriculum Vitae of Constantijn W.A. Panis, Ph.D. ...............23
ATTACHMENT D. Enrollment Advisors.....................................................29

## I.   INTRODUCTION

This report was prepared by Constantijn W.A. Panis, Ph.D., a Principal at Advanced Analytical Consulting Group, Inc (AACG). I have over 20 years of experience in researching and analyzing issues related to labor economics. My résumé with prior testimony and publications is included as Attachment C.

I reserve the right to update or change my opinions as additional information comes to my attention.

This report is issued to Powers Pyles Sutter & Verville, PC ("Counsel"), counsel for BridgePoint Education, Inc. ("BridgePoint") and Ashford University ("Ashford").

## II.   SCOPE OF SERVICES

Counsel requested an analysis of salary adjustments of a selection of enrollment advisors at Ashford. Specifically, I was asked to determine whether the enrollment advisors' salary adjustments were driven solely by the number of students they recruited, or whether other factors also played a role. In addition, I was asked to determine whether the performance evaluations and salary adjustments were consistent with the hypothesis that managers ignored or manipulated compensation plan evaluations to render student recruitment as the sole determinant of enrollment advisors' salary adjustments.

The first stage of my analysis is based on the evaluation and salary adjustment data from personnel records that were previously requested by the Office of Inspector General of the U.S. Department of Education (OIG). As explained below, the number of evaluations and salary adjustments in that selection is low. I therefore requested from Counsel additional records for a random sample of enrollment advisors that I drew. The second stage of my analysis is based on those additional records.

Finally, Counsel requested an analysis of the relationship between performance evaluations on the one hand and the deviation of actual enrollment advisors' salaries from salaries based on formulas communicated by Ashford officials to the OIG on the other hand.

My analysis relied on several Counsel-provided spreadsheets with, among others, performance evaluations and salary adjustments of enrollment advisors. Counsel also provided me with a Draft Audit Report of the OIG and with a spreadsheet that, per Counsel's information, contained OIG's calculations of salaries, expected salaries, and their differences. I also consulted 34 CFR 668.14(b)(22) (ii)(A). See Attachment A for a complete list of the documents I reviewed.

## III.  SUMMARY OF OPINIONS

I have completed my analysis and have developed the following opinions, subject to the qualifications specified herein.

Opinion 1.   The effective weights of qualitative criteria exceeded the weights that were embedded in the evaluation system designs at Ashford.

Opinion 2.   The observed patterns of quantitative ratings, qualitative ratings, and salary adjustments are inconsistent with the hypothesis that salary adjustments were solely determined by quantitative ratings.

Opinion 3.   The observed patterns of quantitative and qualitative ratings are inconsistent with certain types of manager behavior which could have muted the role of enrollment advisors' qualitative ratings and boosted the role of their quantitative performance in determining salary adjustments.

Opinion 4.   The differences between actual salaries and salaries based on formulas communicated by Ashford officials to OIG did not disproportionately benefit enrollment advisors with high quantitative (incentive) ratings. The higher the quantitative rating, the smaller or more negative the difference between actual and expected salary.

## IV.  BACKGROUND

Counsel provided me with a spreadsheet summarizing detailed performance ratings and salary adjustments for a selection of enrollment advisors ("Enrollment Advisor Evaluation and Salary Adjustment Spreadsheet"). It is my understanding that this spreadsheet was based on the same personnel files as provided by Ashford to the OIG in connection with an audit of Ashford's administration of student financial aid funds.

The salary adjustment dates in the spreadsheet range from 1/1/2006 to 1/1/2009. They relate to 58 salary adjustments of 29 enrollment advisors.[1]  I excluded two records from my analysis because their evaluations were based on non-standard evaluation forms.

It is my understanding that enrollment advisors' salary adjustments were based on performance evaluations carried out shortly before the salary adjustments became effective. The supervisor or manager of each enrollment advisor rated 19 criteria on a five-point scale. Each item contributed to the overall rating; the number of points contributed by each item depended on the item's weight.  During 2007, the performance evaluation system changed. The number of criteria decreased from 19 to 18, some criteria changed, and the criteria weights changed.  Table 1 lists the evaluation criteria before and after the change.  In this report, I refer to the period preceding the performance evaluation system change as "Period 0307" and the period following the change as "Period 0407."

**Table 1.  Evaluation Criteria**

| Period 0307 | Period 0407 |
|---|---|
| *Performance* | |
| Outbound Calls Per Week (average) | Outbound Calls Per Week (average) |
| Lead-to-Contact | Lead-to-Contact % |
| Contact-to-Activity | Lead-to-App % |
| Activity-to-Application | Lead-to-Net Start % |
| Lead-to-Appt % | Net Starts |
| Appointments (per week) | Gross Apps to Gross Starts % |
| Applications Per Week (average) | Gross Starts to Net Starts % |
| Show Rate % | Gross Apps to Net Starts % |
| Lead-to-start % | Applications Per Week (average) |
| Starts | Total Referrals Per Month |
| Total Referrals | |
| *Judgment* | |
| Administrative/Organization | |
| Demonstrates effective problem solving skills | |
| Customer Satisfaction Survey | |
| Reporting/Forecasting | |
| *Communication* | |
| Communicates effectively— oral | |
| Communicates effectively— writing | |
| *Working Relationships* | |
| Informs supervisor and affected personnel of status of current assignments relative to the company strategic plan and goals | |
| Shows flexibility by accepting new ideas | |

Source:  Enrollment Advisor Evaluation and Salary Adjustment Spreadsheet

During Period 0307, 11 out of 19 criteria were "Performance" criteria, i.e., items that were directly or indirectly based on the number of prospective students the enrollment advisor guided through the application process from initial contact to active enrollment.  During Period 0407, there were 10 such "Performance" criteria.  In both periods, the other eight

---

[1] Below in this report I discuss the evaluations and salary adjustments of a number of enrollment advisors.  For confidentiality reasons, I refer to individual enrollment advisors by identity number rather than name.  Attachment D lists the enrollment advisors' names and identity numbers.  Attachment D is to be released only under appropriate safeguards.

criteria related to "Judgment," "Communications," or "Working Relationships," i.e., items that generally reflected soft skills and that did not reflect the number of students recruited, admitted, enrolled, or awarded financial aid. Henceforth, I refer to "Performance" criteria as quantitative criteria and to the sum of their ratings as the quantitative rating. Similarly, I refer to "Judgment," "Communications," and "Working Relationships" criteria as qualitative criteria and to the sum of their ratings as the qualitative rating. The eight qualitative criteria were identical in Periods 0307 and 0407.

The criteria weights changed during 2007. In Period 0307, enrollment advisors could obtain at most 35 quantitative and 65 qualitative points. In Period 0407, the maximum ratings were 78 quantitative and 22 qualitative points.

In both periods, Ashford utilized different targets for beginning and for continuing enrollment advisors. For example, in Period 0307, beginning enrollment advisors averaging more than eight appointments per week would earn the highest rating on the Appointments criterion, whereas continuing enrollment advisors needed to average more than 10 appointments per week to get the highest rating on that criterion. Each set of standards was formalized in a matrix. There were thus four matrices, applying to beginning enrollment advisors (Matrix M1) and continuing enrollment advisors (Matrix M2) in Periods 0307 and 0407.

## V.   ANALYSIS OF ENROLLMENT ADVISOR COMPENSATION

### First Analysis File

As explained below, my analysis consists of two stages, corresponding to two analysis files. My first analysis file is derived from the Enrollment Advisor Evaluation and Salary Adjustment Spreadsheet. I excluded two records from my analysis because their evaluations were based on non-standard evaluation matrices.

Thus constructed from the Enrollment Advisor Evaluation and Salary Adjustment Spreadsheet, my analysis file contains 56 records with evaluations and salary adjustments of 29 enrollment advisors—27 records in Period 0307 and 29 records in period 0407.

### Qualitative Criteria Co-Determined Salary Adjustments to a Greater Degree than as Designed

Table 2 shows average evaluation ratings by period and matrix.

**Table 2.  Average Evaluation Ratings by Period and Matrix**

| Period | Matrix | Number of records | Average quantitative rating | Average qualitative rating | Average total rating | Average qualitative rating/ average total rating |
|--------|--------|-------------------|-----------------------------|-----------------------------|----------------------|--------------------------------------------------|
| 0307 | M1 | 13 | 18.2 | 47.0 | 65.3 | 72.1% |
| 0307 | M2 | 14 | 17.2 | 50.6 | 67.8 | 74.6% |
| 0407 | M1 | 9  | 45.3 | 16.6 | 61.9 | 26.8% |
| 0407 | M2 | 20 | 47.7 | 15.6 | 63.3 | 24.7% |

Note: the sum of average quantitative and qualitative ratings is not always
equal to total rating because of rounding errors.

As shown on the first row of Table 2, in period 0307 starting enrollment advisors (Matrix
M1) in my selection received an average quantitative rating of 18.2 points and an average
qualitative rating of 47.0 points, summing to an average total rating of 65.3 points.  The
average qualitative rating thus made up 72.1 percent of the average total rating.

In Period 0307, enrollment advisors could earn at most 35 points on quantitative criteria
and 65 points on qualitative items.  In other words, the ratings scale was designed such
that the weight of qualitative items in the total rating was 65 percent.  In my selection,
qualitative criteria contributed 72.1 percent of the rate rating of starting advisors and 74.6
percent of continuing advisors.  This demonstrates that in Period 0307 the effective weight
of qualitative criteria was greater than the 65 percent weight embedded in the evaluation
ratings design.  Similarly, in Period 0407 the effective weight of qualitative criteria was 26.8
percent for starting advisors (Matrix M1) and 24.7 percent for continuing advisors (Matrix
M2); both effective weights exceed the 22 percent weight embedded in the evaluating
ratings design.

The performance evaluation system appears to have been designed such that qualitative
criteria co-determined salary adjustments.  In the absence of systematic manipulation of
qualitative ratings, the fact that the effective weights of qualitative criteria exceeded the
design weights demonstrates that qualitative criteria co-determined salary adjustments to a
greater degree than as designed.

**There Is No Evidence of Systematic Manipulation of Qualitative Ratings to Mute
Their Effect on Salary Adjustments**

There are at least two ways in which managers could hypothetically manipulate qualitative
ratings in order to mute qualitative ratings' effect on salary adjustments and thereby boost
the role of quantitative ratings.  First, they could rate all enrollment advisors approximately
the same on qualitative criteria—the less variation in qualitative ratings, the smaller their
effect on salary adjustments.  Second, they could ignore enrollment advisors' soft skills and
instead base qualitative ratings on how favorable they rated an enrollment advisor on
quantitative criteria.  Qualitative ratings would then reflect quantitative performance and
exert little or no independent effect.  This section demonstrates that quantitative and
qualitative ratings patterns were inconsistent with either type of manipulative behavior.



**Figure 1.  Quantitative and Qualitative Ratings, Period 0307**

Figure 1 shows quantitative and qualitative ratings in Period 0307.  The left panel contains 13 dots, corresponding to the 13 starting enrollment advisors who were rated on Matrix M1; the 14 dots on the right panel correspond to the 14 continuing enrollment advisors who were rated on Matrix M2.

If managers would have rated all enrollment advisors the same on qualitative criteria, the dots would form a horizontal line.  If managers would have based qualitative ratings on quantitative performance, the dots would form an upward-sloping straight line.  Instead, the dots form a cloud for both Matrices M1 and M2—some enrollment advisors received above-average quantitative but below-average qualitative ratings, whereas others experienced the opposite.  The observed ratings are thus inconsistent with either type of manipulative behavior.

Similarly, Figure 2 shows quantitative and qualitative ratings in Period 0407.  Again, the dots form clouds rather than straight lines.  The observed ratings are thus inconsistent with either type of manipulation of qualitative ratings that would have muted qualitative ratings' effect on salary adjustments and thereby boosted the role of quantitative ratings.



**Figure 2.  Quantitative and Qualitative Ratings, Period 0407**

The cloud patterns in Figures 1 and 2 suggest that managers evaluated enrollment advisors'
qualitative items independently of their quantitative items.  The credibility of the qualitative
rating process is further strengthened by the variation in the eight components that
comprise a qualitative rating.  As discussed above, a qualitative rating is the sum of eight
components reflecting soft skills.  Managers rate each skill on a five-point scale.  None of
the enrollment advisors in my selection received the lowest rating on any qualitative
criterion.  Several enrollment advisors (EA.12 on 4/1/2007, EA.03 on 1/1/2007, EA.04 on
9/1/2007, and EA.14 on 2/1/2008) received component ratings in all four other categories.
Six other enrollment advisors also received component ratings ranging from the second to
the highest categories.  This observed variation suggests that managers tended to evaluate
each item on the enrollment advisor's merit as it related to each specific item.

**Salary Adjustments Were Not Solely Based on Quantitative Ratings**

This section describes the relationship between salary adjustments on the one hand and
quantitative and qualitative ratings on the other hand.  Consistent with the design of the
performance evaluation system, I found that qualitative ratings co-determined salary
adjustments, i.e., that quantitative ratings were not the sole determinant of salary
adjustments.  This finding holds for both Periods 0307 and 0407, for both Matrices M1 and
M2, and for both salary changes and new salary levels.

Compensation of Enrollment Advisors at Ashford University                    Page 8
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010



**Figure 3.  Salary Increases and Quantitative Ratings, Period 0307**
**(Labels denote qualitative ratings; see text)**

Figure 3 shows salary increases and quantitative ratings for Matrices M1 and M2 in Period
0307.  Each dot represents a salary adjustment of an enrollment advisor at a certain date.
In this figure, salary adjustments are measured as the percentage increase in salary.  The
labels next to each dot represent the corresponding qualitative ratings, rounded to the
nearest whole number.  For example, the dot with "37" next to it in the left panel represents
an enrollment advisor who on a certain date received a quantitative rating of 18.75, a
qualitative rating of 36.75 (which rounds to 37), and a salary increase of 8.6 percent.

If salary increases were solely based on quantitative ratings, the dots in Figure 3 would
form a straight line or a curve.  Instead, the dots form a cloud for both Matrices M1 and M2,
indicating that quantitative ratings were not the sole determinant of salary increases.
Indeed, it appears that qualitative ratings played a role.  Consider again the dot with "37"
next to it in the left panel.  The three dots to its north-west represent cases in which
enrollment advisors received lower quantitative ratings but higher salary increases.  In all
three cases, the qualitative ratings were greater than 37.  Table 3 lists these four cases.
Among the four cases in Table 3, EA.25 on 7/1/2007 received the lowest salary increase
despite having the highest quantitative rating.  This can be explained by the fact that the
other three enrollment advisors received higher qualitative ratings.

**Table 3.  Illustrative Cases Contradicting That Quantitative Ratings Alone Determined Salary Increases (Period 0307, Matrix M1)**

| Enrollment Advisor | Date | Quantitative Rating | Qualitative Rating | Salary Increase |
|---|---|---|---|---|
| EA.12 | 10/1/2006 | 18.25 | 53.25 | 29.4% |
| EA.14 | 8/1/2007 | 14.75 | 53 | 18.4% |
| EA.06 | 4/1/2006 | 18.25 | 43 | 17.1% |
| EA.25 | 7/1/2007 | 18.75 | 36.75 | 8.6% |

Similarly, Table 4 illustrates three cases in which the enrollment advisor with the highest quantitative rating (EA.17 on 7/1/2007) received the lowest salary increase.  Again, this can be explained by the fact that the other two enrollment advisors received higher qualitative ratings.

**Table 4.  Illustrative Cases Contradicting That Quantitative Ratings Alone Determined Salary Increases (Period 0307, Matrix M2)**

| Enrollment Advisor | Date | Quantitative Rating | Qualitative Rating | Salary Increase |
|---|---|---|---|---|
| EA.06 | 4/1/2007 | 13 | 61.25 | 39.0% |
| EA.12 | 4/1/2007 | 13.5 | 48 | 18.2% |
| EA.17 | 7/1/2007 | 17.75 | 41.75 | 4.3% |



**Figure 4.  Salary Increases and Quantitative Ratings, Period 0407
(Labels denote qualitative ratings; see text)**

Figure 4 shows salary increases and quantitative ratings for Matrices M1 and M2 in Period 0407.  The labels next to each dot represent the corresponding qualitative ratings, rounded

to the nearest whole number. Similar to what Figure 3 showed for Period 0307, the dots in Figure 4 form clouds rather than a line or curve, indicating that quantitative ratings were not the sole determinant of salary increases.

Table 5 provides counterexamples to the allegation that quantitative ratings were the sole determinant of salary increases in Period 0407, Matrix M1. Among the cases in the table, EA.04 on 9/1/2007 received the lowest salary increase despite having the highest quantitative rating. Again, this can be explained by the fact that the others received higher qualitative ratings.

**Table 5.  Illustrative Cases Contradicting That Quantitative Ratings Alone Determined Salary Increases (Period 0407, Matrix M1)**

| Enrollment Advisor | Date | Quantitative Rating | Qualitative Rating | Salary Increase |
|---|---|---|---|---|
| EA.18 | 9/1/2007 | 49 | 19.5 | 36.1% |
| EA.29 | 10/17/2007 | 44 | 15 | 36.0% |
| EA.21 | 12/1/2007 | 48.5 | 20 | 26.3% |
| EA.04 | 9/1/2007 | 51 | 10.5 | 18.4% |

Similarly, Table 6 provides counterexamples to the allegation that quantitative ratings were the sole determinant of salary increases in Period 0407, Matrix M2. Among the cases in the table, EA.26 on 3/1/2008 received the lowest salary increase despite having the highest quantitative rating. Again, this can be explained by the fact that the others received higher qualitative ratings.

**Table 6.  Illustrative Cases Contradicting That Quantitative Ratings Alone Determined Salary Increases (Period 0407, Matrix M2)**

| Enrollment Advisor | Date | Quantitative Rating | Qualitative Rating | Salary Increase |
|---|---|---|---|---|
| EA.15 | 7/1/2008 | 45 | 19 | 28.6% |
| EA.15 | 1/1/2008 | 36.5 | 15 | 23.5% |
| EA.11 | 12/1/2007 | 46 | 15.5 | 18.4% |
| EA.06 | 10/1/2007 | 47.5 | 17.5 | 5.3% |
| EA.17 | 1/1/2008 | 42 | 14 | 2.0% |
| EA.26 | 3/1/2008 | 49 | 11 | -7.4% |

Clearly, in Periods 0307 and 0407, for Matrices M1 and M2, quantitative ratings cannot have been the sole determinant of salary increases, as measured by the percentage increase of salary. I repeated the analysis for salary increases as measured by the dollar increase of salary and came to the same conclusion that quantitative ratings cannot have been the sole determinant of salary increases. But can they have been the sole determinant of enrollment advisors' new salary *levels*?

Figure 5 shows new salary levels and quantitative ratings for Matrices M1 and M2 in Period 0307; Figure 6 shows the analogue for Period 0407. The labels next to each dot represent the corresponding qualitative ratings, rounded to the nearest whole number. Similar to what Figure 3 and Figure 4 showed for salary increases, the dots in Figure 5 and Figure 6

Compensation of Enrollment Advisors at Ashford University                Page 11
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

form clouds rather than lines or curves, ruling out that quantitative ratings were the sole determinant of new salary levels.



**Figure 5.  New Salary Levels and Quantitative Ratings, Period 0307**
**(Labels denote qualitative ratings; see text)**



**Figure 6.  New Salary Levels and Quantitative Ratings, Period 0407**
**(Labels denote qualitative ratings; see text)**

For each period and each matrix, it is straightforward to point at counterexamples to the allegation that quantitative ratings were the sole determinant of new salary levels. As an illustration for Matrix M2 in Period 0407 consider Table 7. Among the cases in the table, EA.26 on 9/1/2007 and EA.23 on 9/1/2008 earned the lowest salary levels despite having the highest quantitative ratings. Again, this can be explained by the fact that the others received higher qualitative ratings.

**Table 7.  Illustrative Cases Contradicting That Quantitative Ratings Alone Determined New Salary Levels (Period 0407, Matrix M2)**

| Enrollment Advisor | Date | Quantitative Rating | Qualitative Rating | New Salary |
|---|---|---|---|---|
| EA.07 | 3/1/2008 | 58 | 19 | $71,160 |
| EA.21 | 6/1/2008 | 56 | 20 | $70,000 |
| EA.26 | 9/1/2007 | 61.5 | 11 | $54,000 |
| EA.23 | 9/1/2008 | 64.5 | 16 | $53,000 |

In conclusion, my analysis of salary increases and of new salary levels found that quantitative ratings cannot have been the sole determinant of salary adjustments. This finding applies to salary increases and new salary levels, in Periods 0307 and 0407, and for Matrices M1 and M2.

The analysis above uses counterexamples and visual inspection of scatter plots. I attempted to confirm my conclusions using multiple regressions of quantitative and qualitative ratings on salary adjustments. Multiple regression is a statistical tool to determine the simultaneous effects of multiple factors (quantitative and qualitative ratings) on an outcome of interest (salary adjustment).

**Table 8.  Results of Estimation of the Determinants of Percent Salary Increases, by Period and Matrix (Significance levels in parentheses)**

| | Period 0307 | | Period 0407 | |
| | M1 | M2 | M1 | M2 |
|---|---|---|---|---|
| Quantitative | 0.0054 | -0.0025 | 0.0108 | 0.0085 |
| | (48.4%) | (75.5%) | (0.2%) | (3.3%) |
| Qualitative | 0.0146 | 0.0112 | 0.0080 | 0.0023 |
| | (0.5%) | (4.4%) | (32.9%) | (89.9%) |
| Sample size | 13 | 14 | 9 | 20 |

Table 8 shows the results of estimation of the determinants of salary adjustments, as measured by the percentage increases of salary, by period and matrix. The regressors are quantitative and qualitative ratings. (The models also include intercept terms which do not contain relevant information in this context; their estimated values are not reported in the table.) A positive coefficient estimate implies that the regressor contributes positively to salary increases. For example, the estimated effect of the quantitative rating in Period 0307 for Matrix M1 is 0.0054, implying that on average a one-point difference in a pair of enrollment advisors' quantitative ratings translated into a 0.54 percentage points difference in their salary increases. Similarly, the estimated effect of the qualitative rating is 0.0146, implying that on average a one-point difference in qualitative ratings translated into a 1.46 percentage points difference in salary increases.

The numbers in parentheses are significance levels, i.e., they reflect the precision with which the effects are estimated. The lower the significance level, the more precise an estimate is. A commonly-used rule of thumb is that a coefficient that is estimated with a significance level of 5 percent or less is considered statistically significant.

As expected, both quantitative and qualitative ratings relate positively to salary increases. The single exception is the effect of quantitative ratings in Period 0307 for Matrix M2, but the 75.5 percent significance level of that coefficient implies that that effect is very imprecisely estimated.

The effects of qualitative ratings on salary increases in Period 0307 are not only positive, they are also statistically significant. This demonstrates that qualitative ratings statistically significantly co-determine salary increases. In fact, there is no evidence of statistically significant effects of quantitative ratings. The patterns in the selection of cases in my first analysis file are thus inconsistent with the allegation that quantitative ratings are the sole determinant of salary increases during Period 0307.

While the effects of qualitative ratings on salary increases in Period 0407 are positive, they are not statistically significant. A potential explanation for this finding is that the sample sizes are small—9 cases for Matrix M1 and 20 cases for Matrix M2. Even if there are independent effects of qualitative ratings in Period 0407, it is difficult to statistically demonstrate such effects with much precision in small samples. I revisit this issue below.

**Table 9. Results of Estimation of the Determinants of the Logarithm of New Salary Level, by Period and Matrix (Significance levels in parentheses)**

|              | Period 0307 | | Period 0407 | |
|--------------|-------------|-------------|-------------|-------------|
|              | M1          | M2          | M1          | M2          |
| Quantitative | 0.0064      | 0.0343      | 0.0083      | 0.0150      |
|              | (8.7%)      | (0.0%)      | (2.6%)      | (0.0%)      |
| Qualitative  | 0.0105      | 0.0086      | 0.0138      | 0.0185      |
|              | (0.0%)      | (3.6%)      | (22.0%)     | (8.0%)      |
| Sample size  | 13          | 14          | 9           | 20          |

Table 9 shows the results of estimation of the determinants of salary adjustments, as measured by the logarithm of the new salary levels, by period and matrix. A new salary may be interpreted as a salary adjustment without regard to the previous salary level. The results are consistent with those from regressions on salary increases. All estimates are positive, i.e., both higher quantitative and qualitative ratings tended to boost salary levels. In Period 0307, the effects of qualitative ratings were statistically significant, but in Period 0407 they failed to reach statistical significance.

In conclusion, the multiple regression analyses based on the selection of cases in my first analysis file demonstrate statistically significant effects of qualitative ratings on salary adjustments during Period 0307. This finding is inconsistent with the allegation that quantitative ratings were the sole determinant of salary adjustments during Period 0307. While the results suggest that qualitative ratings may have co-determined salary adjustments in Period 0407 as well, there is insufficient evidence to support this conclusion with statistical precision.

**Second Analysis File**

As noted above, the lack of statistical precision encountered in the regressions for Period 0407 may have been caused by small sample sizes. My first analysis file contained only nine records for beginning enrollment advisors (Matrix M1) and 20 records for continuing enrollment advisors (Matrix M2). I therefore replicated the analysis on a larger sample. I requested a list of all enrollment advisors who had ever worked at Ashford and drew a stratified random sample. I divided the population of enrollment advisors into two groups ("strata"). The first stratum consisted of individuals who were employed fewer than 365 days as an enrollment advisor as of June 30, 2009—they could have been hired after June 30, 2008, left Ashford within 365 days of being hired, or were promoted or transferred to a new position within 365 days of being hired. The second stratum consisted of all other enrollment advisors. I randomly drew a sample of four percent from the first stratum and 15 percent of the second stratum. I oversampled enrollment advisors with longer tenures in order to obtain adequate representation of continuing advisors' evaluations (Matrix M2). This resulted in a random sample of 96 advisors; 39 from the first and 57 from the second stratum. The regression analyses presented below weight records proportional to the inverse of the sampling probabilities.

Some of the 96 advisors in my sample left Ashford before their first performance evaluation. Eliminating evaluations based on matrices from Period 0307 and evaluations with missing ratings, my sample yielded 55 evaluations of beginning enrollment advisors (Matrix M1) and 64 evaluations of continuing enrollment advisors (Matrix M2). My second analysis file thus contained 119 performance evaluations and salary adjustments.[2]

I replicated the main elements of the above analysis on the second analysis file. The "cloud" patterns reported above for the first analysis file (Figures 1 through 6) were also present for the second analysis file. See Attachment B.

**Table 10. Results of Estimation of the Determinants of Salary Increases in the Second Analysis File (Significance levels in parentheses)**

|              | Outcome: Percent Increase | | Outcome: Dollar Increase | |
|--------------|---------|---------|---------|---------|
|              | M1      | M2      | M1      | M2      |
| Quantitative | 0.0111  | 0.0127  | 433.37  | 542.97  |
|              | (0.0%)  | (0.0%)  | (0.0%)  | (0.0%)  |
| Qualitative  | 0.0068  | 0.0231  | 297.85  | 961.66  |
|              | (2.2%)  | (5.3%)  | (1.6%)  | (2.7%)  |
| Sample size  | 55      | 64      | 55      | 64      |

The first two columns of Table 10 present the results of multiple regression analyses of advisors' percent salary increases. (While not shown, the specifications also control for an

---

[2] Of the 119 evaluations, 58 were based on the (M1 or M2) 0407 matrix and 61 on the (M1 or M2) "1/2009" matrix that Ashford introduced around January of 2009. All matrices underlying performance evaluations in the second analysis file permit the same maximum quantitative and qualitative ratings—78 and 22 points, respectively. The analysis presented in this report does not distinguish between the earlier and later matrices. I tested the robustness of the results to inclusion of an indicator for earlier/later matrix. The estimated coefficient on that indicator was statistically insignificant in all model specifications and my conclusions on the role of qualitative ratings are robust to controls for earlier/later matrix.

intercept and for employment location being in Iowa rather than in California.[3]) The models
have the same structure as those of Table 8 and the parameter estimates may be
interpreted similarly. As in Table 8, all parameter estimates are positive, indicating that
advisors with higher quantitative or qualitative ratings typically received bigger raises. The
number of records in the second analysis file used for Table 10 is greater than that of the
first analysis file used for Table 8, and the precision with which regression coefficients are
estimated is greater. In particular, the contribution of qualitative ratings is statistically
significant for beginning advisors (Matrix M1) and almost reaches statistical significance at
the 5 percent level for continuing advisors (Matrix M2).

As a robustness check, I also estimated multiple regression models of dollar increases in
advisors' salary; see the third and fourth columns of Table 10. In this specification, the
estimated effects of qualitative ratings are statistically significant for both beginning and
continuing advisors. The parameter estimates may be directly interpreted as dollar
amounts, namely as the average additional salary increase from a one-point higher rating.

**Table 11.  Results of Estimation of the Determinants of Salary Level in the Second
Analysis File (Significance levels in parentheses)**

|              | Outcome: Log(New Salary) | | Outcome: New Salary | |
|--------------|--------|--------|--------|--------|
|              | M1     | M2     | M1     | M2     |
| Quantitative | 0.0095 | 0.0169 | 402.70 | 914.93 |
|              | (0.0%) | (0.0%) | (0.0%) | (0.0%) |
| Qualitative  | 0.0121 | 0.0230 | 496.77 | 1095.75|
|              | (0.0%) | (0.0%) | (0.0%) | (0.0%) |
| Sample size  | 55     | 64     | 55     | 64     |

Table 11 shows parameter estimates of multiple regression models that explain the salary
levels after the performance evaluation. (While not shown, the specifications also control
for an intercept and for employment location being in Iowa rather than in California.) The
first two columns explain the natural logarithm of the new salary level and are similar to
Table 9. As in Table 9, all parameter estimates are positive, indicating that advisors with
higher quantitative or qualitative ratings typically earned more. The number of records in
the second analysis file used for Table 11 is greater than that of the first analysis file used
for Table 9, and the precision with which regression coefficients are estimated is greater. In
particular, the contributions of qualitative ratings are statistically significant for both
beginning advisors (Matrix M1) and for continuing advisors (Matrix M2).

As a robustness check, I also estimated multiple regression models of advisors' dollar
salaries; see the third and fourth columns of Table 11. The estimated effects of qualitative
ratings are again statistically significant for both beginning and continuing advisors. The
parameter estimates may be directly interpreted as dollar amounts, namely as the average
additional salary from a one-point higher rating. For example, on average and holding
other determinants constant, every additional qualitative rating point translated in
$1,095.75 higher annual pay.

_____

[3] The regressions of the first analysis file did not control for location of employment because
all but one of the enrollment advisors selected by the Office of Inspector General of the U.S.
Department of Education worked in California.

In conclusion, the statistical analysis of a random sample of enrollment advisors demonstrates that advisors' qualitative rating—related to judgment, communication skills, and working relationships—determined advisors' salary adjustments independently of their quantitative ratings. Quantitative factors also determined salary adjustments, but they were not the sole determinant. The results are highly statistically significant, apply to both salary increases and new salary levels, hold for both beginning and continuing advisors, and are robust to alternative model specifications.

## VI.   A COMPARISON OF ACTUAL AND EXPECTED SALARIES

Counsel provided me with a spreadsheet that, according to Counsel, contained OIG's calculations of performance evaluation ratings, actual salaries received, two sets of expected salaries, and deviations of actual salaries from expected salaries for a selection of enrollment advisors.

According to the May 2010 Draft Audit Report that was provided to me, OIG was told by two Ashford officials, a Director of Admissions and the Admissions Performance Assessor, how they convert performance ratings points into salaries ("expected salaries"). The formulas communicated by the two officials are equivalent except for rounding errors. For the purpose of this report, I used the formula communicated by the Admissions Performance Assessor.[4]

It is my understanding that OIG calculated expected salaries for 27 evaluations related to 12 enrollment advisors. This section presents my findings of a comparison between actual salaries and expected salaries.[5]

The actual salaries were not always identical to expected salaries. Two out of 27 salaries were equal to their expected value, 17 were higher than expected, and eight were lower than expected. On average, including both positive and negative differences, actual salaries were $915 higher than expected. The average salary percentage difference was 3.3 percent.

At issue is whether enrollment advisors with higher quantitative ratings benefitted more from their supervisors' discretionary authority than advisors with lower quantitative ratings.[6] This was not the case.

---

[4] Evaluation matrices indicate salary ranges corresponding to rating point ranges. The matrices do not state how salaries are to be set within each range. The formulas used here apply linear interpolation of the points and salary ranges. For example, the 0407 matrix for continuing enrollment advisors indicates that California advisors with 61-80 points will receive a salary of $51,000-75,000 per year. Note the points range is 80-61=19 points and the salary range is $75,000-51,000=$24,000. The expected salary for someone with 65 points is $51,000 plus (65-61)/19 of $24,000, or $56,053 per year.
[5] Counsel informed me that the ratings of one evaluation of enrollment advisor EA.23 were based on an incorrect matrix. Instead of 80 points, this advisor was given 60.5 points. I corrected this record accordingly. The correction did not affect my conclusions.
[6] The spreadsheet with OIG calculations uses the terms "Incentive Points" and "Non-Incentive Points"; consistent with the remainder of this report, I will use "quantitative" and "qualitative" points, respectively.

Final Report

Compensation of Enrollment Advisors at Ashford University          Page 17
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010



**Figure 7.  Percentage Differences between Actual and Expected Salaries As They
Relate to Quantitative Ratings**

Figure 7 shows percentage differences between actual and expected salaries on the vertical
axis and quantitative ratings on the horizontal axis.  A positive difference means that the
actual salary exceeded the expected salary.  Each dot corresponds to an enrollment advisor
evaluation.  The cloud of points and its fitted line demonstrate a negative relationship: the
higher the quantitative rating, the smaller or more negative the difference between actual
and expected salary.  In other words, given a certain total points rating, supervisors were
more generous toward enrollment advisors with lower quantitative ratings than to advisors
with higher quantitative ratings.

The negative relationship is statistically significant.  The correlation between percentage
salary differences and quantitative ratings is -0.52 and statistically significant at the
1 percent level.  The negative relationship is also robust to whether the salary difference is
measured in absolute terms (dollars) or relative terms (percentages): the correlation
between dollar salary differences and quantitative ratings is -0.49 and statistically
significant at the 1 percent level.

*Compensation of Enrollment Advisors at Ashford University*                    Page 18
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

## VII.  PROFESSIONAL FEE ARRANGEMENT

AACG bills its professional fees on an hourly basis according to the positions held within the
firm. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Executed in Los Angeles, California

By:_____/s/_____

Date:_____7/29/2010_____

*Compensation of Enrollment Advisors at Ashford University*                    Page 19
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

## ATTACHMENT A.   List of Documents Reviewed

I considered the following information in the development of this report:

- Spreadsheet "EA Evals for Mercer corrected 123009.xls" with performance evaluations and salary adjustments of selected enrollment advisors ("Enrollment Advisor Evaluation and Salary Adjustment Spreadsheet").
- Spreadsheet "EAreport1230(HR Revised).xls" with a listing of Ashford enrollment advisors.
- Spreadsheet "OIG Matrix Audit.xlsx" with performance evaluations and salary adjustments of a sample of enrollment advisors.
- Personnel files of EA.08, EA.10, EA.15, EA.23, EA.30, EA.31, and EA.32.
- Draft Audit Report ED-OIG/A05I0014 (May 2010).
- Spreadsheet "Calculation of Salaries OIG 061510 tr.xls." It is my understanding that this spreadsheet originated from OIG and was supplemented by calculations of an Ashford official.
- Documents with OIG analyses:
  - OIG EA Salary Analysis 1. Quan v Qual, overall (D0319962).PDF.
  - OIG EA Salary Analysis 2. Quan v Qual, Salaries increase (D0319963).PDF.
  - OIG EA Salary Analysis 3. Quan v Qual, salary decrease (D0319964).PDF.
  - OIG EA Salary Analysis 4. Quan v Qual, salary constant (D0319966).PDF.
  - OIG EA Salary Analysis 5. Correlations 1 (D0319969).PDF.
  - OIG EA Salary Analysis 6. Correlations 2 (D0319972).PDF.
  - OIG Financial Services salary analysis (D0319961).PDF.
- 34 CFR 668.14(b)(22) (ii)(A).

## ATTACHMENT B.   Charts Based on the Second Analysis File

Figure 8 shows qualitative and quantitative ratings of beginning enrollment advisors (left panel) and continuing enrollment advisors (right panel), for the second analysis file. It is comparable to Figures 1 and 2 above.



**Figure 8.  Quantitative and Qualitative Ratings, Second Analysis File**

Compensation of Enrollment Advisors at Ashford University          Page 21
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

Figure 9 shows percent salary increases and quantitative ratings for beginning enrollment advisors (left panel) and continuing enrollment advisors (right panel), for the second analysis file. The labels next to each dot represent the corresponding qualitative ratings, rounded to the nearest whole number. Figure 9 is comparable to Figures 3 and 4 above.



**Figure 9.  Salary Increases and Quantitative Ratings, Second Analysis File**
**(Labels denote qualitative ratings; see text)**

Compensation of Enrollment Advisors at Ashford University          Page 22
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

Figure 10 shows new salary levels and quantitative ratings for beginning enrollment
advisors (left panel) and continuing enrollment advisors (right panel), for the second
analysis file. The labels next to each dot represent the corresponding qualitative ratings,
rounded to the nearest whole number. Figure 10 is comparable to Figures 5 and 6 above.



**Figure 10. New Salary Levels and Quantitative Ratings, Second Analysis File**
**(Labels denote qualitative ratings; see text)**

Final Report
ED-OIG/A05I0014                                                    Page 136 of 155

*Compensation of Enrollment Advisors at Ashford University*
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010                                                        Page 23

**ATTACHMENT C.   Curriculum Vitae of Constantijn W.A. Panis, Ph.D.**

*Compensation of Enrollment Advisors at Ashford University*                 Page 24
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

## ADVANCED ANALYTICAL
### CONSULTING GROUP

## Constantijn (Stan) Panis, Ph.D.

Principal
Advanced Analytical Consulting Group, Inc.
Phone: ███ ████████
Email: ██████████████

### Professional Summary

Dr. Panis is an expert in labor markets, retirement income, and econometric modeling. He has extensive litigation support experience including as economic expert witness in labor, health care, and class action cases. He has published extensively; was an award-winning teacher in MBA and undergraduate programs; and co-founded a successful company that developed statistical software to disentangle causality, reverse causality, and selection effects in economic models.

Prior to joining Advanced Analytical Consulting, Dr. Panis led the Economic and Statistical Consulting group of Deloitte & Touche in the Pacific Southwest. Before that, he was a senior economist at the RAND Corporation, where his research on employment patterns, wages, and pension entitlements was funded by the U.S. Department of Labor, the Social Security Administration, and other federal agencies. He served on the faculty of the University of Southern California and the University of California at Irvine, teaching undergraduate and graduate statistics and economics courses.

### Education

- Ph.D., Economics, University of Southern California, Los Angeles, California
- J.D. (equivalent), Dutch Civil Law, University of Groningen, Netherlands
- M.A., Business Economics (cum laude), University of Groningen, Netherlands
- B.A., Economics (cum laude), University of Groningen, Netherlands

### Professional Experience

- Principal, Advanced Analytical Consulting Group, Inc. 2009 – Present
- Manager / Senior Manager, Deloitte Financial Advisory Services LLP, Economic and Statistical Consulting, 2004 – 2009
- Senior Economist/Economist/Associate and Economist/Consultant, The RAND Corporation, 1986-1996 and 1997-2004. Senior Economist, 1999 –2004
- Consultant, Analysis Group, 2004
- Co-founder and CEO, EconWare, Inc., 1999 – 2005

- Business Analyst, Computer Sciences Corporation, 1996 – 1997
- Adjunct Associate/Assistant Professor, University of Southern California, Economics Department and Marshall School of Business, 1993 – 2002 (intermittently)
- Lecturer, University of California at Irvine, Graduate School of Management, 1992 – 1995 (intermittently)

## Expert Opinion and Expert Witness Experience

- Torday v. Secretary of Health and Human Secretary of Health and Human Services. United States Court of Federal Claims, Office of Special Masters, Case No. 07-372V. Expert report, July 29, 2010.
- Walsh v. Principal Life Insurance Company and Princor Financial Services Corporation. United States District Court, Southern District Of Iowa, Case No. 4:07-CV-00386-RP-CFB.  Expert report, September 15, 2009.  Deposition, September 30, 2009.
- Sweeney, et al. v. National Western Life Insurance Company.  United States District Court, Southern District of California, Case No. 05 CV 1018 JLS.  Declaration, September 3, 2009.  Deposition, October 15, 2009.
- County of Sonoma v. Sutter Medical Center of Santa Rosa.  Expert report, November 23, 2007.
- Carrera v. Secretary of Health and Human Services.  United States Court of Federal Claims, Office of Special Masters, Case No. 03-2016V.  Expert report, February 28, 2007.
- United States of America ex rel. James Tiesinga v. Dianon Systems, Inc.  United States District Court, Connecticut, Case No. 3:02CV1573(MRK).  Declaration, November 15, 2006.
- Taylor, et al. v. Farmers Insurance Co., Superior Court, King County, Washington, Case No. 02-2-08934-8 SEA.  Deposition, March 1, 2006.
- Rainbow Development Corp. v. Rhodes Design and Development Corp., et al., District Court, Clark County, Nevada, Case No. A392416.  Deposition, April 21, 2005.

## Professional Organizations:

- American Economic Association
- Association of Business Trial Lawyers
- Los Angeles County Bar Association

## Papers and Publications

- "Volatility Metrics for Mutual Funds" (with Michael Brien and Karthik Padmanabhan). 2010.  Report for the U.S. Department of Labor.
- "Target Date Funds and Retirement Savings" (with Michael Brien, Philip Cross, Thomas Dunn, and Joice Pharris).  2010.  Report for the U.S. Department of Labor.

Compensation of Enrollment Advisors at Ashford University                        Page 26
Expert Report of Constantijn W.A. Panis, Ph.D.
29 July 2010

- "Other Post-Employment Benefits: Overview" (with Michael Brien, Philip Cross, and Thomas Dunn).  2009.  Report for the U.S. Department of Labor.

- "Target Date Funds: Historical Volatility/Return Profiles" (with Michael Brien and Philip Cross).  2009.  Report for the U.S. Department of Labor.

- "Supply of and Demand for Skilled Labor in the United States" (with Lynn Karoly). 2009.  Chapter 2 in *Skilled Migration Today: Prospect, Problems and Policies*, edited by Jagdish Bhagwati and Gordon Hanson.  Oxford University Press.

- "An Analysis of the Choice to Cash Out, Maintain, or Annuitize Pension Rights upon Job Change or Retirement," (with Michael Hurd).  *Journal of Public Economics* 2006, Volume 90 (12): 2213-2217.

- "Health and Spending of the Future Elderly: Consequences of Health Trends and Medical Technology" (with Dana Goldman et al.).  *Health Affairs* Web Exclusive, 26 September 2005 (http://content.healthaffairs.org/cgi/reprint/hlthaff.w5.r5v1).

- "Pension Annuitization and Social Security Claiming," (with Michael Hurd, James Smith, and Julie Zissimopoulos).  2004.  Chapter 5 in *Developing an Annuity Market in Europe*, Elsa Fornero and Elisa Luciano (eds.).  ISBN 1843764768.  Edward Elgar, London.

- *The 21st Century at Work:  Forces Shaping the Future Workforce and Workplace in the United States*, 2004 (with Lynn Karoly), RAND MG-164-DOL.  ISBN 0-8330-3492-8. Santa Monica, California.  See http://www.rand.org/publications/MG/MG164.

- "Disability Forecasts and Future Medicare Costs," (with Jayanta Bhattacharya et al.). *Health Policy Research* 2004, Volume 7: 75-94, David Cutler and Alan Garber (eds), MIT Press, Cambridge, Mass.

- "Annuities and Retirement Well-being," 2004, Chapter 14 in *Pension Design and Structure: New Lessons from Behavioral Finance*, Olivia S. Mitchell and Stephen P. Utkus (eds), ISBN 0-19-927339-1.  Oxford: Oxford University Press.

- "The Size and Composition of Wealth Holdings in the United States, Italy, and the Netherlands," 2005, (with Arie Kapteyn).  Chapter 9 in *Analyses in the Economics of Aging*, David Wise (ed.).  National Bureau of Economic Research, The University of Chicago Press: Chicago, Illinois.

- *Health Status and Medical Treatment of the Future Elderly*, 2004 (with Dana Goldman et al.), RAND TR-169-CMS.  ISBN 0-8330-3653-X.  Santa Monica, California.  See http://www.rand.org/publications/TR/TR169.

- "Forecasting the Nursing Home Population," (with Darius Lakdawalla, Dana Goldman, Jayanta Bhattacharya, Michael Hurd, Geoffrey Joyce).  *Medical Care*, 41(1): 8-20, January 2003.

- "Effects of Changing Social Security Administration's Early Entitlement Age and the Normal Retirement Age," (with Michael Hurd and David Loughran).  Working paper, November 2002.

- "Workers That Claim Early Social Security Benefits," (with Julie Zissimopoulos).  Working paper, October 2002.

- "Nonmarital Childbearing: Influences of Education, Marriage, and Fertility," (with Dawn Upchurch and Lee Lillard), *Demography* 39(2): 311-329, May 2002.

- "Microsimulations in the Presence of Unobserved Heterogeneity," Working paper, December 2003.

- "MetLife Retirement Crossroads Study:  Paving the Way to a Secure Future," 2002, Metropolitan Life Insurance Company, February 2002. http://www.metlife.com/WPSAssets/9763336920101 8640707V1FRAND-Final.pdf.

- "Determinants and Accuracy of Planned Retirement Age," (with Michael Hurd and David Loughran).  Working paper, November 2001.

- "The Impact of Nonmarital Childbearing on Subsequent Marital Formation and Dissolution," 2001, (with Dawn Upchurch and Lee Lillard) in Wu, Haveman, and Wolfe (Eds.), *Out of Wedlock:  Trends, Causes, and Consequences of Nonmarital Fertility.* Russell Sage, New York.

- "The Quality of Retrospective Data: An Examination of Long-Term Recall in a Developing Country," 2001, (with Megan Beckett, Julie DaVanzo, Christine Peterson, and Narayan Sastry), *Journal of Human Resources* 2001, 36(3): 593-625.

- "Comparing Disability Growth among the Young and Old," (with Darius Lakdawalla, Jayanta Bhattacharya, Dana Goldman, Michael Hurd, Geoffrey Joyce).  RAND working paper, April 2001.

- "SSA Program Data User's Manual," June 2000, (with Roald Euller, et al.), Report for the Social Security Administration, RAND PM-973-SSA.

- "Release of Confidential Microdata for Research:  Case Studies of Federal Agencies and Recommendations for the Social Security Administration," May 2000 (with Cynthia Grant and Roald Euller), Report for the Social Security Administration, RAND PM-1044-SSA.

- *Citizens, Computers, and Connectivity: A Review of Trends,* September 1999, (with Tora Bikson), RAND MR-1109-MF.

- "Near Term Model Development, Part II" August 1999, (with Lee Lillard), final report for the Social Security Administration.

- "Panel Attrition from the Panel Study of Income Dynamics: Marital Status, Income, and Mortality," (with Lee Lillard), *Journal of Human Resources* 1998, 33(2): 437-457.

- "Socioeconomic Differentials in the Returns to Social Security," February 1996, (with Lee Lillard).  RAND DRU-1327-NIA.

- "Social Security: Equity, Adequacy, Reforms," 1996, (with Lee Lillard) RAND Documented Briefing, DB-167-NIA.

- "Social Security Reform: Touching the Rail," Winter 1995-96 (with Lee Lillard), *RAND Research Review*, Vol. XIX, No.3.

- "The Value of an Annuity When Payments and Survival Probabilities Depend on Future Events," 1997, (with Lee Lillard and Michael Brien).

- "Marital Status and Mortality: The Role of Health," (with Lee A. Lillard), August 1996, *Demography*, 33(3): 313-327.

- "Life Expectancy Projections for European Union Member Countries," Final report prepared for Directorate General V (Employment, Industrial Relations, and Social Affairs) of the European Commission (with Erwin Charlier and James Kahan).  September 1996.

- "Computers and Connectivity: Current Trends," in *Universal Access to E-mail*, Robert H. Anderson, Tora Bikson, Sally Ann Law, and Bridger Mitchell (eds), RAND.  Also in *Social Psychology of the Internet*, Sara Kiesler (ed.), Mahwah, New Jersey: Erlbaum, Inc., 1996.  (With Tora K. Bikson).

- "Child Mortality in Malaysia: Explaining Ethnic Differences and the Recent Decline," *Population Studies* 49 (1995): 463-479 (with Lee Lillard).

- "Implications of Family Formation for Educational Attainment among Young Women," 1995 (with Lee Lillard and Dawn Upchurch).

- "Health Inputs and Child Mortality: Malaysia," *Journal of Health Economics*, 13 (1994): 455-489 (with Lee Lillard).

- "Interdependencies Over the Life Course: Women's Fertility, Marital, and Educational Experiences," 1996 (with Lee Lillard and Dawn Upchurch).

- "The Decline of Infant Mortality in Malaysia: Causes and Policy Implications." In *Health, Economics, and Development: Working Together for Change*, World Federation of Public Health Associations, pp. 71-72 (presented to the 7-th International Congress, Bali, Indonesia, December, 1994).

- "The Piecewise Linear Spline Transformation with an Application to Age at First Marriage," *Stata Technical Bulletin* 18 (1994): 27-29.

- "Timing of Child Replacement Effects on Fertility Timing in Malaysia," (with Lee A. Lillard), RAND Labor and Population Program, DRU-331-NICHD, June 1993.

- "The Logit Model: An Introduction for Economists," review of book by J. S. Cramer, *Journal of Regional Science*, 1992, 32:392-394.

**Peer Evaluation and Referee Experience**

- Referee for the following academic journals:

| | |
|---|---|
| *Journal of Political Economy* | *Demography* |
| *Journal of Human Resources* | *Social Security Bulletin* |
| *National Tax Journal* | *Demographic Research* |
| *Journal of the Royal Statistical Society, Series B* | *Social Science & Medicine* |
| *Statistical Modeling: an International Journal* | *Economic Journal* |
| *Journal of Population Economics* | *Empirica* |

- R03 Grant Reviewer, National Institute for Child Health and Human Development (2004)

- Review panelist, PENSIM Pension Simulation Model, Department of Labor (2000)

# APPENDIX D: University Supplemental Comments on the Draft Audit Report, November 19, 2010

**Note**: The University refers to the comments dated November 19, 2010, as its second supplemental response to the draft audit report because it provided additional documentation to us on August 31, 2010.  In response to our request, the University provided these documents because they were referenced in its original set of comments but were not provided to us with its July 30, 2010, comments.  Therefore, we consider the comments provided on November 19, 2010, to be the University's only supplemental comments on the draft audit report.

# ASHFORD
# UNIVERSITY
### FOUNDED 1918

November 19, 2010

Gary D. Whitman
Regional Inspector General for Audit
U.S. Department of Education
Office of Inspector General
Chicago/Kansas City Audit Region
Citigroup Center 500 W. Madison, Suite 1414 Chicago, IL 60661

      Re: <u>Draft Audit Report, Control Number ED-OIG/A05IO014</u>

Dear Mr. Whitman:

Please find enclosed our Second Supplemental Response to the Draft Audit Report.

This supplemental response addresses provisions in the Program Integrity final
rulemaking published by the Secretary on October 29, 2010.  The new regulations
were not available when Ashford University submitted its response to the Draft Audit
Report on July 30, 2010, or when it submitted its first supplemental response on
August 31, 2010, following the auditors' request for certain additional information.

Because the new regulations address issues on which the draft findings are based, we
believe it is appropriate that our remarks concerning them be considered by the audit
team in preparing its Final Audit Determination.

Sincerely,

/s/

Jane McAuliffe, Ph.D.
President and CEO

cc:   April White
      Howard Sorensen

**Ashford University's Second Supplemental Response
to the Draft Audit Report**

On October 29, 2010, the Secretary published final regulations on Program Integrity issues.  75 Fed.Reg. 66832 (2010).

The new regulations were not available when Ashford University submitted its response to the Draft Audit Report on July 30, 2010, and when it submitted its first supplemental response on August 31, 2010 following the auditors' request for certain additional information.

The new regulations, among other things, address incentive payments to student recruiters and the return of Title IV funds upon a student's withdrawal.  The new regulation on incentive payments specifically addresses adjustments to fixed salary, the subject matter of Draft Finding 1.  The new regulation on the return of Title IV funds specifically addresses the definitions of an institution that is required to take attendance and an academically-related activity for purposes of determining a student's withdrawal date, which is the subject matter of Draft Finding 2.

Because the new regulations address issues on which the draft findings are based, it is appropriate that they be considered by OIG in preparing its Final Audit Report.  Ashford University therefore respectfully submits this Second Supplemental Response to the Draft Audit Report.

## I.  Draft Finding 1

The draft audit report finds that the University's bi-annual adjustments to the salaries of enrollment advisors, because they were based in part on success in securing enrollments, fall within the statutory prohibition on incentive payments.  On that basis, the draft report would require the University to submit additional documentation to prove that its salary adjustments comply with the safe harbor regulation applicable to salary adjustments, despite the fact that there is no finding that the University violated the regulation and despite the fact that the auditors work papers concluded that the salary adjustments were not based solely on success in securing enrollments.[111]

The current regulation permits multiple salary adjustments, provided they are made no more often than twice per year and are not based solely on the number of students recruited.  The new regulation, on the other hand, contains a presumption that more than one salary adjustment during a year results in improper incentive payments:

---

[111] The audit work papers, and the conclusions reached by Dr. Panis as a result of his extensive analysis of the salary data, thus demonstrate that the University was not engaged in the type of activity referred to in the preamble to the final rule, where the Secretary noted that "in some of these instances, the substantial weight of the evidence suggested that the other factors purportedly were not considered, and that, in reality, the institution based salaries exclusively upon the number of students enrolled."  75 Fed.Reg. 66877 (October 29, 2010).  Here, based on the analysis reflected in the audit work papers, Dr. Panis's analysis, and all the voluminous documentation made available to the auditors, it is clear that the plan as designed, and as actually implemented, complied with the safe harbor.

"[A]n employee who receives multiple adjustments to compensation within a calendar year and is engaged in any student or enrollment or admissions activities or in making decisions regarding the award of title IV, HEA program funds is considered to have received such adjustments based upon success in securing enrollments or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid."

75 Fed.Reg. 66950 (October 29, 2010) to be codified at 34 C.F.R. 668.14(b)(22)(i)(B).

By presuming that the University's twice annual salary adjustments were improper, and therefore requiring the University to provide further documentation to prove the opposite, the draft audit report would retroactively apply the new regulation to conduct that occurred before its effective date.  It is well settled law, however, that an agency cannot regulate retroactively.  *See, e.g., Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988).

Because Draft Finding 1 effectively would amount to retroactive application of a regulation not scheduled to become effective until July 1, 2011, it should be withdrawn from the Final Audit Report.

In addition, other provisions of the new regulation directly support the University's position that the incentive payment statute does not preclude adjustments to salary, and that the burden therefore is not on the University to prove that its adjustments to fixed salary were made in accordance with the existing safe harbor.

The University's response argued, based on a simple analysis of the plain language of the statute, that it does not apply to salary adjustments, and therefore the University has no burden to produce further documentation to establish compliance with the safe harbor currently in effect.  The final regulation specifically supports that conclusion:

"*Commission, bonus, or other incentive payment* means a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or entity for services rendered."

75 Fed.Reg. 66950 (October 29, 2010), to be codified at 34 C.F.R. 668.14(b)(22)(iii)(A), (emphasis added).

It is undisputed that the Ashford compensation plan at issue provided for adjustments to fixed salary.  It therefore is simply not covered by the statute, and there is no burden on the University to demonstrate that the adjustments complied with the safe harbor.[112]

Finally, as to corrective action, the regulation that takes effect on July 1, 2011 explicitly deems "multiple adjustments to compensation in a calendar year…to be based upon success in

---

[112]Even if the University had that burden, it has met it. As demonstrated in the initial response to the Draft Audit Report, the salary adjustments were not based solely on the number of students recruited or enrolled, a conclusion also reflected in OIG audit work papers reporting on two studies of salary adjustment documentation performed during the course of the field work.

securing enrollments…." 75 Fed.Reg. 66950, to be codified at 34 C.F.R. 668.14(b)(22)(i)(B). The University acknowledges that the compensation plan in effect during the audit period included two adjustments in a calendar year, and already has begun the process of modifying its compensation practices to be in compliance with the new rule when it takes effect.

For the above reasons, as well as those set forth in its prior submissions, Ashford University respectfully submits that Draft Finding 1 should be withdrawn.

## II.    Draft Finding 2

The final regulations published October 29, 2010 include two provisions that impose new requirements similar to those suggested by Draft Finding 2.  However, those requirements were not in effect during the relevant time period and, consistent with well-settled principles of law, may not be imposed retroactively and without prior notice.  First, the new regulations will require institutions that voluntarily require attendance-taking by instructors to use those attendance records to determine withdrawal dates for return-of-Title-IV ("R2T4") purposes. Second, the new regulations will impose on online institutions a new definition of "attendance at an academically-related activity" for R2T4 purposes.

### A.  **Draft Finding 2 contends that the University was required to use its attendance records to determine withdrawal dates, but the regulation imposing this requirement does not take effect until July 1, 2011.**

Draft Finding 2 concedes that the University is not required to take attendance.  Under the law described in section V.B.1 of the initial response, the University would be entitled to use a more lenient withdrawal date definition and to assume that all students who withdrew without notice completed at least half of their payment periods.  The University took a more conservative approach, however, that resulted in its returning more Title IV funds than the regulation requires.

As discussed in Section V.B.5 of the initial response, the OIG and the Department lack the authority to recalculate refunds using University attendance records and to sanction the University based on these erroneous recalculations.  The University was not required to use its attendance records to calculate withdrawal dates or student refunds.  Current law – as described above – only obligates the University to use the mid-point of the payment period or a later date of documented attendance.

The regulations which are to take effect on July 1, 2011 would, for the first time, require institutions that are not required to take attendance to use their attendance records to calculate withdrawal dates if they voluntarily take attendance.  The current regulation does not contain this requirement:  an institution is required to take attendance "if an outside entity (such as the institution's accrediting agency or state agency) has a requirement, as determined by the entity, that the institution takes attendance." 34 C.F.R. § 668.22(b)(3)(i).  The new regulation states that an institution may also be required to take attendance if "[t]he institution itself has a requirement that its instructors take attendance."  75 Fed.Reg. 66952 (October 29, 2010), to be codified at 34 C.F.R. 668.22(b)(3)(i)(B).

The effect of Draft Finding 2 is to apply these new regulations to University conduct that preceded their effective date by more than two years. Draft Finding 2 measures the University's purported liability based on the requirements of an institution that is required to take attendance. The University would not owe liabilities for the cited students if the applicable requirements for an institution that is not required to take attendance were applied.  See Initial Response at section V.B.1.  The OIG and Department lack the authority to impose recalculations based on attendance records that the law does not currently require the University to use.  Indeed, as noted in our initial response, the Department conceded during the negotiated rulemaking process that produced the new regulation that "[p]ursuant to the statute, we cannot require the school to use its attendance records if it is not 'required to take attendance.'"  Accordingly, Draft Finding 2 must be withdrawn.

**B.   Finding 2 contends that the University was required to count only on-line participation as attendance, but the regulation imposing this requirement does not take effect until July 1, 2011.**

As discussed in Section V.B.3 of the initial response, although the University could have used the more lenient midpoint definition, it calculates withdrawal dates based on the student's last date of attendance at an academically-related activity.  Specifically, the University determined student dates of attendance by monitoring student attendance via on-line clicks within the University's learning site.  Consistent with the regulations, the University counted only <u>academic</u> clicks to make this determination.  The current regulation defines "academically-related activity" to include, but not be limited to the following:

> "an exam, a tutorial, <u>computer-assisted instruction</u>, academic counseling, academic advisement, turning in a class assignment or attending a study group that is assigned by the institution."

34 C.F.R. § 668.22(c)(3)(ii)(emphasis added).  Accordingly, as explained below, the University only considered academically-related clicks for attendance purposes if they resulted in attendance within an online Learning Block in the student's program.

Draft Finding 2 contends that the University did not measure attendance by examining the Blackboard system to determine that a student submitted an assignment, but instead reviewed a log generated from the system for how many times each student clicked into his or her course each day on Blackboard and monitored how many clicks were made during the session.  The draft finding concludes that the click generated on the log might or might not have been related to academic activity.

As discussed in the University's initial response, the draft finding's apparent contention that the academic activity must entail submission of an assignment is inconsistent with the current regulation.  The definition of "attendance at an academically-related activity" in section 668.22 does not limit academic activities to those involving completion of an exam or submission of an assignment.  Rather, the regulation includes passive activities including, but not limited to, attendance at computer-assisted instruction, a tutorial, a study group, or counseling or advisement sessions.  The regulation does not require completion of an activity or an assignment,

but only attendance at an activity, which is consistent with accepted understanding of academic attendance requiring only a student's attendance in the classroom.[113]

The position asserted in Draft Finding 2 is not consistent with the <u>current</u> regulatory definition, but with the <u>future</u> definition that will take effect on July 1, 2011.  The new definition provides as follows:

(i)    "Academic attendance" and "attendance at an academically-related activity"—
(A) Include, but are not limited to—
    (1) <u>Physically attending a class where there is an opportunity for direct interaction between the instructor and students;</u>
    (2) Submitting an academic assignment;
    (3) Taking an exam, an interactive tutorial, or computer-assisted instruction;
    (4) Attending a study group that is assigned by the institution;
    (5) Participating in an online discussion about academic matters; and
    (6) Initiating contact with a faculty member to ask a question about the academic subject studied in the course; and
(B) Do not include activities where a student may be present, but not academically engaged, such as—
    (1) Living in institutional housing;
    (2) Participating in the institution's meal plan;
    (3) <u>Logging into an online class without active participation;</u> or
    (4) Participating in academic counseling or advisement.
(ii)   A determination of "academic attendance" or "attendance at an academically-related activity" must be made by the institution; a student's certification of attendance that is not supported by institutional documentation is not acceptable."

75 Fed.Reg. 66952, to be codified at 34 C.F.R. § 668.22(l)(7)(emphasis added).  As shown in the emphasized language, the new regulation, for the first time, creates separate standards for on ground and online students.  The new regulation requires "the opportunity for direct interaction" for on ground students, and "active participation" for online students.  Neither "direct interaction" nor "active participation" is defined.

Under the current regulation, a student is in "attendance at an academically-related activity" if he or she attends an online class by logging into the class regardless of whether he or she engages in two-way communications with the instructor or other students at the time, or submits an assignment.  An online student at the University has the opportunity to engage in such activities just like a student sitting in an on ground classroom who chooses not to actively engage in classroom discussions.  Additionally, the online student who has clicked into a virtual classroom to navigate about the classroom to view assignments, reading materials, and online

---

[113] See 75 Fed. Reg. 66898 (October 29, 2010)("Certainly, traditional academic attendance is acceptable, *i.e.*, a student's physical attendance in a class where there is an opportunity for direct interaction between the instructor and students.")

discussions of course materials and topics is actively engaged in "computer-assisted instruction," which is what the current regulation requires.[114]

The new regulation reinforces the University's position that its treatment of student attendance complied with the current regulations.  First, the new regulation acknowledges that attending a class in which there is an opportunity for direct interaction between the instructor and students can count as attendance, even if no two-way interaction occurs.  This principle is consistent with the University's current online attendance practices:  The University does not count attendance clicks until the student has clicked into his or her online classroom and has an opportunity to actively participate in the class.  This is consistent with the current regulation that counts as attendance, among other things, attendance at computer-assisted instruction, tutorials, and study groups.  As noted above, this is further consistent with accepted understanding of academic attendance requiring a student's attendance in the classroom, but not his or her active participation.

Second, to the extent Draft Finding 2 is based on an interpretation of "active participation" that excludes the above activities, the simple fact is that "active participation" is a new requirement, to take effect on July 1, 2011, and not a requirement of the current regulation, which requires only attendance at "computer-assisted instruction."  The future regulation excludes "[l]ogging into an online class without active participation."[115]  The current regulation does not contain this exclusion.  The effect of Draft Finding 2 is to retroactively apply a future regulation to attendance determinations during the audit period that long preceded July 1, 2011.

Third, the current regulation provides no notice to institutions of a purported requirement that online students must meet a different, heightened standard of attendance.  The text of the current definition contains no reference to an additional "active participation" requirement for online students, or to a requirement to treat attendance in online courses differently from on ground students.  In fact, the regulation suggests the opposite by noting that attendance at an academically-related activity includes, among other things, attendance at "computer-assisted instruction."  The regulation does not say attendance at "computer-assisted instruction provided that the student actively engages in two-way communications with the instructor or other students while logged in during the same session."  The current regulation does not instruct institutions to treat on-ground and on-line students differently and, in fact, conveys the opposite message that institutions should treat all students consistently under the definition.

Similarly, the Department has not published guidance notifying institutions of a purported active participation requirement for online student attendance.  In fact, the Department implicitly concedes as much when it states that the requirement "is consistent with the current guidance the Department has provided to individual institutions regarding the applicability of the regulations to online programs."  See 75 Fed. Reg. at 66899 (emphasis added).  The implication

---

[114] We would further note that the materials submitted with the initial response show, for the vast majority of students, multiple "clicks" in different parts of the learning module during each single session.

[115] Although the future regulation does not apply to the audit period, the University notes that it does not concede that students who log into their online classes are not attending and actively participating in their coursework.  Moreover, as noted above, the record demonstrates multiple clicks throughout different portions of the Learning Block for the vast majority of cited students.

is that the Department notified a few institutions of its views, but did not publicly notify all institutions.  The Department's preamble refers to guidance it has provided in the FSA Handbook, but the Handbook contradicts any such "active participation" requirement by providing the following:

> The school (not the student) must document –
> - that the activity is academically related, and
> - the student's <u>attendance</u> at the activity.

2009-2010 FSA Handbook at 5-77 (emphasis added).  Note that the guidance instructs students to document "attendance" at the activity, not "active participation" in the activity.  This point is significant because the Department's new regulations indicate that an on ground student may establish attendance simply by attending a class in which there is an opportunity for direct interaction with the instructor.  An institution could reasonably conclude from the regulation and this guidance that active participation in an online class was not a precondition for attendance.  The Handbook goes on to list additional activities that count as academic activities:

> Examples of academically related activities are –
> 1. examinations or quizzes
> 2. tutorials
> 3. <u>computer-assisted instruction</u>
> 4. academic advising or counseling
> 5. academic conferences
> 6. completing an academic assignment, paper, or project, and
> 7. attending a study group by the institution <u>where attendance is taken</u>.

Id. at 5-77 (emphasis added).  Again, the emphasized language shows that attendance at computer-assisted instruction counts as attendance without any reference to "active participation."  Similarly, the last item regarding study groups requires that attendance be taken, but does not require that "active participation" be documented.  Lastly, the Handbook identifies activities that do not constitute academically-related activities:

> Examples of activities that are not academically related include living in institutional housing and participating in the school's meal plan.

Id. at 5-77.  The Department did not instruct institutions that they must exclude instances of logging into an online class from attendance in the absence of "active participation."  Neither the regulation, nor the FSA Handbook, nor any guidance referenced in Draft Finding 2 notifies institutions of any requirement to document active participation by its students in online courses as a precondition of attendance.  The regulations and guidance stated the opposite:  documented attendance at computer-assisted instruction or in which an online student otherwise had an opportunity to participate substantiates the student's attendance.

Lastly, with the October 29, 2010 publication of the new "active participation" requirement, the University is now on notice of the requirement, although, as noted above, there is no definition of "active participation."  The University will modify its policies on or before the

July 1, 2011 effective date in order to comply with the new regulation when it takes effect.  The law does not require the University to implement these modifications before this date, nor to be measured against the new requirements during the audit period or any other time prior to the July 1, 2011 effective date.

For the above reasons, as well as those set forth in its prior submissions, Ashford University respectfully submits that Draft Finding 2 should be withdrawn.

# APPENDIX E: University's Second Supplemental Comments on the Draft Audit Report, January 10, 2011



January 10, 2011

Keith West
Deputy Inspector General for Audit
U.S. Department of Education
Potomac Center Plaza
550 12th Street, SW
Washington, DC 20202

Dear Mr. West:

I write to thank you and your colleagues, Messrs. Howard, Whitman and Sorensen, for meeting with us just before the holidays, and to address what we understand from the meeting to be the audit team's remaining question, in Draft Finding 1, concerning documentation of salary adjustments for enrollment advisors.

We very much appreciate your agreeing to the meeting and for the courtesy, candor and professionalism you showed in listening and responding to our concerns and our discussion of what we see as areas in the draft report that we believe have been appropriately addressed and resolved through the University's responses to the draft report. We also appreciate your and the team's sharing with us the anticipated changes to the draft report based on the responses to date. We left the meeting confident that the audit will be concluded in a thorough, thoughtful and fair manner.

With respect to Draft Finding 1, Mr. Whitman identified what we understand to be the team's one remaining and unresolved concern, namely an apparent lack of a documented basis for the adjusted salaries resulting from four performance reviews in the audit team's sample of enrollment advisors where the adjusted salary was outside the indicated range for the incentive and non-incentive points earned by the advisor. We would like to take this opportunity to address that concern.

OIG audit workpaper K-7-69 is a spreadsheet summarizing, among other things, the incentive and non-incentive points and resulting salary adjustments for the performance evaluations reviewed by the audit team. Four of the evaluations, involving three enrollment advisors, resulted in salaries outside the indicated ranges. We address each of these in turn. (For reasons of privacy, we do not name the enrollment advisors in this letter, but address them in the order in which they appear in the OIG spreadsheet so the audit team can determine from their documentation the advisors and evaluations we are addressing.)

The first advisor in question, in her evaluation for the period 3/2008 – 8/2008, earned 62.5 incentive points and 10 non-incentive points, which reflected an improvement over her prior evaluation period, when she earned 50 and 10 points, respectively. Pursuant to the applicable matrix, her 72.5 points would have resulted in an annual salary between $51,000 and $75,000. Instead, her salary remained constant at $50,000. The reason her salary remained constant was that she had been promoted to a management position, which would take effect shortly thereafter

{D0347702.DOC · 1 }

HIGHER EDUCATION MADE AFFORDABLE℠
400 NORTH BLUFF BLVD · CLINTON, IA 52732 · T.800.242.4153 · P.563.242.4023 · www.ASHFORD.edu

Mr. Keith West
January 10, 2011
Page 2

and carried a larger salary than she would have earned in her present position. Her salary was
temporarily held  constant until the effective date of the promotion, in order to remain consistent
with the provision of the applicable safe harbor which limits salary increases to no more than two
for any twelve-month period. (Excerpts from this advisor's personnel file reflecting the
promotion are attached at Tab A.)  Accordingly, this was not a case where the performance
review resulted in a salary outside the range in order to improperly reward an employee for
success in securing enrollments. (We would add one obvious point, namely that, since her salary
was held constant, the University cannot be found to have increased her salary, even in part,
based on success in securing enrollments. )

The second advisor in question, in her evaluation for the period 5/2007 – 11/2007, earned 38.5
incentive points and 19 non-incentive points. Pursuant to the applicable matrix, her 57.5 total
points would have resulted in a new salary in the range of $35,000 to $44,000. Instead, she
received a salary of $45,000. This advisor's 19 non-incentive points is near the maximum of 22
(i.e., 86%) non-incentive points, while her 38.5 incentive points are substantially below the
maximum of 78 (i.e., 49%) incentive points.  She therefore performed much better on the non-
incentive (i.e., qualitative) portion of the evaluation than on the incentive (i.e., recruiting) portion
of the evaluation. Although this advisor's personnel file does not indicate why her manager
adjusted her salary to slightly above the maximum for the range, one nonetheless must conclude
that the larger adjustment was not because of recruiting success, because the  recruiting portion
of her evaluation was not nearly as favorable as the  non-recruiting portion of her evaluation. If
anything, she was over-rewarded for her non-recruiting performance, which is not contrary to the
law or safe harbor.

This same advisor, in her evaluation for the period 12/2007 – 6/2008, earned 26 incentive points
and 9 non-incentive points, a decrease in her overall performance   from her prior evaluation.
Pursuant to the applicable matrix, her 35 total points would have resulted in a new salary in the
range of $25,000 to $36,000. Instead, her salary was only reduced to $43,000. This, then, is a
case where the advisor gave a larger salary than the matrix suggested, not to reward her for
successful performance, but to "soften the blow" of her fall-off in production. This is not a case,
therefore, where a manager disregarded the matrix in order to reward an advisor for recruiting
success.

The third advisor in question, in her evaluation for the period 8/2007 – 1/2008, earned 24.5
incentive points and 13 non-incentive points. Pursuant to the applicable matrix, her total 37.5
points would have resulted in a new salary in the range of $25,000 to $36,000. Instead, she
received a salary of $42,500. Her previous salary had been $45,000. Accordingly, this is
another case where performance would have justified a lower salary, but her manager chose to
"soften the blow" by not reducing it as much as could have been the case. Again, this was not a
reward for securing enrollments, but a manager deciding not to dis-incentivize poor performance
as much as the matrix indicated. We note also that this advisor achieved 13 out of 22 non-
incentive points (59%) and 24.5 out of 78 incentive points (34%). This relatively poor
performance on the recruiting points reinforces the conclusion that she was not rewarded for
recruiting success, but for success in the qualitative, non-recruiting portion of the evaluation.

{D0347702.DOC / 1 }

Mr. Keith West
January 10, 2011
Page 3

The above findings with respect to the performance evaluations that resulted in salaries outside the indicated range are consistent with the findings in Dr. Panis's report (Exhibit 1-3 to the University's July 30, 2010 Response to the Draft Audit Report, at pages 16-17). Dr. Panis analyzed, for all enrollment advisors in his sample, the differences between actual salary adjustment and deviation from the salary that would be indicated by a linear relationship between evaluation points and salary range, and found, to a statistically significant extent, that those deviations did not reward incentive points, i.e., recruiting performance. On the contrary, they rewarded instead non-incentive points, i.e. qualitative, non-recruiting performance.

We also would point to the fact that, in January 2009, before the University learned that incentive compensation was a potential finding, the University amended the plan and directed its enrollment managers that salary adjustments should be calculated based on a linear relationship between points and salary, rather than leaving any discretion within (or without) ranges.

Finally, by way of an update since our meeting, effective January 1, 2011, Elizabeth Tice has succeeded me as President of Ashford University and I continue to serve as the Chief Academic Officer of the parent corporation.

Thank you again for meeting with us and for considering this letter as you prepare your final audit report.  This has been a very thorough review by your office, and, as I said at our meeting, I believe the University has derived benefits from it.  We are committed to operating under the highest ethical and legal standards and requirements, to the success of our students, and to providing them accessible, affordable, innovative, and high-quality learning opportunities and degree programs.  We look forward to its fair and prompt resolution.

Sincerely yours,

/s/

Jane McAuliffe
Chief Academic Officer,
Parent Corporation

Sincerely yours,

/s/

Elizabeth Tice
President,
Ashford University

cc:   Patrick Howard
      Gary Whitman
      Howard Sorensen

{D0047702.DOC / 1 }